EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Asociación de Maestros, su sindicato Asociación de Maestros de Puerto Rico-Local Sindical, por sí y en representación de sus miembros<br><br>Parte Recurrida<br><br>v.<br><br>Departamento de Educación; Hon. Julia Keleher, en su carácter oficial como Secretaria del Departamento de Educación del Estado Libre Asociado de Puerto Rico<br><br>Parte Peticionaria | Certiorari<br><br>2018 TSPR 150<br><br>200 DPR ____ |

Número del Caso: CT-2018-6

Fecha: 9 de agosto de 2018

Oficina del Procurador General:

    Lcdo. Isaías Sánchez Báez
    Procurador General

    Lcda. Amir C. Nieves Villegas
    Procuradora General Auxiliar

Abogados de la parte recurrida:

    Lcdo. Rafael Nadal Arcelay
    Lcda. Melissa López Díaz
    Lcdo. Edgardo Pabón Rodríguez
    Lcdo. Salvador Antonetti Sutts

Materia: Sentencia del Tribunal con Opiniones de Conformidad y Opiniones Disidentes.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |  |
|---|---|---|
| Asociación de Maestros, su sindicato Asociación de Maestros de Puerto Rico-Local Sindical, por sí y en representación de sus miembros<br><br>Parte Recurrida<br><br>v.<br><br>Departamento de Educación; Hon. Julia Keleher, en su carácter oficial como Secretaria del Departamento de Educación del Estado Libre Asociado de Puerto Rico<br><br>Parte Peticionaria | CT-2018-0006 |  |

**SENTENCIA**

(REGLA 50)

En San Juan, Puerto Rico, a 9 de agosto de 2018.

Examinado el recurso de certificación intrajurisdiccional, así como los escritos presentados por la parte recurrida y la parte interventora, revocamos la *Sentencia* emitida por el Tribunal de Primera Instancia mediante la cual se decretó la inconstitucionalidad de los Artículos 13.05 (a) (4) (5) (6) (7) (8) (9) de la *Ley de Reforma Educativa de Puerto Rico*, Ley Núm. 85-2018, sobre el Programa de Escuelas Públicas Alianza y el Artículo 14.02 (c) del Programa de Libre Selección de Escuelas. Como consecuencia, se desestima la demanda de autos.

Notifíquese inmediatamente.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Martínez Torres emitió una Opinión de conformidad. El Juez Asociado señor Kolthoff Caraballo emitió una Opinión de conformidad. El Juez Asociado señor Rivera García emitió una Opinión de conformidad a la cual se une la Jueza Asociada señora Pabón

Charneco y los Jueces Asociados señores Kolthoff Caraballo y Estrella Martínez. El Juez Asociado señor Estrella Martínez emitió una Opinión de conformidad a la cual se une el Juez Asociado señor Rivera García. La Juez Asociada señora Rodríguez Rodríguez disintió con opinión escrita a la cual se unió la Jueza Presidenta Oronoz Rodríguez y el Juez Asociado señor Colón Pérez. El Juez Asociado señor Colón Pérez emitió una Opinión disidente. El Juez Asociado señor Feliberti Cintrón está inhibido.

Juan Ernesto Dávila Rivera
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Asociación de Maestros, su sindicato Asociación de Maestros de Puerto Rico-Local Sindical, por sí y en representación de sus miembros<br><br>Recurridos<br><br>v.<br><br>Departamento de Educación; Hon. Julia Keleher, en su carácter oficial como Secretaria del Departamento de Educación del Estado Libre Asociado de Puerto Rico<br><br>Peticionarios | CT-2018-0006 | |

Opinión de conformidad emitida por el Juez Asociado señor MARTÍNEZ TORRES.

En San Juan, Puerto Rico, a 9 de agosto de 2018.

Como la Asociación de Maestros no logró establecer su legitimación activa para incoar la acción por sí o en representación de sus miembros, estoy conforme con revocar la determinación del Tribunal de Primera Instancia sin entrar en los méritos. Sin embargo, entiendo que debimos también revocar nuestra Opinión en Asoc. Maestros P.R. v. Srio. Educación, 137 DPR 528 (1994). Esa Opinión, que el foro primario utilizó para reconocer legitimación activa a la Asociación en este pleito, adolece de varios defectos y

no es cónsona con la jurisprudencia de este Tribunal en materia de legitimación activa.

I

La legitimación activa es uno de los requisitos del principio de justiciabilidad que los tribunales tienen que tomar en consideración antes de adjudicar una controversia en los méritos. Véase Asoc. Fotoperiodistas v. Rivera Schatz, 180 DPR 920 (2011). Para demostrar su legitimación activa, un demandante debe probar: (1) que ha sufrido un daño claro y palpable; (2) que el daño es inmediato y preciso, no abstracto ni hipotético; (3) que existe una conexión entre la causa de acción ejercitada y el daño alegado, y (4) que la causa de acción surge al amparo de la Constitución o de alguna ley. Hernández Torres v. Hernández Colón et al., 131 DPR 593, 599 (1992). Todo demandante tiene que demostrar que posee, no solamente la capacidad para demandar, sino además un interés legítimo en el caso. Col. Ópticos de P.R. v. Vani Visual Center, 124 DPR 559, 564 (1989). Cuando una parte reclama ante un tribunal sin cumplir con estos criterios, su reclamo no es justiciable y procede la desestimación. Véanse Lozada Sánchez et al. v. JCA, 184 DPR 898 (2012); Fund. Surfrider y otros v. A.R.Pe., 178 DPR 563 (2010).

Estos criterios son más rigurosos cuando se pretende reclamar los derechos de terceras personas. Hernández Torres v. Gobernador, 129 DPR 824, 836 (1992). Esto responde al precepto de que un litigante no puede impugnar la constitucionalidad de una ley aduciendo que esta

infringe los derechos constitucionales de terceros que no son parte en la acción. Íd.

Por ello, para que una agrupación pueda reclamar los derechos de sus miembros, le exigimos demostrar: (1) que los miembros de la agrupación tienen legitimación activa para demandar a nombre propio; (2) que los intereses que se pretenden proteger están relacionados con los objetivos de la agrupación, y (3) que la reclamación y el remedio solicitado no requieren la participación individual de los miembros. Col. Ópticos de P.R. v. Vani Visual Center, supra, págs. 565-566. En cambio, si la agrupación desea demandar en defensa de sus intereses propios, debe demostrar un daño claro, palpable, real, inmediato, preciso, no abstracto o hipotético a su colectividad. Fund. Surfrider y otros v. A.R.Pe., supra, págs. 572-573.

Nuestra Resolución en Alvarado Pacheco y otros v. ELA, 188 DPR 594, 619-620 (2013), provee un buen y breve recuento de la norma:

> [E]l concepto "acceso a la justicia" no significa que cualquiera puede plantear cualquier cosa en un tribunal, cuando le plazca. Tiene que haber un caso y controversia justiciable. *Lozada Sánchez et al. v. JCA*, 184 DPR 898 (2012) (Martínez Torres, J.); *Acevedo Vilá v. Meléndez*, 164 DPR 875 (2005) (Hernández Denton, J.); *E.L.A. v. Aguayo*, 80 DPR 552, 584 (1958) (Serrano Geyls, J.). Por ello, el caso no puede ser académico ni prematuro. *Asoc. Fotoperiodistas v. Rivera Schatz*, 180 DPR 920, 933 (2011) (Martínez Torres, J.); *San Gerónimo Caribe Project v. A.R.Pe.*, 174 DPR 640, 652 (2008) (Hernández Denton, J.). Para que un litigante pueda instar una acción en el Tribunal General de Justicia de Puerto Rico es necesario que ostente legitimación activa. *Lozada Sánchez et al. v. JCA*, supra; *Fund. Surfrider y otros v. A.R.Pe.*, 178 DPR 563 (2010) (Martínez Torres, J.); *Romero Barceló v. E.L.A.*, 169 DPR

460, 506 (2006) (Op. disidente de Rodríguez Rodríguez, J.); *Acevedo Vilá v. Meléndez*, supra; *Hernández Torres v. Hernández Colón et al.*, 131 DPR 593 (1992) (Hernández Denton, J.); *Hernández Torres v. Gobernador*, 129 DPR 824 (1992) (Hernández Denton, J.). Para determinar si una parte tiene legitimación activa, tiene que demostrar que "[ha sufrido] un daño claro y palpable; que éste es real, inmediato y preciso, y no abstracto e hipotético; que existe conexión entre el daño sufrido y la causa de acción ejercitada; y que la causa de acción surge bajo el palio de la constitución o de una ley". *Mun. Fajardo v. Srio. Justicia et al.*, 187 DPR 245, 255 (2012)(Martínez Torres, J.). Véanse, además: *Lozada Tirado et al. v. Testigos Jehová*, 177 DPR 893, 924 (2010) (Hernández Denton, J.); *Col. Peritos Elec. v. A.E.E.*, 150 DPR 327, 331 (2000) (Hernández Denton, J.); *Asoc. Maestros P.R. v. Srio. Educación*, 137 DPR 528, 535 (1994)(Hernández Denton, J.).

Por ende, la liberalidad con la que, en ocasiones, se han interpretado los requisitos sobre legitimación activa, "no quiere decir que la puerta esté abierta de par en par para la consideración de cualquier caso que desee incoar cualquier ciudadano en alegada protección de una política pública". Salas Soler v. Srio. de Agricultura, 102 DPR 716, 723-724 (1974). En Fund. Surfrider y otros v. A.R.Pe., supra, pág. 585, lo reiteramos:

> Claro está, hemos reconocido que los requisitos de legitimación activa deben interpretarse de forma flexible y liberal, particularmente al atender reclamos dirigidos contra las agencias y funcionarios gubernamentales. *García v.* Junta de Planificación, 140 D.P.R. 649 (1996). Sin embargo, esto no implica que se haya abandonado "el requisito de que todo litigante tiene que demostrar que ha sufrido un daño concreto y palpable para que los tribunales consideren su reclamo en los méritos". Romero Barceló v. E.L.A., 169 D.P.R. 460, 511 (2006), opinión disidente de la Juez Asociada Señora Rodríguez Rodríguez.

Por eso, hemos dejado claro que no intervendremos en casos donde los daños alegados se presentan en el abstracto o mediante controversias hipotéticas. Véase Lozada Sánchez et al. v. JCA, supra.

De las propias alegaciones de la demanda surge claramente que la Asociación de Maestros carece de legitimación activa. En la *Solicitud de sentencia declaratoria* que dio inicio a este pleito, alegó que su reclamación pretende proteger intereses de la Asociación y de sus miembros que "se ven seriamente vulnerados con las acciones y omisiones de los demandados". Solicitud de sentencia declaratoria, 2 de abril de 2018, pág. 2. Fundamentó sus reclamos en la cláusula constitucional que prohíbe la utilización de fondos públicos para el sostenimiento de escuelas privadas. Art. II, Sec. 5, Const. ELA, LPRA, Tomo I. Sin embargo, no especificó cuál es el daño que supuestamente estarían expuestos a sufrir la Asociación y sus miembros.

Además, alegó que la ley impugnada afecta "derechos constitucionales, aplicados al ámbito laboral". Solicitud de sentencia declaratoria, 2 de abril de 2018, pág. 2. Aunque la Asociación expuso correctamente que tiene, como grupo sindical, la facultad para representar a los miembros de la Unidad Apropiada Magisterial ante el Departamento de Educación, sus alegaciones no le confieren legitimación activa, pues no especifican cómo se afectarían los términos y condiciones de empleo de los maestros. Ninguna de las alegaciones de la Asociación argumenta un daño claro y

palpable, no abstracto o hipotético, ni la conexión entre el supuesto daño y la acción ejercitada.

Cuando el Gobierno solicitó la desestimación por falta de legitimación activa, entre otras, la Asociación ripostó. Alegó que la creación de los *Programas de Escuelas Públicas Alianza* y de *Libre selección de escuelas* les ocasionarían daños a la Asociación y a sus miembros porque parte del presupuesto asignado al Departamento de Educación sería ahora compartido con las Escuelas Públicas Alianza, lo que reduciría los fondos para las escuelas donde trabajan los maestros. Igualmente, adujo que, como organización sindical, se vería afectada al no poder negociar los términos y condiciones de empleo del personal docente que trabajaría en esas nuevas instituciones, pues no serían empleados del Departamento de Educación.

Coincido con el Procurador General en que, bajo esas teorías, tendría que reconocérsele legitimación activa a todo empleado gubernamental que trabaja en agencias de gobierno para impugnar las leyes o reglamentos que permitan a entidades sin fines de lucro o privadas contratadas para la prestación de servicios al público, por el mero hecho de que esos empleados no son públicos. Urgente petición de auto de certificación intrajurisdiccional, 11 de julio de 2018, pág. 20. Además, el daño alegado es hipotético y especulativo, pues de la misma ley surge que la transferencia de personal docente del Departamento de Educación a las Escuelas Públicas Alianza será voluntaria. Por lo tanto, de un análisis de la ley de su faz, no puede

concluirse que los maestros se exponen a un daño claro y palpable. Si la ley pudiera provocar tales daños en su aplicación, eso es otro caso que no está ante nuestra consideración. En esta ocasión solo se impugnó la inconstitucionalidad de la ley de su faz, y para ello, la Asociación no ha logrado establecer su legitimación activa por sí ni en representación de sus miembros.

II

La Opinión de conformidad del Juez Asociado señor Rivera García argumentó que la Asociación tenía legitimación activa porque los maestros, como contribuyentes, pueden hacer reclamos de violación a la cláusula de sostenimiento y por ello, la Asociación puede representarlos en esta calidad. Respetuosamente, discrepo de ese argumento.

En Flast v. Cohen, 392 U.S. 83 (1968), el Tribunal Supremo federal resolvió que la Constitución de los Estados Unidos no prohíbe de manera absoluta que los contribuyentes federales impugnen programas federales con gastos o recolectas alegadamente inconstitucionales. Lo crucial para efectos de legitimación activa es si la parte tiene "un interés personal en el resultado de la controversia" y si esta gira en torno a "las relaciones legales entre las partes con intereses legales adversos". Íd., pág. 101 (citas omitidas y traducción nuestra).[1] Por eso, ser contribuyente no otorga legitimación activa

---

[1] "a personal stake in the outcome of the controversy [...] the legal relations of parties having adverse legal interests".

automáticamente. Es decir, "un contribuyente puede o no tener el interés personal requerido en el resultado de la controversia, dependiendo de las circunstancias del caso particular". Íd. (traducción nuestra).[2]

El análisis de Flast v. Cohen, supra, para determinar si una parte cumple los requisitos mencionados, tiene dos etapas: "Primero, el contribuyente debe establecer un vínculo lógico entre ese estatus y el tipo de legislación cuestionada. [...] Segundo, el contribuyente debe establecer un nexo entre ese estatus y la naturaleza precisa de la infracción constitucional alegada" Íd., pág. 102 (traducción nuestra).[3] El Tribunal Supremo federal entendió que los demandantes en ese caso cumplieron con los requisitos porque "su cuestionamiento constitucional se hizo contra un ejercicio por el Congreso de su poder bajo el art. I, § 8, [...] y el programa cuestionado implica un gasto sustancial de fondos de impuestos federales". Íd., pág. 103 (traducción nuestra).[4] En aquel momento, en 1965, el desembolso de dinero federal ascendía a casi mil millones de dólares. Íd., pág. 103 esc. 23. "Además, los apelantes han alegado que los gastos impugnados violan las cláusulas de establecimiento y libre ejercicio de la

---

[2] "[a] taxpayer may or may not have the requisite personal stake in the outcome, depending upon the circumstances of the particular case".

[3] "First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. […] Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged".

[4] "[t]heir constitutional challenge is made to an exercise by Congress of its power under Art. I, § 8, […] and the challenged program involves a substantial expenditure of federal tax funds".

Primera Enmienda". Íd. (traducción nuestra).[5] Según analizó el Tribunal, uno de los miedos específicos de los redactores de la cláusula de establecimiento fue que el Congreso usara su poder de impuestos y gastos para favorecer una religión sobre otra o para sostener a las religiones en general.

Aunque la Opinión dice expresamente que la norma pudiera ser extensible a otras disposiciones de la constitución, se ha interpretado limitadamente. Véase Arizona Christian School Tuition Organization v. Winn, 563 US 125 (2011). El Juez Fortas, en su opinión concurrente en Flast v. Cohen, supra, había precisamente abogado por una interpretación limitada a la cláusula de establecimiento. "Hay suficiente en la historia constitucional de la cláusula de establecimiento para apoyar la tesis de que esta cláusula incluye una prohibición específica sobre el uso del poder de imponer impuestos para apoyar un establecimiento de religión. No hay ninguna razón para sugerir [...] que pueda haber otros tipos de gastos en el Congreso que puedan ser cuestionados por un litigante únicamente sobre la base de su estatus de contribuyente". Íd., pág. 115 (traducción nuestra).[6]

---

[5] "[i]n addition, appellants have alleged that the challenged expenditures violate the Establishment and Free Exercise Clauses of the First Amendment".

[6] "[T]here is enough in the constitutional history of the Establishment Clause to support the thesis that this Clause includes a specific prohibition upon the use of the power to tax to support an establishment of religion. There is no reason to suggest [...] that there may be other types of congressional expenditures which may be attacked by a litigant solely on the basis of his status as a taxpayer".

En 1994, "[e]ncontramos persuasivo el argumento del Tribunal Supremo federal y del Juez Fortas en Flast v. Cohen". Asoc. Maestros P.R. v. Srio. Educación, supra, pág. 539. Así, adoptamos esa norma para casos en que se alegue una violación a la Sección 3 del Artículo II de nuestra Constitución, relativa a la separación entre Iglesia y Estado. Decidimos también extenderla a reclamos bajo la Sección 5 del Artículo II de nuestra Constitución, que prohíbe el sostenimiento de escuelas privadas por parte del Estado. Explicamos que uno de los propósitos de esta disposición constitucional fue evitar que se utilizaran fondos públicos para sostener escuelas privadas operadas por distintas dependencias religiosas y, de este modo, salvaguardar la separación entre Iglesia y Estado. Asoc. Maestros P.R. v. Srio. Educación, supra, págs. 539-540.

Nuestras expresiones a lo largo de gran parte de aquella Opinión parecían indicar que estábamos adoptando una versión restrictiva de la norma de Flast v. Cohen, supra, limitada a proteger la separación entre Iglesia y Estado. "El reclamo de la Asociación está fundamentado en la cláusula de establecimiento de la Primera Enmienda de la Constitución federal, así como en las cláusulas de separación y sostenimiento de nuestra Constitución. Como ya discutimos, los principios constitucionales de separación entre Iglesia y Estado permiten que, por excepción, cualquier contribuyente tenga legitimación activa para plantear una violación a una de las anteriores

disposiciones". <u>Asoc. Maestros P.R. v. Srio. Educación</u>, <u>supra</u>, pág. 543.

Sin embargo, sin mayor fundamento, mencionamos luego que la cláusula de sostenimiento "también inclu[ye] en su ámbito a las instituciones privadas no religiosas" y que "[s]u objetivo va más allá de la separación de Iglesia y Estado, pretendiendo proteger y fortalecer al máximo nuestro sistema de instrucción pública frente a toda institución educativa privada". <u>Asoc. Maestros P.R. v. Srio. Educación</u>, <u>supra</u>, pág. 547. Este defecto de esa Opinión es insubsanable. La excepción de contribuyente para reclamos bajo la cláusula de sostenimiento no podía independizarse del tema de la separación de Iglesia y Estado, pues fue precisamente la separación de Iglesia y Estado la que dio pie a extender la norma de <u>Flast v. Cohen</u>, <u>supra</u>, a la cláusula de sostenimiento.

El Juez Asociado señor Negrón García así lo cuestionó en su Opinión disidente: "Carece de toda lógica decisoria que la mayoría confiera legitimación a la *Asociación* bajo una rígida doctrina de contribuyentes —casi en desuso— que se *apuntala exclusivamente* en la Cláusula de Establecimiento, y luego secularizar completamente el análisis en los méritos, desligándose por completo de la Cláusula de Establecimiento, no obstante el 'vínculo estrecho' que dicha cláusula guardaba en materia de legitimación". <u>Asoc. Maestros P.R. v. Srio. Educación</u>, <u>supra</u>, pág. 588 (Op. disidente de Negrón García, J.). "De la nada, de repente, aparece *fantasmalmente* la Cláusula de

Sostenimiento con un 'contenido independiente y adicional al de la cláusula de establecimiento de la Primera Enmienda de la Constitución federal'". Íd., pág. 587.

Por otro lado, la Ley de pleitos contra el Estado, Ley Núm. 2 de 25 de febrero de 1946 (32 LPRA sec. 3075), priva de jurisdicción a los tribunales de Puerto Rico para atender acciones en que se impugne la validez o constitucionalidad de cualquier ley o la actuación de un funcionario público autorizada por ley cuando el demandante no alegue otro interés en la acción o procedimiento. En Asoc. Maestros P.R. v. Srio. Educación, supra, dijimos que esa disposición no era impedimento para que adoptáramos la norma de Flast v. Cohen, supra. El Juez Asociado señor Negrón García también criticó este proceder, pues "se sirve de una doctrina de contornos restrictivos y capa caída para crear una excepción a una ley cuyo texto claro e inequívoco prohíbe los                pleitos de contribuyentes, sin excepciones, *y cuya constitucionalidad no ha sido atacada*". Asoc. Maestros P.R. v. Srio. Educación, supra, pág. 586 (Op. disidente de Negrón García, J.).

III

> Por otra parte, constantemente enfatizamos el valor del precedente en nuestro ordenamiento. No obstante, nuestras decisiones no son un dogma escrito en piedra. Por eso, "cuando el razonamiento de una decisión ya no resiste un análisis cuidadoso, no estamos obligados a seguirla". *Fraguada Bonilla v. Hosp. Aux. Mutuo*, supra, pág. 391. "[E]l propósito inspirador de la doctrina de *stare decisis* es lograr estabilidad y certidumbre en la ley, mas nunca perpetuar errores". Am. Railroad Co. v. Comisión Industrial, 61 DPR 314, 326 (1943). Ahora bien,

solo procederá dejar a un lado precedentes "(1) si la decisión anterior era claramente errónea; (2) si sus efectos sobre el resto del ordenamiento son adversos, y (3) si la cantidad de personas que confiaron en ésta es limitada". Pueblo v. Camacho Delgado, 175 DPR 1, 20 esc. 4 (2008). Véase, además, González v. Merck, 166 DPR 659, 688 (2006). Rivera Ruiz et al. v. Mun. De Ponce et al., 196 DPR 410, 429 (2016).

Reconocerle vigencia a la Opinión de Asoc. Maestros P.R. v. Srio. Educación, supra, y leerla como si le otorga a la Asociación de Maestros una llave maestra de acceso a los tribunales para protestar ciertas políticas públicas que no son de su agrado, "tiene el efecto de perpetuar una lectura errónea del Derecho". Rivera Ruiz et al. v. Mun. De Ponce et al., supra, pág. 430 (Expresión de conformidad de Rodríguez Rodríguez, J.). Además, va en contra de los principios mismos de autolimitación judicial y separación de poderes. "El principio de justiciabilidad es tal vez la limitación más importante al ejercicio del Poder Judicial". Romero Barceló v. ELA, 169 DPR 460, 508-509 (Op. disidente de Rodríguez Rodríguez, J.).

Debemos mirar las consecuencias de reconocerle a la Asociación legitimación activa para este pleito, como hacen los demás miembros de esta Curia. Estamos abriendo una puerta peligrosa que parecía cerrada. Es peligrosa y corrosiva porque pretende maniatar la ejecución de la política pública con tan solo presentar reclamos generalizados en los tribunales. Aunque sean improcedentes en los méritos, declarar justiciables esos casos entorpece la agilidad que el pueblo reclama en la ejecución de la

política pública. Después de todo, ningún caso se resuelve en un día. El mejor ejemplo es este recurso. La incertidumbre en espera de nuestra decisión ha durado hasta el inicio del año escolar, aun con la celeridad con la que atendimos este asunto.

Más aun, nuestra decisión levanta cuestionamientos serios sobre el rol de los tribunales en nuestra sociedad. Cumplimos con nuestro deber y gozamos de la confianza pública cuando protegemos a los individuos frente a las violaciones de los derechos que la Constitución y las leyes les garantizan. Pero si permitimos pleitos que no son justiciables para expresarnos sobre el tema de moda, ¿somos obstáculos procesales en la implantación de medidas que buscan ayudar a esos mismos individuos y no infringen la Constitución?

También cumplimos nuestro rol constitucional y gozamos de la confianza pública cuando, en ausencia de una violación de esos derechos, respetamos la separación de poderes y permitimos que los funcionarios que el pueblo eligió ejerzan las facultades que la Constitución les da para diseñar la política pública. No olvidemos que el pueblo podrá avalar o rechazar eventualmente esa política pública con su voto a favor o en contra de los incumbentes. En cambio, nuestras decisiones no están sujetas a la voluntad de los electores. Si ahora descartamos las limitaciones a nuestra facultad revisora y en cambio declaramos justiciables reclamos como el de hoy, ¿tendremos un gobierno por *injunction*? ¿Estará el pueblo a la merced

de que una mayoría en este Tribunal esté de acuerdo con la medida impugnada? En otras palabras: ¿Respetaremos la separación de poderes constitucionales o nos convertiremos en un estorbo público?

Vale recordar nuestras palabras en Hernández Torres v. Gobernador, supra, págs. 848-849:

> [N]o podemos ceder a la tentación de obviar los principios de legitimación activa expuestos anteriormente para adjudicar los méritos de este recurso […]. Por razón de "interés público" no podemos olvidar que a través de la historia de la revisión judicial en Estados Unidos y Puerto Rico, los tribunales han "establecido valiosísimos criterios de autolimitación (judicial) para guiar su conducta en situaciones que requieren el ejercicio de su 'grave y delicada función' de juzgar la validez constitucional de las medidas legislativas .... Factores determinantes de estas normas son la falibilidad del juicio humano, la condición negativa del poder judicial que no posee la autoridad directa que adviene a las otras dos ramas por ser electas por el pueblo, y la convicción de que la corte perdería su influencia y prestigio y finalmente su autoridad, si, a diario, *y fuera de los estrictos límites de un genuino procedimiento judicial*, estuviese pasando juicio sobre la validez constitucional de las actuaciones legislativas y ejecutivas". (Énfasis suplido y escolio omitido.) *E.L.A. v. Aguayo*, supra, págs. 595-597.
>
> Si descartásemos este principio histórico de prudencia judicial, socavaríamos la doctrina constitucional de separación de poderes, faltaríamos el respeto a la soberanía del pueblo y asumiríamos la función que Platón asignó a los filósofos reyes en su monumental obra *La República*. Aceptar esta función violaría los principios rectores de nuestro ordenamiento democrático que juramos defender al asumir nuestros cargos.

Me preocupa que el resto de esta Curia haya demostrado "voluntad —rayana en descoordinada proeza quijotesca— de abrir las puertas judiciales" para discutir los méritos de

un caso no justiciable. Asoc. Maestros P.R. v. Srio. Educación, supra, pág. 588 (Op. disidente de Negrón García, J.). Dependiendo del color del cristal con que se miren los programas en controversia, unos intervienen para proclamar su constitucionalidad y otros para declarar lo contrario. En este proceder, hemos desperdiciado una oportunidad de dar coherencia a nuestra doctrina de legitimación activa. La consecuencia de este proceder errático se verá pronto: La presentación reiterada de casos en los tribunales con la pretensión de que la política pública se revise y controle por orden judicial.

RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Asociación de Maestros, su sindicato Asociación de Maestros de Puerto Rico- Local Sindical, por sí y en representación de sus miembros<br><br>Parte Recurrida<br><br>v.<br><br>Departamento de Educación; Hon. Julia Keleher, en su carácter oficial como Secretaria del Departamento de Educación del Estado Libre Asociado de Puerto Rico<br><br>Parte Peticionaria | CT-2018-0006 | *Certificación Intrajurisdiccional* |

**Opinión de conformidad emitida por el Juez Asociado señor RIVERA GARCÍA a la cual se unen la Jueza Asociada señora Pabón Charneco y los Jueces Asociados señores Kolthoff Caraballo y Estrella Martínez**

En San Juan, Puerto Rico, a 9 de agosto de 2018.

Este caso nos brindaba la trascendental tarea de examinar ciertas disposiciones de la Ley Núm. 85-2018, conocida como la *Ley de Reforma Educativa de Puerto Rico*. En particular, nos correspondería determinar si el Art. 13.05, relacionado al Programa de Escuelas Públicas Alianza, y el Art. 14.02 sobre la Libre Selección de Escuelas Públicas, infringen la cláusula de sostenimiento de la Constitución de Puerto Rico. En otros términos, debíamos auscultar si son constitucionales en cuanto permiten el establecimiento de escuelas que serán operadas

y administradas por una entidad certificada autorizada por el Secretario y, por otro lado, las que permiten la otorgación de certificados a padres de estudiantes para que estos seleccionen la escuela que prefieran que sus hijos asistan.

Al emprender esta difícil tarea, resulta imprescindible reafirmar nuestra obligación de esforzarnos por lograr una interpretación que sea compatible con el mantenimiento de la constitucionalidad de una ley, en virtud de la deferencia que siempre hemos expresado merecen las otras ramas de gobierno. Así las cosas, luego de revisar la normativa establecida en *Asoc. Maestros P.R. v. Srio. Educación*, 137 DPR 528 (1994), en cuanto a la interpretación que allí hicimos sobre la cláusula de sostenimiento en el contexto de otro modelo de legislación, por los fundamentos que expondremos a continuación, estoy conforme con revocar la *Sentencia* del Tribunal de Primera Instancia y desestimar la demanda de autos.[7]

I

---

[7] Alarma sobremanera que varios compañeros de este Tribunal tergiversen el razonamiento que se hace en esta Opinión de conformidad e induzcan a error a la ciudadanía en cuanto a lo que aquí expresamos. Entre otras cosas, confunden y desvirtúan el razonamiento que hacemos al adjudicar las controversias ante nuestra consideración en cuanto a los Programas de Escuelas Públicas Alianza y de Libre Selección de Escuelas. Además, nos imputan que para arribar a esta conclusión enmendamos nuestra Constitución y reemplazamos la palabra "sostenimiento" por "sustitución" cuando, como veremos, fueron estos conceptos los que la Convención Constituyente estableció que regirían la Cláusula de Sostenimiento. Asimismo, como de costumbre, recurren a incesantes ataques, insultos, burlas y ofensas infundadas para sostener lo que a todas luces carece de fundamentos jurídicos. La historia se encargará de juzgar a aquellos que, para adelantar sus causas, se prestan a interpretar el estado de derecho a su conveniencia.

El 3 de abril de 2018, la Asociación de Maestros de Puerto Rico y su sindicato (Asociación) presentó una *Solicitud de sentencia declaratoria* ante el Tribunal de Primera Instancia.[8] Alegó que los programas de las Escuelas Públicas Alianza y de Libre Selección de Escuelas establecidos en la Ley Núm. 85-2018 conocida como *la Ley de Reforma Educativa de Puerto Rico* (en adelante Ley Núm. 85), eran inconstitucionales. Arguyó que en la medida en que el Estado destine fondos y propiedad pública para sostener, sufragar y sustentar entidades educativas privadas o religiosas, infringe la Sección 5 del Artículo II de la Constitución de Puerto Rico que prohíbe la utilización de fondos públicos para el sostenimiento de escuelas que no sean las del Estado.[9]

De otra parte, el 31 de mayo de 2018 un grupo de madres[10] (parte interventora) presentó una *Solicitud de*

---

[8] Apéndice de la petición de certificación intrajurisdiccional, Anejo II, págs. 57-69.

[9] *Íd*. pág. 60.

[10] La Sra. Jennifer González Muñoz es madre de dos niños, de dos y seis años. Aunque ella y su esposo trabajan tienen escasos recursos económicos para el sostenimiento de su familia. El hijo mayor de ambos tiene problemas del habla y por ello ha sido víctima de *bullying* en la escuela a la que asiste. A ambos le preocupa el entorno de violencia que existe en la escuela, pues sostienen que los estudiantes le faltan el respeto a los maestros sin que ello acarree ninguna consecuencia. Además, aducen que, a menudo, se cancelan las clases sin previo aviso; afectando el progreso académico de sus hijos. Por su parte, la Sra. Danitza González Carrión es madre de tres niños que asisten a la escuela del barrio donde residen. Expresó que tiene una niña de siete años y tiene un promedio académico de cuatro puntos. Señaló que la niña ha demostrado tener una pasión para aprender el inglés. Sin embargo, la escuela le brinda poco o nada de instrucción en ese idioma. Finalmente, la Sra. Jessica Ñeco tiene una hija de catorce años que es dotada y en la escuela a la que asiste a pesar de ser una de las escuelas públicas más prestigiosas, no está satisfaciendo las necesidades de su hija. Señaló que comparte ciertas frustraciones con su hija, ya que al ser una estudiante tan sobresaliente con frecuencia se aburre en las clases. Entiende que se beneficiaría del programa si pudiera estudiar en una escuela que tenga un currículo más abarcador y en un entorno estudiantil más competitivo.

*intervención*. Adujeron que sus hijos estudian en escuelas públicas y tienen un interés individual, personal y tangible de beneficiarse de los programas. Afirmaron que si la Ley Núm. 85 se declara inconstitucional sus hijos se verían privados de los beneficios que esta concede. Por ello, solicitaron comparecer como parte interventora.

Luego de múltiples trámites procesales y la celebración de una vista argumentativa, celebrada el 13 de junio de 2018, el Tribunal de Primera Instancia emitió una *Sentencia* en la que resolvió que la Asociación tenía legitimación activa ya que, como representante exclusivo de los maestros del sistema de educación pública, persigue defender el sistema de enseñanza pública y vindicar los derechos y objetivos de la organización. Consignó que la implementación de los referidos programas afectará a los miembros al diluirse el dinero que será asignado a las escuelas públicas y a los maestros para lograr sus deberes. Determinó que se podrían alterar los términos y condiciones laborales de los maestros del sistema público si son transferidos a una Escuela Pública Alianza. Entendió que la Asociación poseía legitimación activa conforme a lo resuelto en *Asoc. Maestros P.R. v. Srio. Educación*, *supra*, el cual permitió que un contribuyente cuestione leyes o acciones estatales ante la violación de las cláusulas de establecimiento y de sostenimiento de la Constitución de Puerto Rico. En cuanto a la solicitud de intervención, la declaró ha lugar al concluir que las madres demostraron tener un interés legítimo.

Finalmente, determinó que las Escuelas Públicas Alianza son un modelo de escuelas privadas financiadas por el Estado cuya operación es contraria a la cláusula de sostenimiento de nuestra Constitución. En consecuencia, decretó la inconstitucionalidad parcial[11] del Art. 13.05 (a) (5-9) de la Ley Núm. 85, que autoriza el establecimiento de las Escuelas Públicas Alianza como parte de nuestro sistema de educación pública, y el Art. 13.05 (a) (4), el cual establece el concepto de Escuelas Públicas Alianza en instituciones que no son del Estado. También, decretó la inconstitucionalidad del Art. 14.02 (c) que creó el Programa de Libre Selección de Escuelas al razonar que dicha disposición infringe la cláusula de sostenimiento.

Inconforme, el 11 de julio de 2018 el Estado compareció ante el Tribunal de Apelaciones mediante un *Escrito de Apelación*.[12] Señaló la comisión de los errores siguientes:

(1) Erró el Tribunal de Primera Instancia al reconocerle legitimación activa a la asociación demandante para instar la acción de epígrafe.

(2) Erró el Tribunal de Primera Instancia al concluir que las disposiciones de la Ley 85-2018 que establecen el Programa de Escuelas Públicas Alianza infringen la cláusula de Sostenimiento contenida en el Art. II, Sec. 5 de la Constitución de Puerto Rico.

(3) Erró el Tribunal de Primera Instancia al concluir que las disposiciones de la Ley 85-2018

---

[11] Parcial en la medida en que "la prohibición no se extiende a aquellas Escuelas Alianza manejadas por municipios, consorcios municipales o la universidad pública, ya que estas entidades son extensiones del Estado que están bajo su supervisión, sobretodo bajo su control". Véase *Sentencia Declaratoria*, pág. 35.

[12] Apéndice de la petición de certificación intrajurisdiccional, Anejo I, págs. 1-282.

que establecen el Programa Libre Selección de Escuelas infringen la cláusula de Sostenimiento contenida en el Art. II, Sec. 5 de la Constitución de Puerto Rico.

El mismo día presentó ante esta Curia una *Urgente petición de auto de certificación intrajurisdiccional* y una *Urgente moción en auxilio de jurisdicción*. En esta última planteó que el asunto es uno del más alto interés público puesto que "el efecto de lo decidido por el foro de instancia trastoca el mandato legislativo dirigido a la implantación integral de la Ley de Reforma Educativa, uno de los estatutos más trascendentales en nuestra historia reciente".[13] Además, sostuvo que la "errónea decisión del Tribunal de Primera Instancia coloca a nuestro sistema educativo y a los estudiantes, [los] padres y [los] maestros que lo componen, en un estado de total incertidumbre de cara al inminente comienzo del próximo año escolar, lo cual ocurrirá en menos de un (1) mes".[14] A tales efectos, adujo que ha llevado a cabo un sinnúmero de trámites encaminados a poner en vigor el programa y que de no adjudicarse la disputa no se podría efectuar la encomienda legislativa. Además, arguyó que continuaría el estado de incertidumbre jurídica que provoca el dictamen del Tribunal de Primera Instancia y la preparación para el comienzo del próximo año escolar. Por ello, solicitó que adelantemos el trámite judicial por la importancia y pronta atención que requiere este conflicto.

---

[13] *Urgente Moción en auxilio de jurisdicción*, pág. 3.
[14] *Íd.*

Sobre los méritos de la controversia, en síntesis, el Estado sostuvo que el Programa de Escuelas Públicas Alianza es un concepto de escuelas públicas, creado por autorización legislativa y que operan con cierto grado de autonomía administrativa, curricular y operacional. Entendió que en el foro federal se validó su constitucionalidad siempre que la enseñanza que se imparta sea gratuita, no sectaria ni discriminatoria. En cuanto al Programa de Libre Selección de Escuelas, aseveró que es una ayuda económica concedida a las familias y no a las instituciones educativas privadas. En ese sentido, señaló que la ley es neutral y que no concede privilegios particulares a las escuelas privadas sobre las públicas. Finalmente, argumentó que la Asociación carece de legitimación activa para incoar la acción ya que no logró establecer en qué manera la creación de los programas en controversia le ocasionan un daño real, palpable, y preciso tanto en su carácter individual como a sus miembros. Esbozó que esta tampoco logró establecer la conexión entre el alegado daño y las disposiciones de la Ley Núm. 85.

El 13 de julio de 2018 emitimos una Resolución en la cual expedimos el recurso de certificación intrajurisdiccional, paralizamos los efectos del dictamen emitido por el Tribunal de Primera Instancia y concedimos a las partes un término de cinco días para que se expresaran en cuanto a los señalamientos de error que presentó el Estado.

La parte interventora compareció y, en esencia, argumentó que debemos reevaluar y revocar nuestra decisión en *Asoc. Maestros P.R. v. Srio. Educación*, *supra*, principalmente, porque los cambios significativos en el ámbito legal la convirtieron en una obsoleta. En esencia, sostuvo que sus hijos se han visto afectados por la crisis actual del sistema educativo de Puerto Rico. Por ello, consideró que los programas en, todos sus extremos, están diseñados para brindarles, a ellos como padres, la oportunidad de escoger la escuela adecuada para sus hijos y, a estos últimos, tener acceso a una educación de calidad. Aseveró que, de no validarse, limitaríamos a todas las familias de escasos recursos la oportunidad de atender sus necesidades académicas individuales.

Por su parte, la Asociación, amparándose en lo resuelto por este Tribunal en *Asoc. Maestros P.R. v. Srio. Educación*, *supra*, alegó que tiene legitimación activa para impugnar bajo la cláusula de sostenimiento ya que este Tribunal hizo extensiva la excepción establecida en *Flast v. Cohen*, 392 US 83 (1968), sobre acciones de contribuyentes al amparo de la cláusula de establecimiento. En aquella ocasión, reconocimos que por estar relacionadas la una con la otra, la excepción establecida en ese caso aplica a impugnaciones de contribuyentes al amparo de la cláusula de establecimiento y a la de sostenimiento.

Señaló que como entidad se dedica a "promover y defender los derechos laborales de todos sus miembros, promover condiciones óptimas para ofrecer educación pública

gratuita y a fomentar el desarrollo intelectual y profesional sindical de los trabajadores de la educación".[15] Razonó, además, que como organización tiene una larga y probada trayectoria en reclamar la reivindicación de derechos de la organización y en proteger los intereses relacionados al quehacer educativo, la educación pública y los derechos de los maestros. Planteó, que el uso de fondos públicos del presupuesto del Departamento de Educación para la administración de entidades privadas y para la otorgación de certificados que tienen el fin de sufragar la educación en instituciones privadas, afectan al magisterio y a la educación pública ya que al quitarles una porción del presupuesto destinado al Departamento incidirá en el mejoramiento y en la operación de las escuelas del sistema de educación pública. También, consignó que se podrían alterar los términos y condiciones laborales de los maestros que se transfieran a una Escuela Pública Alianza.

En cuanto a los méritos de la controversia, aclaró que sus planteamientos se fundamentan únicamente en la cláusula de sostenimiento y no en la de establecimiento. Señaló que se infringe la cláusula de sostenimiento puesto que mediante las Escuelas Públicas Alianza se transfiere dinero público a una entidad privada para promover la educación pública. Sostuvo que estas escuelas estarán administradas por entidades privadas y serán estos entes quienes estarán a cargo de tomar las decisiones operacionales y

---

[15] *Alegato de la parte recurrida*, pág. 5.

administrativas. Igualmente, argumentó que, si alguna de estas entidades "tiene base religiosa, será incluida la educación religiosa en la misma, siendo entonces sufragada por fondos públicos".[16] Arguyó que en el caso de que operen en facilidades que sean del Estado y no paguen una renta por el uso, ello constituiría un traspaso de propiedad pública a manos de entes privados. Planteó, además, que el Estado se limitaría a "supervisa[r] ciertos aspectos de las escuelas privadas pero su operación, administración, organización, finanzas, empleomanía y filosofía son privadas".[17]

Sobre el Programa de Libre Selección de Escuelas, cuestionó únicamente la constitucionalidad de aquellos que, mediante certificados, autorizan el pago de educación privada con fondos públicos y no el resto de las modalidades. A esos efectos, adujo que se infringe la Constitución de Puerto Rico ya que el fin último del programa es sufragar los costos y sostener la educación privada. Añadió que ello constituye un traspaso de dinero público a terceros privados. Ante esta situación, esbozó que el Estado pretende viabilizar un sistema becario para sustituir el sistema de enseñanza pública para ponerlo en control de entes privados. Por ello, concluyó que ambos programas son inconstitucionales de su faz, pues la cláusula de sostenimiento busca que los servicios de

---

[16] *Alegato de la parte recurrida*, pág. 11.
[17] *Íd.*, pág. 12.

educación pública estén únicamente en control del Estado y ninguno de los dos programas tienen esa finalidad.

Examinados los argumentos de ambas partes, procedemos a resolver.

## II

A. *La legitimación activa*

Sabido es que "los tribunales existen únicamente para resolver controversias genuinas surgidas entre partes opuestas que tienen un interés real de obtener un remedio que haya de afectar sus relaciones jurídicas".[18] Por ello, se requiere "la presencia de una controversia genuina y viva, en la cual estén presentes intereses opuestos, y que al ser resuelta afecte las reclamaciones jurídicas de los litigantes".[19] Esto garantiza que el promovente de una acción tenga un interés en el pleito "de tal índole que, con toda probabilidad, habrá de proseguir su causa de acción vigorosamente y habrá de traer a la atención del tribunal las cuestiones en controversia".[20]

Desde que adoptamos jurisprudencialmente el requisito de "caso o controversia" el ejercicio de la función judicial está supeditado a la existencia de una

---

[18] *E.L.A. v. Aguayo*, 80 DPR 552, 558-559 (1958). Véase, además, *Fund. Surfrider y otros v. A.R.P.E.*, 178 DPR 563, 572 (2010); *Asoc. Alcaldes v. Contralor*, 176 DPR 150, 157 (2009); *Hernández Torres v. Gobernador*, 129 DPR 824 (1992).

[19] *E.L.A. v. Aguayo*, *supra*, pág. 584.

[20] *Noriega v. Hernández Colón*, 135 DPR 406, 427 (1994), al citar a *Hernández Agosto v. Romero Barceló*, 112 DPR 407, 413 (1982).

controversia justiciable.[21] Esta doctrina de justiciabilidad consiste, a su vez, en un conjunto de doctrinas que nos guiarán en nuestra función de determinar si es preciso atender la validez estatutaria o constitucional de un asunto particular. Es decir, si existen "fuerzas subyacentes que motivan en realidad la abstención o intervención judicial en una situación dada".[22] Entre esos principios está la legitimación activa (*standing*) de quienes acuden a los tribunales a vindicar sus derechos.[23]

En consecuencia, para determinar si una parte tiene legitimación activa es indispensable que el promovente de una causa de acción, en ausencia de un estatuto que la confiera, satisfaga los requisitos siguientes: (1) que ha sufrido un daño claro y palpable; (2) que el daño es real, inmediato y preciso, y no abstracto o hipotético; (3) que existe una conexión entre el daño sufrido y la causa de acción ejercitada, y (4) que el reclamo surja bajo el palio de la Constitución o de una ley.[24]

En términos generales, el principio de legitimación activa consiste en determinar quién puede acudir al

---

[21] *Fundación Arqueológica v. Depto de la Vivienda*, 109 DPR 387, 391 (1980). Véase, además, *Asoc. Fotoperiodistas v. Rivera Schatz*, 180 DPR 920, 942 (2011); *Col. Ópticos de P.R. v. Vani Visual Center*, 124 DPR 559 (1989).

[22] *E.L.A. v. P.R. Tel. Co.*, 114 DPR 394, 399 (1983); *Hernández Agosto v. Romero Barceló*, *supra*, pág. 413.

[23] *Col. Ópticos de P.R. v. Vani Visual Center*, *supra*, pág. 563.

[24] *Asoc. Fotoperiodistas v. Rivera Schatz*, *supra*, pág. 943. Véase, además, *Romero Barceló v. E.L.A.*, 169 DPR 460, 470-471 (2006); *Col. Peritos Elec. v. A.E.E.*, 150 DPR 327, 341 (2000); *P.P.D. v. Gobernador I*, 139 DPR 643 (1995); *Hernández Torres v. Gobernador*, *supra*; *Hernández Agosto v. Romero Barceló*, *supra*.

tribunal en búsqueda de vindicar sus derechos.[25] Como regla general, hemos establecido que las partes "tienen capacidad tan solo para plantear sus propios derechos contra actos alegadamente ilegales del gobierno".[26] Sin embargo, jurisprudencialmente se han reconocido varias excepciones a esta norma. Este es el caso de las asociaciones.

1) *Asociaciones*

A las asociaciones se les ha reconocido legitimación activa para demandar en dos instancias, ya sea, a nombre propio o a nombre de sus miembros o integrantes. Es decir, esta puede solicitar intervención judicial por los daños sufridos por la agrupación y para defender los derechos de la entidad.[27] A tales efectos, hemos sostenido que cuando la acción la insta "una asociación, ésta tiene legitimación para incoar una acción judicial por daños sufridos por la agrupación y para vindicar los derechos de la entidad. Cuando una organización esté demandando en defensa de sus intereses colectivos, le corresponde alegar un daño claro y preciso a sus actividades".[28] En otros términos, debe demostrar un daño claro, palpable, real, inmediato, preciso, no abstracto ni hipotético a su colectividad.[29]

---

[25] *Asoc. Fotoperiodistas v. Rivera Schatz*, *supra*, 942; *Col. Ópticos de P.R. v. Vani Visual Center*, supra, pág. 563.

[26] *Íd.*, pág. 943. Véase, además, *C.E.S. U.P.R. v. Gobernador*, 137 DPR 83, 106 (1994); *E.L.A. v. P.R. Tel. Co.*, 114 DPR 394, 396 (1983).

[27] *Col. Peritos Elec. v. A.E.E.*, *supra*, pág. 341.

[28] *Col. Ópticos de P.R. v. Vani Visual Center, supra*, pág. 565.

[29] *Íd.; Col. Peritos Elec. v. A.E.E.*, *supra; Noriega v. Hernández Colón, supra.*

En cambio, cuando lo hace en representación de sus miembros no tiene que demostrar que ha sufrido daños propios.[30] En este escenario contará con legitimación activa siempre que cumpla con tres requisitos, a saber: (1) que el miembro tiene legitimación activa para demandar a nombre propio; (2) que los intereses que se pretenden proteger están relacionados con los objetivos de la organización; y (3) que la reclamación y el remedio solicitado no requieren la participación individual de los miembros en el pleito.[31]

Al resolver un caso que se presente ante nuestra consideración, según *E.L.A. v. Aguayo*, 80 DPR 552 (1958), debemos desplegar nuestra facultad constitucional de revisar las leyes conforme a los preceptos constitucionales que exigen que esta únicamente sea ejercida dentro de los linderos de una controversia real y sustancial entre intereses opuestos que permitan un remedio judicial. Debemos examinar, entonces, si la parte demandante tiene legitimación activa conforme a los parámetros establecidos para acciones incoadas por las asociaciones, ya sea a nombre propio o en representación de sus miembros.

Cabe resaltar que en *Asoc. de Maestros de P.R. v. Srio. Educación*, *supra*, adoptamos la excepción preceptuada en *Flast v. Cohen*, *supra*, para reclamos de contribuyentes que impugnan la constitucionalidad de una ley o una

---

[30] *Col. Ópticos de P.R. v. Vani Visual Center*, *supra*. Véase, además, *Muns. Aguada y Aguadilla v. JCA*, 190 DPR 122, 133 (2014); *Col. Peritos Elec. v. A.E.E.*, *supra*, pág. 342; *García Oyola v. J.C.A.*, 142 DPR 532 (1997); *Salas Soler v. Srio. de Agricultura*, 102 DPR 716 (1974).

[31] *Col. Peritos Elec. v. A.E.E.*, *supra*.

actuación gubernamental bajo la cláusula de establecimiento. En *Flast*, el Máximo Foro judicial consideró que, al amparo de la cláusula de establecimiento, una persona sufre un daño como contribuyente al extraerse y utilizarse su dinero como contribuyente para apoyar una religión.[32] Así las cosas, en *Asoc. de Maestros de P.R. v. Srio. Educación*, *supra*, dijimos que "por el vínculo estrecho que existe entre esa sección y la que prohíbe el sostenimiento de escuelas privadas por parte del estado debíamos adoptar la norma de *Flast v. Cohen*, *supra*, basada en la cláusula de establecimiento, para reclamos bajo la Sec. 5 del Art. II, *supra*".[33] El razonamiento utilizado en ese momento fue que era "cónsono con nuestro **historial constitucional** y, particularmente, con la preocupación de nuestra Convención Constituyente por salvaguardar la separación entre la Iglesia y el Estado". (Énfasis suplido).[34] Ante ese escenario, reconocimos que los **miembros** de la Asociación tenían legitimación activa para incoar una causa de acción como contribuyente, al amparo de la cláusula de sostenimiento.

Al examinar si se cumplen los demás requisitos para que esta pueda demandar en representación de los maestros en calidad de contribuyentes, observamos que entre los

---

[32] "The taxpayer's allegation in such cases would be that his tax money is being extracted and spent in violation of specific constitutional protections against such abuses of legislative power". *Ariz. Christian School Tuition Org. v. Winn*, 563 US 125, 140 (2011); *Flast v. Cohen*, 392 US 83 (1968).

[33] *Asoc. de Maestros P.R. v. Srio. Educación*, 137 DPR 528, 539 (1994).

[34] *Íd*.

intereses que la Asociación, como organización, persigue están el defender los derechos laborales de todos sus miembros, velar por que se ofrezca una educación pública gratuita y ~a~ fomentar el desarrollo intelectual y profesional de los maestros del sistema de enseñanza pública. En sus argumentos exponen que la Ley Núm. 85, destina parte de los fondos públicos del Departamento y los utiliza para escuelas privadas, por tanto, afectaría sus condiciones de trabajo y la operación de las escuelas. En este sentido, los intereses que se pretenden proteger, en cuanto a los derechos de los maestros, están relacionados con los objetivos que persigue salvaguardar la Asociación.

Finalmente, esta última estableció que la reclamación y el remedio solicitado no requieren la participación individual de los miembros en el pleito, ya que se trata de una controversia estrictamente de derecho en la cual únicamente debemos examinar si ciertas disposiciones de la Ley Núm. 85 infringen **de su faz** la cláusula de sostenimiento de nuestra Constitución. Por lo anterior, la Asociación posee la legitimación activa necesaria para entablar el presente pleito en representación de los maestros del sistema de educación pública de Puerto Rico.

Resuelto esto, procederemos a determinar si la Ley Núm. 85 establece mecanismos para el sostenimiento de escuelas privadas en contravención con la Constitución de Puerto Rico al crear el Programa de Libre Selección de Escuelas para ciertos estudiantes participantes y al establecer las Escuelas Públicas Alianza.

## III

A. *La constitucionalidad de una ley*

Está firmemente establecido que una ley se presume constitucional hasta que se resuelva lo contrario. Un estatuto puede ser declarado inconstitucional de su faz o en su aplicación.[35] Bajo la primera doctrina, el análisis se circunscribe a determinar si del texto de la ley surge el vicio que la hace inconstitucional.[36] En la segunda, es preciso analizar el contexto en el que la ley ha sido aplicada para auscultar si en su aplicación tiene el efecto de infringir alguna disposición constitucional.[37]

A tales efectos, estamos llamados a armonizar, entre otras cosas, el historial legislativo y el propósito que tuvo la Asamblea Legislativa para promulgar el estatuto en cuestión con las disposiciones en controversia.[38] Con ello en mente, debemos buscar la manera de conciliar, en lo posible, el fin perseguido de manera que podamos llegar a un resultado lógico y razonable.[39] Con este marco doctrinal en mente, analizaremos las disposiciones de la Ley Núm. 85 que impugna la parte recurrida para determinar si de su faz

---

[35] *Asoc. Ctrl. Acc. C. Maracaibo v. Cardona*, 144 DPR 1, 22 (1997).

[36] *Íd.*

[37] *Íd.*, pág. 23.

[38] *Pérez v. Mun. de Lares,* 155 DPR 697, 706 (2001). Véase, además, *Irizarry v. J & J Cons. Prods., Co., Inc.*, 150 DPR 155 (2000); *Dorante v. Wrangler of P.R.*, 145 DPR 408 (1998); *Vázquez v. A.R.Pe.*, 128 DPR 513 (1991).

[39] *Íd.*

surge algún indicio que tenga visos de inconstitucionalidad a la luz de la cláusula de sostenimiento.

B. *La cláusula de sostenimiento*

De entrada, debemos señalar que la normativa establecida y la interpretación que hicimos sobre la cláusula de sostenimiento en *Asoc. Maestros P.R. v. Srio. Educación*, *supra*, es claramente errónea.[40] Ello, independientemente del modelo de legislación educativa bajo revisión. Específicamente, por la interpretación y el derecho expuesto en torno a la cláusula de sostenimiento.

Para saber si la Ley Núm. 85 infringe esa disposición constitucional es imperativo que delimitemos adecuadamente el significado que tiene el término "sostenimiento". En primer lugar, el Diccionario de la Lengua Española define este concepto como la "[a]cción y efecto de sostener o sostenerse"[41] o como "[m]antenimiento o sustento".[42] La palabra "sostener" la define como "prestar apoyo, dar aliento o auxilio" o "[d]ar a alguien lo necesario para su

---

[40] Como excepción, existen tres circunstancias que justifican dejar a un lado un precedente: "(1) si la decisión anterior era claramente errónea; (2) si sus efectos sobre el resto del ordenamiento son adversos, y (3) si la cantidad de personas que confiaron en ésta es limitada". *Pueblo v. Sánchez Valle*, 192 DPR 594, 645-646 (2015), al citar *Pueblo v. Camacho Delgado*, 175 DPR 1, 20 esc. 4 (2008). Véanse, además, *Fraguada Bonilla v. Hosp. Aux. Mutuo*, 186 DPR 365, 391 (2012); *E.L.A. v. Crespo Torres*, 180 DPR 776, 796-797 (2011); *Pueblo v. Díaz de León*, 176 DPR 913, 920 (2009); *San Miguel, etc. & Cía. v. Guevara*, 64 DPR 966, 974 (1945).

[41] Real Academia Española, *Diccionario de la lengua española*, 16ta ed., Madrid, pág. 1178 (1939). Véase, además, Julio Casares, Diccionario ideológico de la lengua española, 2da ed., Editorial Gustavo Gili, S.A., Barcelona, pág. 783 (1959). Al día de hoy se le ha dado la misma interpretación al término sostenimiento. Véase, Real Academia Española, *Diccionario de la lengua española*, 23ra ed. (Edición del Tricentenario), México, Espasa Libros, pág. 2043 (2014).

[42] *Íd.*

manutención".[43] Según los diccionarios citados, el término sostenimiento equivale a proporcionar lo necesario para subsistir. A tales efectos, en la medida en que se dé a alguien lo necesario para subsistir, es decir, para mantenerse, permanecer o conservarse implica que se le está sosteniendo.

En el ámbito jurídico, el término tiene su origen en la jurisprudencia federal **que considera el sostenimiento (*support*) como una forma de establecimiento.**[44] Es decir, los precedentes judiciales federales han interpretado la cláusula de establecimiento como una forma de sostener entidades religiosas. Esta premisa está sustentada en los motivos que tuvieron los Padres Fundadores de la Constitución Federal para luchar contra las acciones impuestas por algunos estados que obligaban a los ciudadanos a apoyar económicamente a ciertos grupos religiosos.[45]

La Constitución de Puerto Rico en el Art. II, Sec. 5, establece lo siguiente:

> Habrá un sistema de instrucción pública el cual será libre y enteramente no sectario. La

---

[43] Real Academia Española, *Diccionario de la lengua española*, 23ra ed., (Edición del Tricentenario), México, Espasa Libros, pág. 2042 (2014).

[44] Véase, por ejemplo, *Everson v. Board of Education*, 330 US 1 (1947). Véase, además, Ignacio Rivera García, *Diccionario jurídico según la jurisprudencia del Tribunal Supremo de Puerto Rico,* Vol. III: A-Z 1989-2000, Ediciones SITUM, págs. 454-455 (2008). Véase, además, Ignacio Rivera García, *Diccionario de términos jurídicos*, Lexis Publishing, 3ra ed. rev., pág. 267 (2000).

[45] *Everson v. Board of Education, supra*. Véase, además, James Madison, *Memorial and Remonstrance Against Religious Assesment*, Bill of Rights Institute http://billofrightsinstitute.org/wp-content/uploads/2011/12/MemorialofRemonstrance.pdf (última visita 9 de agosto de 2018).

enseñanza será gratuita en la escuela primaria y
secundaria y, hasta donde las facilidades lo
permitan, se hará obligatoria para las escuelas
públicas primarias. La asistencia obligatoria a
las escuelas públicas primarias, hasta donde las
facilidades del Estado lo permitan, según se
dispone en la presente, no se interpretará como
aplicable a aquellos que reciban instrucción
primaria en escuelas establecidas bajo auspicios
no gubernamentales.

No se utilizará propiedad ni fondos públicos para
**el sostenimiento de escuelas o instituciones
educativas que no sean las del Estado**. Nada de lo
contenido en esta disposición impedirá que el
Estado pueda prestar a cualquier niño servicios
no educativos establecidos por ley para
protección o bienestar de la niñez. (Énfasis
suplido).[46]

Esta disposición constitucional tuvo su antecedente en el Art. 2 de la Ley Orgánica de 1917, conocida como la Ley Jones, la cual disponía que "[n]o se dictará ninguna ley relativa al establecimiento de cualquiera religión o que prohíba el libre ejercicio de la misma"[47] y que "[j]amás se asignará, aplicará, donará, usará, directa ni indirectamente, dinero o propiedad pública para el uso, beneficio o sostenimiento de ninguna secta, iglesia, denominación, institución o asociación sectaria, o sistema religioso, o para el uso, beneficio o sostenimiento de ningún sacerdote, predicador, ministro u otro instructor o dignatario religioso, como tal".[48]

---

[46] Art. II, Sec. 5, Const. PR, LPRA, Tomo I, ed. 2008, pág. 292.

[47] Acta Jones, 39 Stat. 951, Documentos Históricos, Sec. 2, LPRA, Tomo 1, ed. 1982, pág. 63. Véase, además, Raúl Serrano Geyls, *Derecho constitucional de Estados Unidos y Puerto Rico*, Programa de Educación Jurídica Continua Universidad Interamericana de Puerto Rico Facultad de Derecho, Vol. II, págs. 1611, 1613 (1988).

[48] Acta Jones, 39 Stat. 951, Documentos Históricos, Sec. 2, *supra*. Es oportuno señalar que el Art. 34 de la referida ley dispone que el proyecto de presupuesto general no comprenderá nada más que

Así, al redactar nuestra Carta de Derechos, durante el cuadragésimo primer día de sesión, los constituyentes atendieron una propuesta de enmienda presentada por el señor José Trías Monge para que se eliminaran las palabras "**la enseñanza en**" y se sustituyan por la frase "**el sostenimiento de**". (Énfasis suplido).[49] Así, la oración leería de la manera siguiente: "No se utilizará propiedad ni fondos públicos para **el sostenimiento de** escuelas o instituciones educativas que no sean las del Estado" (Énfasis suplido).[50]

El Delegado Sr. Virgilio Brunet propuso que se incluyera la frase "**o beneficio**". (Énfasis suplido).[51] No obstante, al Delegado Sr. Celestino Iriarte le preocupó que el término "beneficio" trajera confusión. El Delegado Sr. José Trías Monge añadió que, al proponerla, su intención era que quedara clara "la distinción entre la obligación del Estado para atender al sostenimiento o beneficio de escuelas, únicamente escuelas que estén bajo el dominio exclusivo del Estado".[52]

Subsiguientemente, el señor Trías Monge expresó que aceptaba la enmienda pues "[l]a intención es más bien entonces entre escuelas o instituciones, intercalar o enseñanzas y niños, quedando debidamente salvaguardado el

---

asignaciones para gastos ordinarios de los departamentos ejecutivo, legislativo y judicial, para el pago de intereses de la deuda pública y para escuelas públicas.

[49] 2 *Diario de Sesiones de la Convención Constituyente* 1476 (1952).

[50] *Íd.*

[51] *Íd.,* pág. 1477.

[52] *Íd.*

derecho de los niños a recibir aquellas ayudas que el Estado ofrezca".[53] Además, entendió que se trataba de una enmienda de estilo que **"no expand[ía] el concepto indicado"**.(Énfasis suplido).[54] Lo importante para él era que quedara clara "la obligación del Estado para atender al sostenimiento o beneficio de escuelas, únicamente escuelas que estén bajo el dominio exclusivo del Estado".[55] Es decir, que los fondos públicos, no deben utilizarse para el sostenimiento o beneficio de escuelas que no estuvieran bajo el dominio exclusivo del Estado.

Sin embargo, el señor Iriarte se opuso a la enmienda porque entendió que en el futuro podría haber "oposición a que se beneficiaran indirectamente instituciones que no fueran las del Estado".[56] En otros términos, a que se malinterpretara que se prohibía el beneficio a "instituciones que no fueran del gobierno de Puerto Rico o de Estados Unidos o instituciones privadas, administradas o dirigidas por sectas religiosas".[57] En particular, le preocupó el hecho de que pudiera "interpretarse que indirectamente estaban recibiendo beneficios esas instituciones por el hecho de asignarse becas a estudiantes que estuvieran matriculados en esas instituciones

---

[53] *Íd.*

[54] *Íd.*

[55] *Íd.*

[56] *Íd.*, pág. 1478.

[57] *Íd.*

religiosas", lo cual "podría prestarse a discrímenes", y ese no era el significado que se pretendía dar.[58]

La razón detrás había sido que años antes, el Tribunal Supremo federal había resuelto que no había ningún indicio de inconstitucionalidad en un estatuto que permitía el reembolso que hacía el estado para gastos de transportación a los padres de estudiantes que enviaban a sus hijos a cualquier escuela, fuera religiosa o no. Específicamente, en el debate se hizo alusión a *Everson v. Board of Education*, 330 US 1 (1947), un caso en el que el demandante, en su carácter de contribuyente, incoó una demanda contra el estado de Nueva Jersey e impugnó la constitucionalidad de una ley que autorizaba el reembolso, por parte de las juntas escolares locales, de los costos de transporte hacia y desde las escuelas, incluyendo las privadas. Alegó que esta ayuda indirecta violaba tanto la constitución del estado de Nueva Jersey como la Primera Enmienda.[59] El noventa y seis por ciento (96 %) de las escuelas que se beneficiaron de esta ley eran escuelas privadas católicas. En la Opinión escrita por el Juez Black, el Tribunal Supremo federal resolvió que el Estado **no estaba sosteniendo a ninguna escuela en particular**, sino que ayudaba a los padres a sufragar estos gastos, independientemente de su religión. Así, estableció que "[t]he State contributes no money to the schools. **It does not support them**. Its legislation, as applied, does no more

---

[58] *Íd.*

[59] *Everson v. Board of Education*, *supra*, pág. 18.

than provide a general program to help parents get their children, regardless of their religion, safely and expeditiously to and from accredited schools". (Énfasis y subrayado suplido).[60]

De esta manera, el delegado Iriarte, para evitar, más que confusión, discrimen, votó en contra de incluir dicho término. Finalmente, luego de un intercambio de criterios que discutiremos más adelante, la frase "o beneficio" quedó excluida de la disposición que alude a la cláusula de sostenimiento para no limitar aquellos aspectos que fueron objeto del debate.[61]

Entonces, se debatió si el Gobierno de Puerto Rico podía, por medio de alguna ley o de algunos fondos, pagar la matrícula a niños puertorriqueños de escuelas privadas. Subsiguientemente, el Delegado Sr. Jaime Benítez contestó que su criterio era que "el gobierno de Puerto Rico no puede establecer un sistema becario **que sustituya el sistema de instrucción pública** que tiene la obligación el Estado de establecer, y que tiene la obligación de ser completamente no sectario" (Énfasis y subrayado suplido).[62] Nótese que entre los objetivos principales de la cláusula se consignó que el Estado no podía sustituir el sistema de enseñanza por uno que no fuera público y sectario.

La idea del señor Trías Monge con su propuesta fue "hacer más clara la idea de la separación entre la Iglesia

---

[60] *Íd.*

[61] *Diario de Sesiones*, *supra*, pág. 1482.

[62] *Íd.*, pág. 1483.

y el Estado" sin afectar los servicios no educativos que el Estado provee a la niñez. Su propósito fue mantener los principios constitucionales establecidos por la Constitución Federal en cuanto a la separación de Iglesia y Estado y la libertad de culto sin impedirle al Estado prestar a cualquier niño servicios no educativos establecidos por ley para protección o bienestar de la niñez.[63]

Así, antes de aprobarse la enmienda objeto del debate, el señor Trías Monge concluyó su planteamiento de la manera siguiente:

> [e]sos son los dos grandes principios que se establecen en esta sección y, naturalmente, muchas veces no se podrá predecir exactamente el impacto en ciertas áreas, en ciertos problemas que podrán desarrollarse; pero ahí están, naturalmente, las decisiones del Tribunal Supremo de los Estados Unidos, y sus decisiones sobre esta área tan importante de los derechos humanos privarán y regirán a Puerto Rico en este sentido.[64]

Finalizada la discusión, la enmienda sugerida por el señor Trías Monge se aprobó y con ello quedó establecida la Cláusula de Sostenimiento, según la conocemos.

Un examen de los planteamientos allí suscitados nos lleva a concluir que la razón para no incluir la frase "o beneficio" era porque si se incluía, en el futuro podía surgir algún impedimento para que las instituciones que no fueren las del Estado se beneficiaran indirectamente. Para los delegados, a base de los precedentes judiciales

---

[63] *Íd.*, págs. 1483-1484.

[64] *Íd.*

federales "podría prestarse a discrímenes" contra el sector religioso. Además, podría entenderse como una prohibición a que un estudiante reciba una ayuda económica por parte del Estado que bien éste podía utilizar para su educación, cosa que no estaba prohibido por nuestra Constitución.

Es importante resaltar el contexto histórico en que se suscitó este debate. Luego del cambio de soberanía, Puerto Rico pasó del gobierno español a manos del gobierno de Estados Unidos de América. El sistema de enseñanza bajo el dominio español estaba a cargo de la Iglesia Católica, por lo que la educación religiosa absorbía gran parte del currículo escolar. De otra parte, bajo el régimen norteamericano se implementaron las bases del sistema de enseñanza pública y se independizó completamente la escuela pública de la tutela eclesiástica, conforme a los principios de separación de Iglesia y Estado.[65]

Ciertamente, *Everson v. Board of Education*, *supra*, fue una decisión histórica que marcó una desviación en la interpretación que hasta el momento se había hecho sobre la cláusula de establecimiento y su alcance en cuanto a los que es constitucionalmente permisible. Así, el Máximo Foro encontró que, aunque esta cláusula exige al Estado mantenerse neutral en cuanto a la religión, el Estado únicamente estaba implementando un programa general de ayuda económica que no tenía el propósito de dar

---

[65] Ana Helvia Quintero, *Historia de la educación en Puerto Rico*, Fundación Puertorriqueña de las Humanidades, https://enciclopediapr.org/encyclopedia/historia-de-la-educacion-en-puerto-rico/#1464907140943-f49dd52a-a507 (última visita, 9 de agosto de 2018).

sostenimiento a ninguna escuela en específico sino el de proveer un servicio a la comunidad, particularmente a los padres de estudiantes.

Está claro que la controversia del caso ante nos gira única y exclusivamente en torno a la cláusula de sostenimiento. No obstante, para propósitos ilustrativos, y por consideración al análisis inmerso en los casos, procederemos a examinar alguna jurisprudencia en la que el Tribunal Supremo de Estados Unidos analizó la constitucionalidad de ciertos programas educativos financiados por algunos estados para beneficiar económicamente a padres que tenían a sus hijos en escuelas privadas religiosas.

C. *La sostenibilidad de escuelas privadas en la jurisdicción federal*

Como mencionamos, en *Everson v. Board of Education*, *supra*, el Tribunal Supremo federal resolvió que el Estado no estaba sosteniendo a ninguna escuela en particular sino ayudando a los padres a sufragar el costo de transporte escolar. Así, estableció que el Estado de ninguna manera estaba sosteniendo a estas escuelas. Lo que permitía la ley era establecer un programa general para ayudar a los padres a llevar a sus hijos de forma segura y expedita hacia y desde las escuelas acreditadas.[66]

Luego, en *Lemon v. Kurtzman*, 403 US 602 (1971), el Tribunal Supremo de Estados Unidos tuvo la oportunidad de

---

[66] *Everson v. Board of Education*, *supra*, pág. 18.

atender una controversia en la que varios ciudadanos y contribuyentes impugnaron la constitucionalidad de las leyes de Rhode Island y Pennsylvania que permitían el aumento de salario a través de incentivos a maestros de escuelas privadas y el reembolso de gastos por materiales educativos que se compraran a escuelas privadas.[67] El Máximo Foro resolvió que se viola la cláusula de establecimiento cuando el Estado promueve o pretende dar un acomodo preferencial a una religión en particular.[68] El análisis de la Corte Suprema fue que, ante la ausencia de una prohibición constitucional específica, se debían trazar líneas protectoras que distanciaran la cláusula de establecimiento de "tres males", a saber: el auspicio, **el sostenimiento** y la intromisión excesiva del Estado en actividades religiosas.[69] Para ello, era indispensable auscultar, entre otras cosas, la naturaleza de las instituciones, así como la naturaleza del beneficio que se daría a estas.

En casos similares suscitados años antes, relacionados a la cláusula de establecimiento y el uso de fondos públicos por parte del Estado, el Alto Foro validó algunos

---

[67] En el caso de Pennsylvania, los fondos del programa se derivaban de la imposición de arbitrios a productos o a servicios.

[68] El Tribunal Supremo federal adoptó un estándar de adjudicación en el cual una actuación gubernamental viola la cláusula de establecimiento si: (1) no posee un propósito secular, sino religioso, (2) su efecto es promover o inhibir la religión; o (3) conlleva una intromisión excesiva del gobierno con la religión.

[69] "In the absence of precisely stated constitutional prohibitions, we must draw lines with reference to the three main evils against which the Establishment Clause was intended to afford protection: 'sponsorship, financial support, and active involvement of the sovereign in religious activity'". *Lemon v. Kurtzman*, 403 US 602, 612 (1971).

estatutos que proveían ciertos beneficios a entidades religiosas.[70] Posteriormente, en *Zelman v. Simmons-Harris*, 536 US 639 (2002), el estado de Ohio aprobó un programa piloto para que familias de escasos recursos tuvieran la oportunidad de elegir entre escuelas públicas o privadas para que sus hijos recibieran educación gratuita por parte del Estado a través de un programa de "vouchers" o vales educativos. El programa permitía que se les proveyera tutorías a aquellos estudiantes que permanecieran en

---

[70] Para ese entonces, el Foro federal había emitido sendas opiniones, entre ellas la siguiente: *Everson v. Board of Education*, 330 US 1 (1947) y *Mc Collum v. Board of Education*, 333 US 203 (1948). Véanse, además: *Board of Education v. Allen*, 392 US 236 (1968); *Waltz v. Tax Comm'n*, 397 US 664 (1970); *Mueller v. Allen*, 463 US 388 (1983); *Good News Club v. Mildford Central School*, 533 US 98 (2000).

Además del caso de *Everson v. Board of Education*, *supra*, previamente reseñado, en *Board of Education v. Allen*, *supra*, atendió una controversia en la que un ciudadano impugnó la validez de una ley del estado de Nueva York que permitía prestarles libros laicos a estudiantes de **escuelas privadas**. La Corte Suprema de Estados Unidos sostuvo que el estatuto expresamente disponía que su objetivo era "to be furtherance of the educational opportunities available to the young". Argumentó que el beneficio económico era para los padres y niños y no para las escuelas. Por lo tanto, la declaró constitucional.

Luego, en *Mueller v. Allen*, *supra*, ese foro tuvo que decidir si era constitucionalmente válido el que se descontaran unos gastos de educación privada de una escuela religiosa en la planilla de contribución de ingresos de un ciudadano. Así, el Foro federal resolvió que era válido, pues no había un pago directo a la escuela, no se promovía excesivamente la religión y no requería un envolvimiento excesivo con el contenido religioso que se enseña. Por otro lado, la ley o la actuación gubernamental no puede discriminar contra la religión de algunas instituciones por lo que el trato debe ser igual o neutral para ambas.

Así, en *Good News Club v. Mildford Central School*, *supra*, Milford Central School es una escuela pública que le negó el uso de sus instalaciones una organización privada religiosa luego del horario escolar ya que existía una ley de Nueva York que enumeraba los propósitos para los cuales se permitía el que ciudadanos solicitaran utilizar las facilidades. La organización presentó una acción judicial impugnando la constitucionalidad de la ley por infringir la libertad de expresión y el libre ejercicio de culto. El Tribunal Supremo de Estados Unidos resolvió que impedirles o negarle el uso de las instalaciones violaba la libertad de expresión por constituir un discrimen a base del contenido de la expresión. Además, razonó que permitirles el uso no violaría la cláusula de establecimiento ya que la actividad era una abierta al público general por lo que no había un endoso a una religión *per se*.

escuelas públicas. Cualquier escuela podía participar del programa, fuere pública o privada; religiosa o secular. Varios ciudadanos impugnaron la legislación por su condición de contribuyentes en cuanto entendían que infringía la cláusula de establecimiento.

El Tribunal Supremo de Estados Unidos resolvió que el programa de vales educativos era constitucionalmente válido en la medida en que era **neutral** hacia todas las religiones; proveía asistencia **directamente a los padres** para que éstos eligieran libremente la escuela de su predilección para la educación de sus hijos; perseguía un propósito secular y no adelantaba ninguna religión; cubría un gran espectro de beneficiarios; y permitía la participación de escuelas religiosas y no religiosas.

En Puerto Rico las controversias que se han suscitado bajo la cláusula de establecimiento en su mayoría han sido con relación a disputas contractuales-laborales.[71] En el contexto de la educación, la jurisprudencia trata sobre el efecto que han tenido ciertos estatutos sobre la libertad de culto.[72] Ahora bien, contrario a la Constitución Federal, nuestra Constitución es más extensiva y abarcadora. Contamos con una disposición autóctona: la cláusula de sostenimiento. En cuanto a esta última solo hemos tenido la

---

[71] Véase, entre otros, *Acevedo Feliciano et al. v. Iglesia Católica Apostólica y Romana et al.*, 2018 TSPR 106, 200 DPR __ (2018); *Mercado Rivera v. Univ. Católica de PR*, 143 DPR 610 (1997); *Díaz Hernández v. Col. Nuestra Sra. Rosario*, 123 DPR 765 (1989); *Academia San Jorge v. Junta de Relaciones del Trabajo*, 110 DPR 193 (1980).

[72] Véase, por ejemplo, *Asoc. de Academias y Colegios Cristianos de PR v. ELA*, 135 DPR 150 (1994); *Agostini Pascual v. Iglesia Católica*, 109 DPR 172 (1979).

oportunidad de interpretarla en *Asoc. Maestros P.R. v. Srio. Educación*, *supra*, al atender una controversia similar a la de autos en la que se impugnó la Ley Núm. 71-1993 porque presuntamente infringía la cláusula de establecimiento y la de sostenimiento. En aquella ocasión, resolvimos que la cláusula de sostenimiento prohíbe "al Estado preferir, u otorgar privilegios particulares, a las escuelas privadas sobre el sistema público de enseñanza".[73] Expresamos que "[l]o que está prohibido es que **se aísle** la escuela privada para algún beneficio especial. El Estado no puede, mediante sus actuaciones, **favorecer indebidamente** a la escuela privada, **sosteniéndola impermisiblemente**". (Énfasis suplido).[74]

En cuanto a las becas, concluimos que la Ley Núm. 71-1993 permitía el uso de "fondos públicos para pagar directamente a escuelas privadas, laicas o sectarias, por los servicios educativos prestados a los estudiantes que estando previamente en escuelas públicas, asisten ahora a esas escuelas privadas por ellos seleccionadas".[75] Por ello, resolvimos que en la medida en que se utilicen estos fondos para la enseñanza en **sostenimiento y beneficio de una escuela privada que no es del Estado**, está expresamente prohibido por la Sec. 5 del Art. II de la Constitución de Puerto Rico.

---

[73] *Íd.*

[74] *Íd.*, pág. 548.

[75] *Íd.,* págs. 548-549.

Como mencionamos, esta ha sido la única ocasión en la que este Tribunal ha tenido la oportunidad de analizar la cláusula de sostenimiento. En ese momento reconocimos que entre la cláusula de establecimiento y la de sostenimiento existe un vínculo innegable que debemos considerar al evaluar las disposiciones de un estatuto que, se alegue, infrinja la segunda. También es cierto que el objetivo principal de la cláusula de establecimiento fue establecer la separación entre la Iglesia y el Estado, conforme lo dispone la Primera Enmienda de la Constitución Federal, por lo que ambas tuvieron propósitos particulares. Así, el enfoque central de la cláusula de establecimiento es uno religioso, en el cual el aspecto económico es pertinente en algunas instancias. En cambio, el enfoque de la cláusula de sostenimiento es uno estrictamente económico. Entiéndase, la utilización de fondos públicos para sostener escuelas que no sean las del Estado, independientemente si esta persigue un propósito secular o no.

### IV

A. *La Ley de la Reforma Educativa de Puerto Rico*

La Constitución de Puerto Rico consagra el derecho de toda persona a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos y las libertades fundamentales del hombre.[76] Según hemos sostenido el Estado tiene un interés

---

[76] 1 LPRA Const. PR Tomo I, Art. II, Sec. 5, pág. 292.

apremiante en que la educación, pública o privada, sea una de excelencia.[77]

La Ley Núm. 85 reformó el sistema educativo del país con el objetivo de que los estudiantes reciban una educación de calidad que les permita desarrollar al máximo sus capacidades para convertirse en ciudadanos plenos que contribuyan al bienestar de Puerto Rico. Mediante la creación de este estatuto se implementó un sistema de enseñanza compuesto por las escuelas públicas existentes y otras de nueva creación operadas por entidades autorizadas por la Secretaria de Educación, que participarán en la administración de escuelas para fortalecer y enriquecer el currículo de enseñanza y las experiencias de aprendizaje de los estudiantes.[78] En concordancia con lo anterior, la Ley Núm. 85 dispuso como principio el establecimiento de comunidades educativas que promulguen el aprendizaje de forma innovadora al atender la necesidad de que el individuo que egrese del sistema pueda insertarse en la fuerza laboral y ser productivo.[79]

B. *Programa de Libre Selección de Escuelas*

En el Art. 14.01 de la Ley Núm. 85 crea el Programa de Libre Selección de Escuelas con el propósito de promover la igualdad en el acceso a una educación de calidad para los

---

[77] *Asoc. Academias y Col. Cristianos v. ELA*, 135 DPR 150 (1994).

[78] Exposición de Motivos de la Ley Núm. 85.

[79] *Íd.*

sectores más vulnerables de nuestra sociedad y permitir que los padres, las madres, los tutores o los encargados tengan la alternativa de elegir la escuela de su preferencia, sea esta pública o privada. Cabe destacar que el programa se instituirá de forma experimental y se establecerá gradualmente luego de considerar, entre otras cosas, el aprovechamiento de los recursos.[80]

A esos fines, la disposición establece que la Secretaria creará una oficina la cual será la encargada de implementar y administrar este programa. Para participar, los interesados deberán cumplir con unos requisitos de elegibilidad y aprovechamiento académico.[81] Se dispone que solo serán elegibles **hasta el tres por ciento (3 %)** del total de los estudiantes matriculados en el sistema cada año escolar.[82] El programa contará con un presupuesto que no excederá el tres por ciento (3 %) del equivalente al presupuesto asignado por el Departamento de acuerdo a la fórmula establecida por estudiante para cada año fiscal, entiéndase el setenta por ciento (70 %) destinado a servicios directos al estudiante.[83]

A los estudiantes que cualifiquen se les concederá un certificado mediante el cual podrán seleccionar una de las siguientes modalidades:

(a) libre selección de escuelas públicas por estudiantes de otras escuelas públicas

---

[80] Art. 14.05 de la Ley Núm. 85.

[81] Art. 14.03 de la Ley Núm. 85.

[82] Art. 14.02 de la Ley Núm. 85.

[83] Art. 14.05 de la Ley Núm. 85.

(b)  libre selección de escuelas públicas por estudiantes de escuelas privadas;

(c)  **acceso a escuelas privadas por estudiantes de escuelas públicas;**

(d)  adelanto educativo para estudiantes talentosos que tomen cursos universitarios acreditables tanto para programas universitarios como para programas de escuela secundaria; o

(e)  **acceso a escuelas privadas para cumplir con el acomodo razonable para un estudiante de educación especial al cual el Departamento no le ha podido proveer lo necesario para cumplir sus logros académicos según disponen las leyes estatales y federales aplicables.** (Énfasis suplido).[84]

C.  *Constitucionalidad del Programa de Libre Selección y el acceso a escuelas privadas por estudiantes de escuelas públicas*

En la Convención Constituyente los delegados debatieron sobre la cláusula de sostenimiento. Como mencionamos, durante la discusión se trajo a colación el tema de las becas. Asunto que motivó al Delegado Sr. José M. Dávila Monsanto a inquirir si la concesión de becas era un beneficio para el estudiante o para la escuela. Inmediatamente, el señor Iriarte respondió que estas "[b]eneficia[ban] al becado".[85] Sin embargo, arguyó que si se incluía la palabra "beneficio" se podía interpretar que se iba a beneficiar indirectamente a la institución. Sobre este asunto, el señor Brunet expresó que el Estado, entre otras cosas, podía dar becas porque estas son **"una ayuda**

---

[84]  *Íd*.

[85]  *Diario de Sesiones*, *supra*, pág. 1478.

económica al estudiante, que el estudiante la utiliza, naturalmente para su educación". (Énfasis suplido).[86]

En esa línea añadió que "[l]os dineros que da el pueblo de Puerto Rico a los jóvenes puertorriqueños para estudiar, es un beneficio al estudiante, no es a una institución en particular". (Énfasis suplido).[87] En su alocución puntualizó que "[e]l pueblo de Puerto Rico lo que hace es darle, prestarle una ayuda económica a ese estudiante. Y no hay nada en la constitución que prohíba eso".[88] Aclaró que en el caso de que la ayuda económica se tratara de libros, por ejemplo, se podían conceder "siempre y cuando [...] se le den al estudiante".[89] Distinguió eso del supuesto en el que el Estado se lo dé directamente a la escuela:

> Ahora, si el Estado le da los libros a la escuela para que la escuela los utilice, ya es algo distinto, porque eso va a beneficiar a la escuela. Ahora, si el Estado, a determinados niños, niños pobres, el Estado dispone que a los niños que reúnan tales o cuales condiciones de pobreza, de capacidad, [se les den, pues] son merecedores a recibir determinados libros de texto, **¿qué importa que esos niños estén en una escuela pública o una escuela privada? Deben recibirlos.** Ahora lo que el Estado no va a poder hacer, es darle dinero a la escuela privada para que compre los libros de texto que la escuela privada quiera y [. . . en vez de] dárselo a los niños. Es una cosa distinta. (Énfasis suplido y corchetes en el original).[90]

---

[86] *Íd.*, pág. 1479.

[87] *Íd.*, pág. 1480.

[88] *Íd.*

[89] *Íd.*

[90] *Íd.*

Según establecimos al principio, la enmienda para incluir expresamente la frase "o beneficio" quedó derrotada por entender que, al ser un asunto de estilo, el beneficio estaba inmerso dentro de la palabra sostenimiento. Posteriormente, se generó un debate por la sustitución de la frase "la enseñanza en" por "el sostenimiento de". El Delegado Sr. Ramiro Colón quería saber si, de acuerdo como quedaría redactada la enmienda en la Constitución, el Gobierno de Puerto Rico, además de las becas, podía por medio de alguna ley o de algunos fondos, pagar **la matricula** a los niños de escuela privada. En particular, resulta importante resaltar este debate, entre los delegados Benítez y Colón sobre el pago de la matrícula por parte del Estado en escuelas privadas:

> Sr. RAMIRO COLÓN: No me ha contestado. La pregunta era la siguiente: Si de acuerdo con esta constitución, quedando enmendada como se ha propuesto, ¿puede o no puede el gobierno de Puerto Rico por medio de alguna ley **o de algunos fondos**, pagarle a niños puertorriqueños, matrícula, no darle beca, **pagarle la matrícula, en escuelas privadas en Puerto Rico?**

> Sr. BENÍTEZ: Esto **dependerá**, esto dependerá de cuál sea la situación de hecho que exista, en esa circunstancia. Esto es, el gobierno de Puerto Rico no podría, dentro de esta disposiciones, tomar el sistema becario, o el artilugio de sistemas becario, para sostener escuelas privadas; o, tampoco podría el Gobierno proveer un sistema becario para producir a través de él enseñanza religiosa a sus estudiantes. Como tampoco podría utilizar el sistema becario para llevar a cabo un programa de educación en el cual se violara el sentido fundamental de la disposición que rige todo el párrafo de que "habrá un sistema de instrucción pública el cual será libre y enteramente no sectario". (Énfasis y subrayado suplido).[91]

---

[91] *Íd.*

Entonces, el señor Colón expresó lo siguiente:

> [s]e ha dicho aquí, que al dársele una beca a un estudiante, lo que equivale a pagarle una matrícula, **no se beneficia el colegio donde va a estudiar, sino al estudiante**, y me parece a mí que si ése es el sentido, **nada de esta constitución ha de prohibir que el gobierno de Puerto Rico le pague matricula en Puerto Rico a los niños cuando vayan a escuelas privadas.** (Énfasis suplido).[92]

Así, el señor Benítez reconoció las tres instancias en que está prohibido el pago de la matrícula en las escuelas privadas: cuando este equivaldría al sostenimiento de estas escuelas; cuando mediante este se estuviera estableciendo una religión y cuando el pago de la matricula llegara al nivel de tener el efecto de sustituir el sistema de instrucción pública de Puerto Rico. Se expresó que lo que no podía hacer el gobierno de Puerto Rico era tomar el sistema becario para **sostener** escuelas privadas ni **sustituir** el sistema de instrucción pública.[93]

La Asociación cuestiona la constitucionalidad de las disposiciones que autorizan el pago de educación privada con fondos públicos. Específicamente, sostiene que se infringe la Sec. 2 del Art. II de la Constitución de Puerto Rico ya que el fin último del programa de Libre Selección de Escuelas es utilizar el dinero público para sufragar los costos de la educación privada. Alegó además que el Estado pretende viabilizar un sistema becario para sustituir el

---

[92] *Íd.*, pág. 1483.

[93] *Íd.*

sistema de enseñanza pública por uno privado. Esboza que tal actuación en contraria a la intención de los constituyentes.

Por su parte, el Estado aduce que los certificados son una ayuda económica que serán entregados directamente a las familias y no a las escuelas para que los padres y estudiantes escojan con libertad la escuela de su preferencia. Entiende que el análisis de la validez constitucional de una acción estatal debe ser el mismo para la cláusula de establecimiento y para la de sostenimiento.

Como expresamos, un examen del historial de los debates habidos durante la Convención Constituyente refleja que al aprobarse el Art. II, Sec. 5 de la Constitución de Puerto Rico lo que se quiso evitar era que el Estado, mediante el sostenimiento de escuelas, promoviera una religión en particular y sustituyera el sistema de enseñanza pública por una privada. Por ello, se dispuso que el sistema de enseñanza tenía que ser público, gratuito, libre y no sectario. Los constituyentes dejaron claro las erradas interpretaciones que podrían suscitarse en el futuro si se incluía la palabra "beneficio" en la cláusula de sostenimiento. Lo cierto es que ello limitaría al Estado de proveer una ayuda económica a los padres de estudiantes para que sus hijos la utilizaran para su educación y contra ello no existía prohibición constitucional alguna. En el debate de la constituyente quedó establecido que lo que el Estado no podía hacer era tomar el sistema becario para sostener escuelas privadas y tampoco sustituir el sistema

de instrucción pública por uno privado. Ese no es el propósito que persigue la Ley Núm. 85. Por el contrario, lo que busca es proveer una ayuda económica a los padres para que sus hijos reciban la educación en la institución que prefieran.

Por otro lado, del propio texto de la ley se desprende que la cantidad de certificados que se otorgarán dependerá de los fondos disponibles. Esta cantidad no podrá sobrepasar el ochenta por ciento (80 %) de la totalidad del presupuesto asignado a cada estudiante. Además, únicamente serán elegibles para participar un tres por ciento (3 %) de los niños matriculados en el sistema de enseñanza pública del país, cantidad que no es significativa en comparación con el número de estudiantes matriculados en el Sistema de Educación Pública.

En cuanto a la ayuda que se pretende conceder a los estudiantes de educación especial para que estos tengan acceso a escuelas privadas no vemos como nuestros delegados, a quienes les preocupó en sobre manera el asunto de la educación, tuvieran la intención de restringir a esta clase el acceso a escuelas privadas para que el Estado provea asistencia cuando el Departamento no pueda hacerlo así y se les pueda ofrecer el acomodo razonable que estos necesitan.

En ese sentido, en *Zobrest v. Catalina Foothills School Dist.*, 509 US 1 (1993), el foro federal resolvió que cuando el Estado provee servicios como parte de un programa general que beneficia a los niños de educación especial que

cualifiquen y lo hace de forma neutral, independientemente de que la entidad sea pública o privada, religiosa o no religiosa, ello no significa que el estado pretende financiar a estas instituciones. Razonó que la ayuda que se le provee a estos niños no constituye un subsidio impermisible, de suerte que los niños de educación especial son los que, en última instancia, se benefician del programa y el beneficio que recibe la institución es uno incidental.

Por ello, no podemos concluir que ello equivale al sostenimiento de la educación privada por parte del Estado, cuando el presupuesto que se utilizará no es sustancial en proporción al presupuesto del Departamento de Educación. Tampoco que se pretende sustituir la educación pública por una privada, pues, la cantidad de los recursos que podrán ser destinados para este fin, es de un tres por ciento (3 %) o menos del equivalente presupuestado por estudiante para cada año fiscal para implementar el programa piloto y un dos por ciento (2 %) de los fondos que el Departamento asigne para cubrir gastos administrativos.

No cabe duda de que todo sostenimiento equivale a que exista un beneficio, es decir, para que haya sostenimiento siempre tiene que una escuela privada beneficiarse. Ahora bien, el alcance que los constituyentes quisieron dar al entender que el término "beneficio" estaba inmerso dentro de la palabra "sostenimiento" fue el establecer que el beneficio debe llegar a tal grado que **sostenga** a las escuelas privadas, o más aún, que **sustituya** el sistema de

enseñanza pública. Así, no se trata de un mero beneficio, sino que el beneficio que se conceda debe llegar al punto de sostener la entidad privada. Para propósitos de la cláusula de sostenimiento, según lo definieron nuestros constituyentes, no vemos cómo el Programa de Libre Selección de Escuelas puede representar un beneficio que implique un sostenimiento de escuelas privadas en contravención con nuestra Constitución.

## V

A. *Las Escuelas Públicas Alianza*

La Ley Núm. 85 estableció cambios fundamentales en la dirección educativa en Puerto Rico. Al tomar al estudiante como estandarte del Departamento, con el objetivo de priorizar el derecho de estos, reenfocó las gestiones administrativas, académicas y de recursos humanos.[94] Además, con el propósito de proveer escuelas de alto rendimiento y la disponibilidad de recursos humanos de excelencia, instituyó la necesidad de un sistema de rendición de cuentas, constante comunicación con la ciudadanía en general y seguimiento a la implementación de los diversos cambios en todos los niveles del sistema.[95] Así, conforme se reconoce en su exposición de motivos, impulsó acciones que garantizaran un proceso de enseñanza y de aprendizaje de calidad, responsabilidad y creatividad en la atención de las necesidades educativas de nuestros niños y jóvenes. En

---

[94] *Íd.*

[95] *Íd.*

fin, ante la crisis educativa existente, la Ley Núm. 85 se cimentó en el reconocimiento de que el Departamento de Educación tiene el deber y la obligación de promulgar la excelencia en la calidad de enseñanza que se imparte en cada una de las escuelas del Sistema de Educación Pública de Puerto Rico.

Entre las acciones impulsadas, la Ley Núm. 85 dispuso como uno de sus pilares el establecimiento de centros de aprendizaje compuestos de, entre otras cosas, "escuelas tradicionales y modelos" y "escuelas públicas alianzas".[96] La Asamblea Legislativa consideró que "[l]a creación de […] [las escuelas públicas alianzas] permitirá a los padres y comunidades la oportunidad de insertarse y empoderarse de la educación de sus niños, conociendo las necesidades particulares de ellos y de sus comunidades".[97] De igual manera, expresó que las escuelas públicas alianzas redundaran en una mayor oferta y oportunidades educativas para los estudiantes.[98]

Según consignado, la intención fue que "[l]as Escuelas Públicas Alianza, así como las Entidades Certificadas que administren las mismas, estar[ían] sujetas a los mismos estándares de evaluación y rendición de cuentas del Departamento que el resto de las escuelas públicas de

---

[96] *Íd.* Conforme dispone el Art. 13.10 de la Ley Núm. 85, *supra*, "el número de Escuelas Públicas Alianzas no será mayor del diez por ciento (10%) utilizando como base el número total de las escuelas públicas en funciones al 15 de agosto de 2018. El Secretario proveerá el inicio de este proyecto para el año fiscal 2018-2019".

[97] Exposición de Motivos de la Ley Núm. 85.

[98] *Íd.*

Puerto Rico".[99] De hecho, el espíritu consignado en la ley fue que "el Departamento, a través de su Secretario, supervisar[a] estas escuelas para asegurar que éstas cumplen cabalmente" con las leyes estatales, las leyes federales y con la Carta Constitutiva.[100] Así, el fin último detrás de la reforma implementada en la ley, en definitiva, es dar un nuevo enfoque al sistema de educación pública y "acabar con la burocracia existente en el Departamento de Educación y poner los estudiantes primero, dándole las herramientas necesarias para triunfar en el futuro y ser agentes de cambios positivos para Puerto Rico".[101]

En particular, el Art. 13.01 de la Ley Núm. 85 establece la naturaleza de una Escuela Pública Alianza. Al hacerlo establece que se trata de "una **escuela pública** de nivel elemental y/o secundario, de nueva creación [,] que es operada y administrada por una Entidad Educativa Certificada autorizada por el Secretario". (Énfasis suplido). Establece, además, que es "una **escuela pública** de nivel elemental y/o secundario existente, cuya operación y administración es transferida a una Entidad Educativa Certificada por el Secretario, de conformidad con el otorgamiento de una Carta Constitutiva". (Énfasis suplido).[102] De hecho, la Ley Núm. 85 instituye a la Escuela

---

[99] *Íd.*; Art. 13.02 de la Ley Núm. 85.

[100] Exposición de Motivos de la Ley Núm. 85.

[101] *Íd.*

[102] Art. 13.01 de la Ley Núm. 85. El Art. 13.08 dispone que "[e]l personal docente o no docente que trabaje en una escuela administrada por el Departamento que pase a ser una Escuela Pública Alianza, podrá participar en entrevistas y evaluaciones con el fin de recibir una oferta de empleo por parte de la Entidad Educativa Certificada, que

Pública Alianza como "**una escuela pública, no sectaria y sin fines de lucro, que operara bajo la supervisión del Secretario**". (Énfasis suplido).[103]

En este sentido, como mencionáramos, la ley dispone expresamente que estas escuelas deben cumplir y estarán sujetas, entre otras cosas, "a los requisitos de evaluación y rendición de cuentas, que serán uniformes para todas las escuelas del Sistema de Educación Pública, incluyendo, las Escuelas Públicas Alianza".[104] De igual manera, el Art. 13.03 de la ley establece que estas escuelas deben ser consideradas para propósitos de todas las leyes y reglamentos estatales y federales como **componentes del Sistema de Educación Pública.**

   B. *Criterios al determinar si el modelo de escuela chárter se cataloga como una escuela pública*

En la evaluación de la naturaleza de las Escuelas Públicas Alianza, es preciso resaltar el tratamiento brindado en otros estados al determinar si modelos similares de escuelas que se han implementado son públicas.

En *Council of Orgs & Others for Ed About Parochiaid, Inc. v. Governor*, 455 Mich 557 (1997), se tuvo que decidir si la pieza legislativa que instauró el modelo de escuela

---

operará y administrará la escuela. Los empleados del Departamento que reciban y acepten de forma voluntaria una oferta de empleo por parte de la Entidad Educativa Certificada, se convertirán en empleados de esta".

   [103] Exposición de Motivos de la Ley Núm. 85; Art. 13.02 de la Ley Núm. 85.

   [104] Art. 13.02 de la Ley Núm. 85.

chárter en Míchigan era constitucional.[105] El Tribunal
Supremo del estado resolvió que su Constitución no exigía
que la legislatura retuviera el control exclusivo sobre las
escuelas públicas, sino que su responsabilidad era el
mantener un sistema de enseñanza pública. Pronunció que las
escuelas chárter debían considerarse como públicas pues **se
encontraban bajo el control del estado y de sus agentes**.[106]
Para arribar a esta conclusión, ponderó que el ente que
autorizaba a operar la escuela podía revocar el permiso en
cualquier momento si estimaba que había causa para ello.[107]
Razonó, también, que el estado ejercía control sobre las
escuelas chárter a través del proceso que llevaba a cabo

---

[105] En lo concerniente, la Sec. 2 del Art. 8 de la Constitución del Estado de Míchigan disponía lo siguiente:

> The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law. Every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin.
>
> No public monies or property shall be appropriated or paid or any public credit utilized, by the legislature or any other political subdivision or agency of the state directly or indirectly to aid or maintain any private, denominational or other nonpublic, preelementary, elementary, or secondary school. No payment, credit, tax benefit, exemption or deductions, tuition voucher, subsidy, grant or loan of public monies or property shall be provided, directly or indirectly, to support the attendance of any student or the employment of any person at any such nonpublic school or at any location or institution where instruction is offered in whole or in part to such nonpublic school students. The legislature may provide for the transportation of students to and from any school.

[106] *Council of Orgs & Others for Ed About Parochiaid, Inc. v. Governor*, 455 Mich 557, 574 (1997). (Michigan's public school academies meet this requirement because they are under the ultimate and immediate control of the state and its agents).

[107] *Íd*. (First, a charter may be revoked any time the authorizing body has a reasonable belief that grounds for revocation exist, such as either the academy's failure to abide by the terms of its charter or its failure to comply with all applicable law.") Véase, además, R. J. Martin, *Charting the Court Challenges to Charter Schools*, 109 Penn St. K. Rev. 43, 68 (2004), ("the Michigan Supreme Court determined that the charter school enabling act, as amended, provided sufficient public accountability by means of its extensive implementation process of charter approval and monitoring.")

para conceder su autorización.[108] Además, sopesó que el estado era quien tenía el control del dinero.[109]

En *Wilson v. State Bd. of Educ.*, 75 Cal. App. 4th 1125 (2000), se dilucidó la constitucionalidad de una disposición relativa a las escuelas chárter. En específico, se objetó que el estado abdicó su control sobre su función educacional como por ejemplo en los currículos, los libros, los métodos de enseñanza y la operación de las escuelas chárter.

Al disponer del asunto, el Tribunal de Apelaciones de California diferenció la delegación de ciertas funciones educacionales y la transferencia del sistema de instrucción pública.[110] Puntualizó que el sistema de educación pública que la Constitución requería de la Legislatura es que proveyera educación pre-escolar, primaria, secundaria de escuelas técnicas y de colegios estatales.[111] Empero, que la operación de las escuelas y el enfoque educativo eran detalles que fueron dejados a la discreción de la asamblea legislativa.[112] Pronunció que el erigir escuelas chárter era un ejercicio válido de la legislatura para adelantar sus

---

[108] *Íd.* (Second, because authorizing bodies are public institutions, the state exercises control over public school academies through the application-approval process. During this process, the authorizing body can reject any application with which it is not completely satisfied in any detail, and through the authorizing body's right to revoke the charter of any public school academy that does not comply with its charter.").

[109] *Íd.* (Third, the state controls the money. The act provides for the funding of public school academies in the manner of other public schools, § 507, and public school academies may not charge tuition.").

[110] *Wilson v. State Bd. of Educ.,* 75 Cal. App. 4th 1125, 1134 (2000), ("Appellants confuse the delegation of certain educational functions with the delegation of the public education system itself.").

[111] *Íd.*

[112] *Íd.*

propósitos de enseñanza. Sostuvo que estas eran una criatura estrictamente estatutaria y que la Asamblea Legislativa diseñó la forma en que surgirían, las personas que asistirían y las que enseñarían. Además, cómo se debían gobernar y estructurar, los fondos que recibirán, cómo se haría el rendimiento de cuentas (*accountability*) y de qué forma serían evaluadas.[113]

Cónsono con lo que precede, hay literatura que reseña que

> [t]o avoid potential legal problems relating to issues of control, drafters of charter legislation need to make charter schools part of the public education system, both in language of the legislation and in the substance of the statutory scheme. Drafters must also make it clear in the legislation, by express language and in substance, **that charter schools fall under the supervision and general control of the state board of education (or other constitutionally mandated body vested with the authority to supervise and control public education).** To ensure the legislation's constitutionality, the careful drafter should include procedures which ensure the charter schools' accountability to the state board of education. (Énfasis suplido)[114]

Asimismo, el profesor Derek W. Black en su artículo *Charter Schools, Vouchers, and the Public Good* enumeró las

---

[113] *Íd*. (The Charter Schools Act represents a valid exercise of legislative discretion aimed at furthering the purposes of education. Indeed, it bears underscoring that charter schools are strictly creatures of statute. From how charter schools come into being, to who attends and who can teach, to how they are governed and structured, to funding, accountability and evaluation--the Legislature has plotted all aspects of their existence. Having created the charter school approach, the Legislature can refine it and expand, reduce or abolish charter schools altogether. […] In the meantime the Legislature retains ultimate responsibility for all aspects of education, including charter schools. CA(2b) (2b) ("'Where the Legislature delegates the local functioning of the school system to local boards, districts or municipalities, it does so, always, with its constitutional power and responsibility for ultimate control for the common welfare in reserve.'").

[114] J. T. Wall, *The Establishment of Charter Schools: A Guide to Legal Issues for Legislatures*, 1998 BYU Educ. & L. J. 69, 76 (1998).

particularidades de las escuelas públicas. En primera instancia, opina que se debe corroborar si el estatuto la denomina como tal, aunque reconoció que ello por sí solo no la convierte en escuela pública.[115] Expresa que uno de los aspectos más importantes es que los servicios educativos se ofrezcan **gratuitamente**.[116] Otra característica fundamental es que se garantice el igual acceso a la escuela, ya que la misión de una escuela pública es **servir a la comunidad** y a todos los estudiantes de ella sin que se haga ninguna distinción entre ellos.[117] Además, estima que una de las misiones de las escuelas públicas es inculcar valores como la democracia, la igualdad y la tolerancia. Por tanto, tienen responsabilidad constitucional y democrática.[118]

El razonamiento adoptado en estos casos y los criterios elaborados por los estudiosos del tema que hemos mencionado, nos parecen persuasivos. Entendemos que constituyen la vía correcta al momento de determinar si las Escuelas Públicas Alianza son públicas y, por tanto, cónsonas con nuestra Constitución.

---

[115] D. W. Black, *Charter Schools, Vouchers, and the Public Good*, 48 Wake Forest L. Rev. 445, 477 (2013) ("[a]s initial matter, the act of statutorily affixing the label 'public' to school does not automatically make school 'public' in any real, substantive sense.").

[116] *Íd.*

[117] *Íd.*, pág. 478 ("[t]he mission of a public school is to serve its community and all of the students within it without making distinctions of any sort between them.").

[118] *Íd.*, pág. 479 ("'Public schools' mission also extends to fostering the earlier discussed values once students are enrolled, including democracy, equality, and tolerance. Public schools pursue these ends not only because they are public values but also because the Constitution mandate as much. This is no small distinction. As state actors, public schools are bound to treat students (and teachers) fairly, which entails, among other things, equality, rationality and viewpoint neutrality.").

C. *Análisis a la luz de los propósitos de la ley, los poderes delegados a la Secretaria, la jurisprudencia y la naturaleza pública de las Escuelas Públicas Alianza*

Ciertamente, aunque es un factor a considerar y sumamente importante el que la Asamblea Legislativa estableciera las Escuelas Públicas Alianza como "escuelas públicas", la mera denominación en esa dirección **no es suficiente** para concluir que se trata de escuelas de esa naturaleza. Hay otros factores indispensables que debemos considerar al contestar esta interrogante. No obstante, un análisis pausado, ponderado y cuidadoso de las características que gobernaran las Escuelas Públicas Alianza, así como las facultades que ostenta el Departamento de Educación, por conducto de su Secretaria, nos llevan a concluir que este tipo de instituciones educativas son escuelas públicas. Es decir, son parte de nuestro sistema de instrucción pública, libre, gratuito y enteramente no sectario, como manda nuestra Constitución.

En primer lugar, cabe resaltar que la Ley Núm. 85 establece expresamente que las Escuelas Públicas Alianza formarán parte del Sistema de Enseñanza Pública. Más aún, la ley puntualiza que estas escuelas deben ser consideradas para propósitos de todas las leyes y reglamentos federales y estatales como componentes del Sistema de Educación Pública. Esto les impone la obligación de proveer, entre otras cosas, las mismas garantías que las escuelas públicas tradicionales. De hecho, las instituye reiteradamente como

"**escuela[s] pública[s], no sectaria[s] y sin fines de lucro,** que operar[án] bajo la supervisión del Secretario". (Énfasis suplido).[119]

La creación de estas escuelas surgió como parte del reconocimiento de que el Departamento de Educación tiene el deber y la obligación de promulgar la excelencia en la calidad de enseñanza que se imparte en cada una de las escuelas del Sistema de Educación Pública. Asimismo, dispuso que estas escuelas estarían sujetas a los mismos estándares de evaluación y rendición de cuentas (*accountability*) del Departamento que el resto de las escuelas públicas tradicionales en Puerto Rico.[120] Asimismo, se reconoció que la Secretaria del Departamento **supervisará** estas escuelas para asegurarse que cumplan cabalmente con las leyes estatales, federales y con su Carta Constitutiva.

En el diseño legislativo de la Ley Núm. 85 le confirió a la Secretaria varios deberes y poderes sobre el establecimiento de las Escuelas Públicas Alianza, que resultan indispensables considerar al momento de evaluar la naturaleza de las mismas, a saber: (1) establecer cualquier regla o reglamento necesario para implementar y alcanzar los propósitos y disposiciones de la ley, lo que incluye la evaluación y certificación de las Entidades Educativas Certificadas; (2) establecer los estándares y procedimientos para la revocación o no revocación de la

---

[119] Exposición de Motivos de la Ley Núm. 85; Art. 13.02 de la Ley Núm. 85.

[120] *Íd.*; Art. 13.02 de la Ley Núm. 85.

Carta Constitutiva, así como la administración de aquellas escuelas cuya Carta Constitutiva haya sido revocada o no revocada; (3) establecer las reglas o reglamentos para determinar el Modelo de Intervención más apropiado para cada una de las Entidades Educativas Certificadas que pudieran estar sujetas a intervención de conformidad con los términos de la Carta Constitutiva; (4) establecer reglas o reglamentos para solicitar y evaluar las propuestas de las Cartas Constitutivas por parte de las Entidades Educativas Certificadas, de conformidad con los requisitos establecidos en la propia ley y la legislación federal aplicable; (5) otorgar una Carta Constitutiva con la Entidad Educativa Certificada que sometió la propuesta mejor cualificada, de conformidad con la evaluación correspondiente; (6) otorgar Cartas Constitutivas con Entidades Educativas Certificadas para operar y administrar múltiples recintos bajo una sola autorización; (7) **retener y ejecutar la responsabilidad <u>directa y exclusiva</u> sobre aquellas escuelas a las que se otorgue una Carta Constitutiva;** (8) establecer las reglas y reglamentos para el **<u>monitoreo</u> anual del desempeño académico, financiero y operacional de las Entidades Educativas Certificadas con Cartas Constitutivas, y realizar una evaluación rigurosa de dicho desempeño** en, como mínimo, cada dos (2) años;[121] (9)

---

[121] Véase, además, Art. 13.07(c) de la Ley Núm. 85 ("El Secretario deberá continuar monitoreando el desempeño y el cumplimiento legal de cada Escuela Pública Alianza, incluyendo la recopilación y análisis de datos en apoyo a la evaluación continua, según la Carta Constitutiva. El Secretario tendrá la autoridad de realizar actividades de supervisión que le permitan cumplir con sus responsabilidades de conformidad con esta Ley, incluyendo hacer requerimientos de

establecer las reglas o reglamentos para designar oficiales evaluadores o establecer comités de evaluación para medir el desempeño de las Entidades Educativas Certificadas; entre otros poderes.[122] Asimismo, la ley instituye que la Secretaria del Departamento es la **responsable de revisar y autorizar o denegar**, **en todo o en parte**, **la solicitud de una Entidad Educativa Certificada para recibir una Carta Constitutiva para la operación y administración de una Escuela Pública Alianza**.[123]

La Asociación plantea que el programa de Escuelas Públicas Alianza es un modelo que se asemeja a las escuelas privadas. Sostiene que se infringe la cláusula de sostenimiento ya que, aunque el Estado reglamente, la operación, administración, organización, finanzas, empleomanía y filosofía de estas escuelas estará a cargo de entes privados. En este sentido, arguye que se transferirá dinero público a una entidad privada para promover la educación pública. Asimismo, argumenta que, si alguna de estas entidades "tiene base religiosa, será incluida la educación religiosa en la misma, siendo entonces sufragada por fondos públicos". También refuta que en el caso de que las escuelas operen en facilidades que sean del Estado y no paguen una renta por el uso, ello constituiría un traspaso de propiedad pública a manos de entes privados.

---

información o investigaciones, siempre que sean consistentes con los términos y condiciones de la Carta Constitutiva").

[122] Exposición de Motivos de la Ley Núm. 85; Art. 13.04 de la Ley Núm. 85.

[123] Art. 13.04 de la Ley Núm. 85.

Por su parte, el Estado sostiene que las Escuelas Públicas Alianza son un modelo de enseñanza dentro del Sistema de Educación Pública del Departamento de Educación. Aduce que, conforme a la jurisdicción federal son constitucionalmente válidas siempre que su enseñanza sea gratuita, no sectaria ni discriminatoria. Entiende que conforme a la Ley Núm. 85, estas cumplen con estas características y con todas las disposiciones establecidas en la Carta Constitutiva. Además, resalta que estarán sujetas a las mismas exigencias que las escuelas públicas de Puerto Rico. Finalmente, alega que la Asamblea Legislativa inequívocamente tuvo la intención de que estas fuese parte integral del Departamento de Educación como parte de un sistema coherente donde este último ejerce pleno control.

En cuanto a estas alegaciones, reafirmamos que el Art. 13.01 de la Ley Núm. 85, *supra*, establece claramente que la Escuela Pública Alianza es una escuela pública, no sectaria y sin fines de lucro, que será operada y administrada por una Entidad Educativa Certificada autorizada por la Secretaria de conformidad con el otorgamiento de una Carta Constitutiva. A tales efectos, el Departamento de Educación tiene el deber y la obligación de promulgar reglas y reglamentos para que se cumplan con los estándares y procedimientos para que las entidades educativas que se certifiquen operen conforme a los mismos estándares de evaluación y rendición de cuentas que el resto de las

escuelas públicas tradicionales.[124] Asimismo, hacemos hincapié en el hecho de que el establecimiento de las escuelas públicas alianza queda sujeto no solo a la supervisión y la evaluación, sino al control del Departamento de Educación y su Secretaria. En vista de ello, no hay duda de que la Secretaria del Departamento, retendrá la responsabilidad directa y exclusiva sobre estas entidades y monitoreará constantemente el desempeño académico, financiero y operacional de estas. Más aún, esta tiene el poder de conceder, luego de celebrarse el proceso correspondiente por el Departamento, las autorizaciones para el establecimiento de estas escuelas. Además, tiene el poder inequívoco de revocar el permiso o autorización en cualquier momento si estima que hay causa para ello. No es lo mismo delegar ciertas funciones educacionales, que la transferencia del sistema de instrucción pública. En consecuencia, colegimos que esto último no sucede con las Escuelas Públicas Alianza.

En ese sentido, reafirmamos que el control del Departamento, en primer lugar, surge por el dominio que la Secretaria ejercerá mediante el proceso de selección de las entidades que reúnan las características y exigencias necesarias para proveer una educación de excelencia mediante la otorgación de la carta constitutiva. También,

---

[124] Incluso, la Opinión disidente de la Juez Asociada señora Rodríguez Rodríguez reconoce que los estándares de evaluación y rendición de cuentas que establece la ley "guarda un parecido inmenso con el proceso de licenciamiento necesario para operar una escuela pública 'tradicional'".

está presente en el nivel de rendición de cuentas que tendrán esas escuelas con el Departamento de Educación y en la facultad absoluta de la Secretaria para revocar la Carta Constitutiva en cualquier momento, si no se cumple con los criterios correspondientes.

Finalmente, cabe notar como factor determinante que el propósito de estas escuelas de avanzada es servir gratuitamente a la comunidad y que estén abiertas a todos los estudiantes de ella, sin diferenciar entre sus habilidades o necesidades académicas o sin que se haga ninguna distinción entre ellos.[125] Se instituyen para atender las necesidades educativas particulares de nuestros niños y jóvenes estudiantes. Además, estas escuelas como parte del sistema educativo puertorriqueño compartirán la filosofía educativa de las escuelas públicas tradicionales. Por lo que el marco filosófico educativo se fundamentará en el desarrollo pleno e integral de los estudiantes al amparo de la responsabilidad constitucional y democrática de una escuela pública tradicional.

Como hemos advertido, nuestra Constitución no requirió que el Estado retenga la administración exclusiva de las escuelas públicas. Lo que se pretendió fue que las escuelas estuvieran bajo el dominio y control del Estado. Asimismo, que fuera "un sistema de instrucción pública [. . .] libre y enteramente no sectario".[126] Además, exigió que la

---

[125] Art. 13.11 de la Ley Núm. 85 ("Las Escuelas Públicas Alianza serán gratuitas y estarán abiertas a todos los niños, independientemente de sus habilidades o necesidades académicas").

[126] Art. II, Sec. 5, *Const. PR*, *supra*.

educación que provea el Estado en la escuela primaria y secundaria sea gratuita. En ese sentido, es forzoso concluir que las Escuelas Públicas Alianza, según establecidas en la Ley Núm. 85, son escuelas públicas del Sistema de Educación Pública en Puerto Rico. Por tanto, las disposiciones de la Ley Núm. 85 promulgadas para la instauración de las Escuelas Públicas Alianza son constitucionales.

**VI**

El Tribunal de Primera Instancia determinó que las Escuelas Públicas Alianza "parece ser un modelo de escuelas privadas" que "contarán con autonomía administrativa y académica". Entendió que este modelo de escuelas "se aproxima más a un sistema de educación privado" que a las escuelas públicas como las conocemos hoy. Aunque reconoció que el Departamento establecerá las condiciones mediante las cuales estas escuelas se deben regir, sostuvo que ello "no es suficiente para evitar catalogar este tipo de escuelas como privadas". En cuanto al Programa de Libre Selección de Escuelas señaló que adolece de los mismos vicios de inconstitucionalidad en la medida en que el lenguaje denota un carácter preferencial para que los estudiantes de escuelas públicas asistan a una escuela privada. Razonó que "parecería que el Programa de Libre Selección de Escuelas está disponible para todos los estudiantes, pero en su aplicación complica que los hoy estudiantes de escuelas privadas puedan obtener los

certificados". Finalmente, entendió que era "indiferente que la ayuda se conceda a los padres, pues, al final, la institución privada es la que resultaría beneficiada o sostenida".

Tras justipreciar todos los factores y circunstancias de la aprobación de la Ley Núm. 85, concluimos que las disposiciones relativas al Programa de Escuelas Públicas Alianza son constitucionales, porque, según surge del propio texto de la ley, el Estado, a través de la agencia, ejerce control y amplios poderes sobre la implementación y la administración de estas escuelas gratuitas, no sectarias y libres, las cuales están abiertas a la comunidad en general. En lo que concierne al Programa de Libre Selección de Escuela, resolvemos que es constitucional de su faz, en cuanto permite que los padres reciban directamente una ayuda económica para que sus niños puedan asistir a la escuela de su preferencia. Si bien las escuelas recibirán un beneficio, conforme está diseñado este programa de becas en la Ley Núm. 85, no podemos concluir ni siquiera remotamente que este tiende a sustituir el sistema de enseñanza pública de Puerto Rico y, como consecuencia, sea de tal grado que conlleve un sostenimiento de escuelas privadas en contravención con nuestra Constitución. Por todo lo anteriormente expuesto, resolvemos que erró el Tribunal de Primera Instancia al declarar inconstitucionales los Artículos 13.05 (a) (4) (5) (6) (7) (8) (9) de la Ley Núm. 85 sobre el Programa de Escuelas

Públicas Alianza y el Artículo 14.02 (c) del Programa de Libre Selección de Escuelas.

## VII

Por los fundamentos esbozados, estoy conforme con revocar en su totalidad la *Sentencia* del Tribunal de Primera Instancia y desestimar la demanda de autos.

Edgardo Rivera García
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Asociación de Maestros, su sindicato, Asociación de Maestros de Puerto Rico-Local Sindical, por sí y en representación de sus miembros<br><br>Recurridos<br><br>v.<br><br>Departamento de Educación; Hon. Julia Keleher, en su carácter oficial como Secretaria del Departamento de Educación del Estado Libre Asociado de Puerto Rico<br><br>Peticionarios | CT-2018-0006 |

Opinión de Conformidad emitida por el Juez Asociado señor Kolthoff Caraballo

San Juan, Puerto Rico, a 9 de agosto de 2018.

> *La cláusula del sostenimiento impide que el Estado provea **beneficios, ayudas o apoyo** a una escuela privada. […] **A manera de ejemplo, el Estado no podría asignar fondos públicos para la construcción de escuelas privadas.*** (Énfasis nuestro).[127]

Cuando un padre de familia recibe el pago por el trabajo realizado, no podemos afirmar con corrección que **la fuente de ese pago** constituye el sostén o "sostenimiento" de su familia. A esa familia la "sostiene" ese padre o madre, que con esfuerzo y empeño trabajan para "sostenerla".

---

[127] Asoc. Maestros P.R. v. Srio. Educación, 137 DPR 528, 547-548 (1994).

Claro está, para los miembros de ese círculo íntimo que llamamos familia y que reciben el beneficio económico del trabajo diario de ese padre y de esa madre, el fruto de ese esfuerzo constituye claramente su "sostenimiento" porque **lo reciben de forma gratuita**, sin otra condición que ser miembros de ese círculo familiar. No obstante, para el padre y la madre que trabajan para traer el pan de cada día al hogar, el dinero que reciben no constituye **sostén o "sostenimiento"**, sino la justa compensación por el trabajo realizado.

La controversia en el presente caso versa sobre si la llamada Cláusula de Sostenimiento, dispuesta en el Art. II, Sec. 5 de nuestra Constitución, permite la erogación de dinero del erario para el Programa de Escuelas Públicas Alianza y el Programa de Libre Selección de Escuelas que establece la Ley Núm. 85-2018, conocida como la Ley de Reforma Educativa de Puerto Rico (Ley 85). La Sentencia de este Tribunal correctamente establece que el Programa de Libre Selección de Escuelas es constitucional porque, en síntesis, son los padres de los niños quienes recibirán la ayuda económica para que sus niños puedan asistir a la escuela de su preferencia y, por lo tanto, el Estado no estará "sosteniendo" ninguna entidad privada, sino otorgando una ayuda directamente a los padres. Por otro lado, la Sentencia de este Tribunal concluye, también correctamente, que el Programa de Escuelas Públicas Alianza es constitucional porque, en síntesis, estas son escuelas públicas, conforme las describe la ley, por lo que no

existe ningún sostenimiento a entidad privada, como lo prohíbe la Cláusula de Sostenimiento de nuestra Carta Magna.

En principio, estoy conteste con ambas conclusiones, por lo que mi voto es de conformidad con la Sentencia de este Tribunal. Sin embargo, escribo aparte para, en primer lugar, señalar una razón adicional por la cual creo que la Ley 85 es constitucional, en el contexto de la controversia que este Foro tiene ante sí, pero, además, para advertir una preocupación en cuanto al texto de la referida ley.

Adelantando conclusiones, creo que esta controversia se simplifica con el hecho de que la palabra "sostenimiento" utilizada en la Sec. 5 del Art. II de nuestra Constitución no comprende la relación económica que la Ley 85 autoriza con relación a los programas de Escuelas Públicas Alianza y Libre Selección de Escuelas. Y es que, como explicaré más adelante, el concepto "sostenimiento", por su significado lexicológico y en el contexto histórico en que se utilizó cuando la referida cláusula fue redactada, implica **"dar" o "sustentar" de forma graciosa o gratuita**. De manera que, lo que en realidad prohíbe nuestra llamada Cláusula de Sostenimiento es la acción del Estado de aprobar **asignaciones económicas graciosas** a entidades educativas privadas. Sin embargo, si la asignación de dinero del erario no consiste en un regalo, ayuda o asignación legislativa gratuita, sino que es el pago por los servicios rendidos por las entidades educativas privadas contratadas, forzosamente no estaríamos

hablando de "sostener" tales entidades. Como la retribución al padre o madre de familia, o a ambos, por el trabajo realizado no constituye "sostenimiento" de su familia por parte de quien le realiza el pago, así ocurre en la situación del caso de autos. En otras palabras, quien realiza una tarea por un precio convenido, una vez realizada la tarea simplemente recibe la prestación de lo convenido, sin que quepa hablar de ayuda o prestación graciosa. De eso se trata, sencillamente, la controversia en este caso.

I

**A. El significado lexicológico de la palabra "sostenimiento"**

El Art. II, Sec. 5 de nuestra Carta Magna regula lo concerniente a la educación pública en el País. En lo atinente, nuestra Carta de Derechos expresa que:

> No se utilizará propiedad ni fondos públicos para el **sostenimiento** de escuelas o instituciones educativas que no sean las del Estado. Nada de lo contenido en esta disposición impedirá que el Estado pueda prestar a cualquier niño servicios no educativos establecidos por ley para protección o bienestar de la niñez. (Énfasis nuestro).[128]

Como adelanté, una razón adicional por la cual se sostiene la constitucionalidad de la ley en cuestión obedece al significado real de la palabra "sostenimiento" del Art. II, Sec. 5 de nuestra Constitución. Las palabras deben entenderse en su significado ordinario y cotidiano, a

---

[128] Art. II, Sec. 5, Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 297.

menos que el contexto indique que tiene un sentido técnico.[129]   Como señaló el legendario Juez del Tribunal Supremo federal John Marshall, en el primer cuarto del siglo 19, en una expresión que aplica con el mismo rigor a los Padres de nuestra Constitución:

> Debe entenderse que los ilustrados patriotas que enmarcaron nuestra constitución y las personas que la adoptaron han empleado palabras **en su sentido natural y han intentado lo que han dicho.** (Énfasis y traducción nuestra).[130]

De igual forma, las palabras del también Juez de la Corte Suprema federal Joseph Story son tan verdaderas hoy como lo fueron cuando salieron a la luz en el 1833:

> Cada palabra empleada en la constitución debe ser explicada en su sentido claro, obvio y común, a menos que el contexto proporcione un fundamento para restringirlo, calificarlo o ampliarlo. Las constituciones no están diseñadas para sutilezas metafísicas o lógicas, para sutilezas de expresión, para la corrección crítica, para elaborados matices de significado, o para el ejercicio de la agudeza filosófica o la investigación judicial. Son instrumentos de naturaleza práctica, fundados en el negocio común de la vida humana, adaptados a las necesidades comunes, diseñados para el uso común, y adaptados para entendimientos comunes. (Traducción nuestra).[131]

Con el marco doctrinal anterior, analicemos la expresión que nos concierne.  La palabra "sostenimiento" como unidad lingüística significa "mantenimiento" o

---

[129] A. Scalia y B.A. Garner, Reading Law: The Interpretation of Legal Texts, St. Paul, Thomson/West, 2012.

[130] Gibbons v. Ogden, 22 US 1, 71 (1824).
[131] J. Story, Commentaries on the Constitution of the United States, Boston, Hilliard, Gray and Company, 1833, pág. 157.

"sustento".[132]  O sea, la acción y efecto de "sostener", se refiere a "mantener" o "sustentar" a alguien o algo.  La palabra "mantener" -en su acepción más pertinente- significa "costear las necesidades económicas de alguien", como por ejemplo "[c]ostear los estudios de alguien. Costear alguna expedición".[133]  En cuanto a la palabra "sustento", en sus acepciones pertinentes implica "prestar apoyo, dar aliento o auxilio", o "dar a alguien lo necesario para su manutención".[134]  Nótese, entonces, que todas las acepciones que provee el diccionario con relación a la palabra "sostenimiento" implican algo que se hace o se lleva a cabo **de forma gratuita, más bien como una ayuda.** De hecho, ese es el contexto en el que comúnmente se utiliza la palabra en nuestra Isla y como se utilizaba en los tiempos en los que los Delegados de la Convención Constituyente redactaron la cláusula en cuestión. De ahí que, por ejemplo, de "mantener" surge la expresión con connotación negativa que por décadas se ha utilizado en Puerto Rico de "es un mantenido", esto para implicar que la persona vive de las dádivas de otro. De ahí también que el

---

[132] "Sostenimiento", Diccionario de la Lengua Española, 22ma ed., Madrid, Ed. Espasa Calpe, 2001, T. II, pág. 2096.

[133] "Mantener", Diccionario de la Lengua Española, 22ma ed., Madrid, Ed. Espasa Calpe, 2001, T. II, pág. 1444.

[134] "Sustento", Diccionario de la Lengua Española, 22ma ed., Madrid, Ed. Espasa Calpe, 2001, T. II, pág. 2115.

"sustento de un menor" se entiende como el deber de los padres de suplir graciosamente lo que sus hijos necesitan.

**B. El significado de la palabra "sostenimiento" en su contexto histórico-jurídico**

Como bien señala la Sentencia de este Tribunal, en el ámbito jurídico, la palabra "sostenimiento" utilizada en la Sec. 5 del Art. II de nuestra Constitución surge directamente de la jurisprudencia federal de finales de los años '50, en la que se cuestionaba las acciones del Estado al darle sostenimiento (**"support"**) a entidades religiosas, en alegada violación a la Cláusula de Establecimiento de la Primera Enmienda federal. En ese contexto, la Constitución de Estados Unidos dispone que:

> El Congreso no aprobará ninguna ley con respecto al establecimiento de religión alguna, o que prohíba el libre ejercicio de la misma […].[135]

Por su parte, el Art. II, Sec. 3 de la Carta de Derechos de la Constitución de Puerto Rico establece lo siguiente:

> No se aprobará ley alguna relativa al establecimiento de cualquier religión ni se prohibirá el libro ejercicio del culto religioso. Habrá completa separación de la iglesia y el estado.[136]

Conviene señalar que esta Sección 3 del Art. II de nuestra Constitución incluye tres componentes. Esto es, dos cláusulas que son una traducción expresa de la Primera

---

[135] Emda. I, Const. EE.UU., LPRA, Tomo 1, ed. 2016, pág. 182.

[136] Art. II, Sec. 3, Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 284.

Enmienda de la Constitución de Estados Unidos: la que prohíbe el establecimiento de una religión oficial y la relativa a la libertad de culto. Y, una tercera disposición, cuyo origen se encuentra en la jurisprudencia federal, y mediante la cual se refleja la teoría de que la relación ideal entre el Estado y la Iglesia preceptúa el reconocimiento de dos esferas de acción separadas.[137]

El contexto de las disputas entre los Delegados de la Asamblea Constituyente en torno a las disposiciones relativas a la separación de la Iglesia y el Estado tiene su origen en la historia de Puerto Rico antes y después de 1898. Específicamente, durante el dominio del Gobierno español en la Isla la religión del Estado era el catolicismo y luego en 1898 las Iglesias protestantes llegaron y buscaron el amparo, en una estricta separación de Iglesia y Estado, para protegerse del poderío de la antigua Iglesia oficial.[138]

Sobre esas luchas de poder entre la Iglesia Católica y las Iglesias protestantes, el ex Juez Presidente del Tribunal Supremo de Puerto Rico José Trías Monge se expresó en los siguientes términos:

> La Iglesia Católica libró una intensa campaña, antes y durante el curso de la Convención Constituyente, en favor de que la nueva

---

[137] Agostini Pascual v. Iglesia Católica, 109 DPR 172, 175 (1979).

[138] H. L. Acevedo, La Convocatoria de una semilla, Ponce, Pontificia Universidad Católica de Puerto Rico, 2015, pág. 126. Véase, además, J. Trías Monge, Historia Constitucional de Puerto Rico, Editorial de la Universidad de Puerto Rico, Río Piedras, 1982, Vol. III, págs. 176-181.

Constitución rechazase el lenguaje restrictivo de la Ley Orgánica [Ley Jones] y reprodujese tan sólo las disposiciones de la Primera Enmienda a la Constitución de los Estados Unidos. Las iglesias protestantes abogaban con igual vehemencia en favor de una afirmación más rigurosa del principio de la separación del estado y la iglesia, en modo comparable al dispuesto en la Ley Orgánica.[139]

Ahora bien, en cuanto a la clara relación de nuestra Cláusula de Sostenimiento con la Cláusula de Establecimiento de la Primera Enmienda de la Constitución de Estados Unidos, la jurisprudencia del Tribunal Supremo federal de finales de los años '50, en la que se cuestionaba las acciones del Estado al darle sostenimiento ("support") a entidades religiosas, fue fundamental. En

---

[139] Trías Monge, op. cit., pág. 176. Los párrafos 18 y 19 de la Carta Orgánica de 1917 (Ley Jones) establecían -en lo pertinente- que:

[18] No se dictará ninguna ley relativa al establecimiento de cualquier religión o que prohíba el libre ejercicio de la misma, y se permitirá en todo tiempo el libre ejercicio y goce de profesiones y cultos religiosos sin distinciones ni preferencias, y no se exigirá como condición para desempeñar cualquier cargo o puesto de confianza en el Gobierno de Puerto Rico, ningún otro requisito político o religioso que un juramento de defender la Constitución de los Estados Unidos y las leyes de Puerto Rico.

[19] Jamás se asignará, aplicará, donará, usará, directa o indirectamente, dinero o propiedad públicos para el uso, beneficio o sostenimiento de ninguna secta, iglesia, denominación, institución o asociación sectaria, o sistema religioso, o para el uso, beneficio o sostenimiento de ningún sacerdote, predicador, ministro, u otro instructor o dignatario religioso, como tal. […]

Sec. 2 de la Carta Orgánica de 1917, 39 Stat. 951, LPRA, Tomo 1, ed. 2016, pág. 59.

particular, los casos de Everson v. Board of Education, 330

US 1 (1947), y McCollum v. Board of Education, 333 US 203

(1948), ambos resueltos pocos años antes de nuestra

Convención Constituyente.   En Everson v. Board of

Education, *supra*, el Tribunal Supremo federal evaluó la

constitucionalidad, a la luz de la Cláusula de

Establecimiento, de una ley del Estado de Nueva Jersey que

**concedía un subsidio** a los padres que tenían que pagar la

transportación pública de sus hijos, ya fuera a escuelas

públicas o privadas, incluyendo aquellas con credos

religiosos.  La Corte Suprema federal, por voz del Juez

Hugo Black, determinó que no constituía una violación a la

Cláusula de Establecimiento la aportación que realizaba el

Estado de Nueva Jersey a esos padres que habían decidido

que sus hijos estuvieran en escuelas privadas con credos

religiosos.  Este caso es muy importante, a nivel de toda

la Nación Americana y los territorios, por dos razones: en

primer lugar, porque el Tribunal Supremo federal decide que

la Cláusula de Establecimiento de la Primera Enmienda

federal aplica a los estados.[140]  En segundo lugar, porque

---

[140] El tema de la incorporación de la Cláusula de Establecimiento podría
(y probablemente debería) haber sido considerado, debatido y evaluado a
fondo.  La incómoda frase del texto "con respecto al establecimiento"
podría haber sido interpretada de manera jurisdiccional.  Visto así,
"con respecto al" habría indicado que el Gobierno federal carecía de
jurisdicción para establecer alguna religión oficial y, por lo tanto,
no podía establecer o favorecer una religión, **pero tampoco interferir
con la autoridad del Estado sobre el establecimiento de una religión.**
Esta interpretación habría reconocido el federalismo como un principio
central de la Cláusula de Establecimiento.  Sin embargo, en este caso
de Everson v. Board of Education, 330 US 1 (1947), el Juez Hugo Black
evadió el tema al decir simplemente que la Decimocuarta Enmienda ya
había hecho que la Primera Enmienda fuera aplicable a los estados.
Como fundamento, el Juez Black citó a Murdock v. Pennsylvania, 319 US
105 (1943).  Murdock, sin embargo, no era un caso que tuviera que ver

la Corte Suprema federal en su Opinión "constitucionaliza" o hace parte del texto constitucional una expresión incluida en una carta de 7 de octubre de 1801 del Presidente Thomas Jefferson señalando que la Cláusula de Establecimiento pretendió erigir "una pared de separación entre la iglesia y el estado". A penas 10 meses de haber resuelto Everson, el Tribunal Supremo federal, nuevamente por voz del Juez Black, resolvió McCollum v. Board of Education, supra. En McCollum, los directores de una escuela pública en el Condado de Champaign, Illinois, habían diseñado un programa mediante el cual los padres de los estudiantes que así lo quisieran, expresaban por escrito su deseo y autorización para que sus hijos tomaran clases de religión en un salón del plantel escolar, una vez a la semana, por espacio de 45 minutos, en sustitución de una clase electiva. Las clases se ofrecerían en tres grupos separados, por un sacerdote católico, un rabino judío y un ministro evangélico, conforme la elección de los padres de los estudiantes. Los padres que no autorizaran que sus hijos tomaran la clase de religión, se les ofrecía otra clase electiva totalmente secular. La Sra. McCollum,

---

con la Cláusula de Establecimiento, sino con su contraparte, la Cláusula de Libertad de Religión ("Free Exercise Clause"). De esta manera, el Juez Black logró, de manera sagaz y eficiente, eliminar el posible componente de federalismo de la Cláusula de Establecimiento sin hacer un argumento legal sustantivo. Véase V. P. Muñoz, Religious Liberty and the American Supreme Court: The Essential Cases and Documents, Lanham, Rowman & Littlefield Publishers, Inc., 2013, Kindle Edition, pág. 3.

madre de uno de los estudiantes de la escuela, reclamó que la intención de los directores de la escuela de enseñar religión en las facilidades de una escuela pública y como parte de un horario regular violaba la Cláusula de Establecimiento. Así, el Tribunal Supremo declaró inconstitucional la acción de la escuela al determinar que violaba la Cláusula de Establecimiento de la Primera Enmienda. Esto debido a que el Estado no podía utilizar los edificios públicos estatales y la maquinaria escolar pública, **todo pagado con los impuestos de la ciudadanía**, para la diseminación de doctrinas religiosas. Pero, además, el Juez Black señaló nuevamente, citando a Everson, que el texto de la Primera Enmienda había erigido una pared de separación entre la Iglesia y el Estado.

En Puerto Rico, y en el contexto histórico, ambos casos, Everson y McCollum, fueron trascendentales. De ahí que, aunque en el texto de la Primera Enmienda de la Constitución federal la notoria expresión de "completa separación entre iglesia y estado" no aparezca, sí aparece en el texto de nuestra Constitución al ser adoptada por nuestros Delegados constituyentes tres años después de haberse resuelto Everson y McCollum. Ciertamente ambos casos estaban muy presentes en la mente de nuestros Constituyentes al adoptar la Cláusula de Libertad Religiosa o Libertad de Culto y al establecer el lenguaje de la Cláusula de Sostenimiento. De hecho, el Diario de Sesiones contiene una discusión del caso de Everson en voz del delegado Fernando J. Géigel Sabat, en el contexto de la

Sec. 5 del Art. II de nuestra Carta Magna, del cual cito un extracto:

> Pero es el caso, señores, que esta contención está resuelta por el más alto tribunal de la nación. Es el caso de Everson v. Board of Education, volumen 330, U. S. Reports, página 1. En este caso se trataba del beneficio a los padres de los niños por la transportación que pagaban para enviarlos a una escuela perteneciente a una institución religiosa (católica).
> El honorable juez Black en la opinión que emitió expresó, aunque no uso sus propias palabras, pero sí el consenso de su opinión, lo siguiente: que como la ayuda es al individuo, éste, como ser humano, tiene derecho a los mismos beneficios que tienen los otros seres humanos que van a las escuelas públicas, declarando que aunque con el pago del reembolso se ayuda indirectamente a la institución religiosa que tiene ese plantel, ello no es violación a la enmienda primera de la Constitución de los Estados Unidos, o sea [la] separación de la Iglesia y el Estado; y el caso fue resuelto de acuerdo con esta opinión.
> En otro párrafo de su opinión, se expresa así el honorable juez Black que, entre paréntesis, era el Juez Presidente del Tribunal Supremo de Estados Unidos: Copio del inglés: "On the other hand...".[141]

Ahora bien, ¿qué pertinencia tiene todo lo anterior con el significado de la palabra "sostenimiento" de nuestra Sec. 5, Art. II? Demuestra, en primer lugar, que al incluir la palabra "sostenimiento" de la Cláusula de Sostenimiento, esos casos federales eran el marco referencial de los Constituyentes. En segundo lugar, que el problema que se buscaba corregir en ese marco referencial era que el Estado no utilizara propiedad ni fondos públicos que pudieran constituir una donación, ayuda o asignación **gratuita** del Estado a ninguna religión.

---

[141] 2 Diario de Sesiones de la Convención Constituyente 1496.

Nótese que el "support" al que se refiere, tanto el caso de Everson como el de McCollum, se trataba de ayudas o aportaciones gratuitas del Estado. En un caso mediante el reembolso a los padres que habían pagado la trasportación de sus hijos a escuelas sectarias y la otra mediante la utilización de propiedad pública por la que ninguna de las denominaciones religiosas estaba pagando y, por lo tanto, el dinero estaba saliendo de las arcas del Estado.

De hecho, la Cláusula de Establecimiento de la Primera Enmienda y la naturaleza de las controversias en torno a este asunto se originaron por el rechazo de la Nación americana de los siglos 17 y 18 a la pretensión de los líderes de las primeras colonias de continuar sustentando (manteniendo) a la Iglesia Anglicana a través de la recolección de impuestos al Pueblo.  En aquel momento, en Inglaterra existía una religión oficial del gobierno, esto es, la Iglesia Anglicana era la Iglesia oficial del País.  Esto significaba que la Corona inglesa mantenía económicamente a la Iglesia Anglicana y los ciudadanos, sin importar su creencia o falta de ella, tenían que contribuir mediante impuestos al mantenimiento de esa Iglesia. Esa fue la realidad sobre la fe religiosa que trajeron de Inglaterra los primeros habitantes de esas trece colonias y fue el concepto que, en mayor o menor grado, aquellos ciudadanos nacidos en esas colonias (los llamados nativos) vivieron por más de 170 años antes de su

independencia.[142] Como vemos, la historia detrás de la Cláusula de Establecimiento gira en torno al concepto de un gobierno **promoviendo y subsidiando** una Iglesia. De hecho, esa realidad se mantuvo en Estados Unidos en mayor o menor escala por más de 50 años, aun después de la independencia de esas 13 colonias originales y de la aprobación, incluso, de la Primera Enmienda.[143]

Como ya leímos en la cita del delegado Géigel Sabat, todo lo anterior es perfectamente compatible con la discusión que del texto en cuestión surgió durante la Convención Constituyente. Tal discusión demuestra la clara relación de nuestra Cláusula de Sostenimiento con la Cláusula de Establecimiento de la Primera Enmienda de la Constitución federal, así como de lo conscientes que estaban nuestros Constituyentes de la jurisprudencia del Tribunal Supremo. Incluyo otra cita, esta vez de las expresiones del otrora Juez Presidente de este Foro, el delegado José Trías Monge:

> Sr. Trías Monge: Exactamente. Quería añadir, únicamente, con la venia del Presidente, que exactamente como ha indicado el Presidente de la Comisión **la idea es simplemente hacer más clara y tajante la separación entre la Iglesia y el Estado, pero sin del otro lado, naturalmente, afectar el principio de que los servicios no educativos que se le prestan a la niñez puedan seguir prestándosele.**
>
> O sea, aquí **hay dos principios básicos que se**

---

[142] J. H. Hutson, <u>Church and State in America: The First Two Centuries</u> (Cambridge Essential Histories), Cambridge, Cambridge University Press, 2008, Kindle Edition.

[143] Íd.

**instituyen en esta sección. Uno es el principio de separación del Estado e Iglesia, tal como ha sido consignado en la Constitución federal y el cual seguirá su desarrollo normal vía las interpretaciones del Tribunal Supremo de los Estados Unidos.**

Naturalmente que [en] distintas situaciones que pudiésemos imaginar en estos momentos, pues sería difícil una contestación precisa [en] muchos [casos] a estas situaciones, porque **estamos enchufados ante el sistema constitucional norteamericano en esta fase específica. O sea, son nuestras las garantías en cuanto a libertad de religión que se han instituido en la Constitución de los Estados Unidos. Estamos idénticamente, formando parte de ese sistema constitucional.** En cuanto a la libertad de religión y a otros aspectos también se refiere, ése es el primer principio. (Énfasis nuestro).[144]

Sobre la intención que tuvieron los Delegados de la Asamblea Constituyente al estudiar, evaluar y aprobar las disposiciones del Art. II, Sec. 5 de nuestra Constitución, hallamos estas expresiones en una Opinión del ex Secretario de Justicia Lcdo. Rafael Hernández Colón en 1966:

De lo anterior se desprende que, de una parte, la Asamblea Constituyente deseó que mediante el lenguaje de la sección 5 del artículo II de nuestra Constitución se entendiese como una redacción del principio de separación de Iglesia y Estado, tal como ha sido consignado en la Constitución Federal e interpretado por el Tribunal Supremo de los Estados Unidos…[145]

Luego de considerar detenidamente el significado lexicológico de la palabra "sostenimiento", así como

---

[144] 2 Diario de Sesiones de la Convención Constituyente 1481-1484.

[145] Op. Sec. Just. Núm. 32 de 1966.

estudiar el marco histórico y jurídico existente cuando la Cláusula de Sostenimiento se redactó, debo concluir que el término "sostenimiento" de la referida cláusula constitucional se refiere únicamente a la **asignación graciosa de fondos públicos**. Esto es, una asignación de fondos del erario que se da gratuitamente.[146] No me cabe duda que la utilización del término "sostenimiento" surge de la preocupación de esos Delegados Constituyentes de mantener el principio de separación de Iglesia y Estado. En particular, el objetivo cardinal que buscaban era evitar donaciones que beneficiaran a las instituciones religiosas.[147] La pregunta que resta por contestar entonces es qué tipo de erogación de fondos públicos autoriza la

---

[146] "Gracioso", <u>Diccionario de la Lengua Española</u>, 22ma ed., Madrid, Ed. Espasa Calpe, 2001, T. I, pág. 1149.

[147] En su Alegato, la recurrida Asociación de Maestros argumenta que "[l]a cláusula de sostenimiento busca que los servicios de instrucción pública estén únicamente en control del Estado, lo que no sucede en ninguno de estos programas [Escuelas Públicas Alianzas y el Programa de Libre Selección de Escuelas]". (Véase Alegato de la parte recurrida, pág. 20). En primer lugar, ya he establecido cuál fue claramente el propósito de la Cláusula de Sostenimiento, que en nada se relaciona con lo alegado por la Asociación. Ciertamente, nuestra Constitución garantiza la existencia de un sistema de instrucción público de enseñanza, pero no es a través de la referida cláusula. En segundo lugar, el que nuestra Constitución garantice un sistema de **instrucción pública** lo que en realidad implica es que el Estado tendrá la obligación de proveer **educación gratuita** para todos los ciudadanos. Sin embargo, nada en el texto constitucional impide que tal **educación gratuita** pueda ser administrada por entes privados, siempre y cuando sea el Estado el que supervise y mantenga el control final de tal educación.

De manera tal que si el Estado, en su poder de *Parens patriae* y en la búsqueda de alternativas que propendan al mejoramiento de la educación de nuestros niños, determina que a través de la implantación de la política pública de la Ley Núm. 85-2018, conocida como la Ley de Reforma Educativa de Puerto Rico (Ley 85), se consigue ese primer peldaño para lograr que nuestros niños reciban una **educación gratuita** de excelencia, nada en el texto constitucional parece prohibirlo, siempre y cuando tal política pública no constituya una delegación excesiva o una renuncia a sus deberes constitucionales.

Ley 85 y si tal tipo de erogación se encuentra comprendida en la prohibición de la Cláusula de Sostenimiento.

**C. La naturaleza de la relación económica que se establece en la Ley Núm. 85-2018 en cuanto al Programa de Escuelas Públicas Alianza**

La Ley 85 establece la nueva política pública del Gobierno de Puerto Rico en el ámbito educativo. Esta política pública pretende implementar mecanismos que viabilicen el alcance del derecho fundamental a la educación.[148]

Es decir, la Ley 85 busca brindarle a los estudiantes la oportunidad de alcanzar una educación que facilite el desarrollo de su personalidad, bienestar propio, de su

---

[148] El derecho fundamental a la educación consagrado en la Constitución de Puerto Rico lee como sigue:

> Toda persona tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales. Habrá un sistema de instrucción pública el cual será libre y enteramente no sectario. La enseñanza será gratuita en la escuela primaria y secundaria y, hasta donde las facilidades del Estado lo permitan, se hará obligatoria para la escuela primaria. La asistencia obligatoria a las escuelas públicas primarias, hasta donde las facilidades del Estado lo permitan, según se dispone en la presente, no se interpretará como aplicable a aquellos que reciban instrucción primaria en escuelas establecidas bajo auspicios no gubernamentales. No se utilizará propiedad ni fondos públicos para el sostenimiento de escuelas o instituciones educativas que no sean las del Estado. Nada de lo contenido en esta disposición impedirá que el Estado pueda prestar a cualquier niño servicios no educativos establecidos por ley para protección o bienestar de la niñez.

Art. II, Sec. 5, Const. ELA, LPRA, Tomo 1.

familia y de Puerto Rico.[149]   Así, a través de la Reforma

Educativa se persigue proteger a los estudiantes para que

reciban una educación que les permita desarrollar al máximo

sus capacidades y, como corolario, contribuyan al bienestar

de nuestra sociedad desde todos los ámbitos.[150]   Por esto,

apremia lograr un sistema de instrucción pública moderno,

eficiente, humano y de excelencia para que el "desarrollo

de nuestra Isla sea uno sustentable que, a su vez, maximice

los recursos disponibles en la actualidad sin comprometer

el progreso de futuras generaciones".[151]

Entre los mecanismos que provee la Reforma Educativa

para viabilizar el mejor bienestar de los estudiantes y el

pleno alcance de su derecho fundamental a la educación, se

crea el modelo del Programa de Escuelas Públicas Alianza, a

saber:

> Una Escuela Pública Alianza es: (i) una escuela pública de nivel elemental y/o secundario, de nueva creación que es operada y administrada por una Entidad Educativa Certificada autorizada por el Secretario; o (ii) una escuela pública de nivel elemental y/o secundario existente, cuya operación y administración es transferida a una Entidad Educativa Certificada autorizada por el Secretario, de conformidad con el otorgamiento de una Carta Constitutiva.[152]

---

[149] Art. 1.01 de la Ley 85.

[150] Exposición de Motivos de la Ley 85.

[151] Íd.

[152] Art. 13.01 de la Ley 85.

En cuanto al funcionamiento de las Escuelas Públicas Alianza, la Ley 85 establece que éstas serán públicas, no sectarias y sin fines de lucro. También, la educación en estas escuelas será gratuita y operarán bajo la supervisión del Secretario de Educación y de conformidad con lo establecido en las Cartas Constitutivas.[153]

Por su parte, la Ley 85 establece las instituciones que podrán cualificar como Entidades Educativas Certificadas.[154] Entre los criterios para que las Entidades Educativas Certificadas sean aprobadas, éstas deberán contar con un equipo gerencial para administrar, operar y dirigir la escuela; un plan de aprovechamiento académico;

---

[153] Art. 13.02 de la Ley 85. Por su parte, el Art. 1.03 de la Ley 85 define "Carta Constitutiva" de la siguiente manera:
> Se refiere a un acuerdo formal, vinculante entre el Secretario y una entidad, que la certifica como una Entidad Educativa Certificada y la autoriza a operar y administrar una Escuela Pública Alianza dentro de los términos específicos del acuerdo.

[154] El Art. 13.05 de la Ley 85 dispone lo siguiente:

a. *Cualificaciones para Entidades Educativas Certificadas.* De acuerdo a los procedimientos y criterios establecidos por esta Ley y por el Autorizador, las siguientes entidades pueden calificar como Entidades Educativas Certificadas a las que se les otorgue una Carta Constitutiva:

1. Un municipio de Puerto Rico.
2. Consorcios municipales.
3. Alianzas entre municipios o consorcios municipales con otras entidades educativas públicas u otras entidades educativas no gubernamentales sin fines de lucro. Estas alianzas se pueden configurar siguiendo diferentes figuras jurídicas.
4. Instituciones públicas o sin fines de lucro de educación postsecundaria.
5. Instituciones de educación escolar elemental, intermedia y superior sin fines de lucro.
6. Entidades educativas no gubernamentales u otras entidades sin fines de lucro.
7. Organizaciones sin fines de lucro creadas por padres y madres o maestros.
8. Organizaciones de maestros, sindicato de maestros o cualquier grupo de maestros debidamente organizado y certificado por el Departamento del Trabajo y Recursos Humanos conforme a las disposiciones de la Ley 45-1998, según enmendada.
9. Cooperativas debidamente organizadas con fines educativos.

personal que cumpla con las certificaciones y licencias exigidas por el Departamento de Educación; un sistema en el que los padres y la comunidad escolar tengan participación activa en la educación de sus hijos; mecanismos de evaluación y un proyecto en el que se atiendan las necesidades de los estudiantes con discapacidad.[155]

Con respecto a la relación entre el Departamento de Educación y las Entidades Educativas Certificadas, la Ley 85 dispone que **las Cartas Constitutivas establecen los términos y condiciones que deberá cumplir la Entidad Educativa Certificada.** Las Cartas Constitutivas deberán ser firmadas por ambas partes contratantes, es decir: el Secretario de Educación (Autorizador) y la Entidad Educativa Certificada. Como requisito, toda Carta Constitutiva establecerá que se fomentará la educación bilingüe (español e inglés) y que, además, serán prioridad las materias de ciencia, tecnología, ingeniería, matemáticas y arte. También, las Cartas Constitutivas incluirán un plan de mejoramiento académico y un modelo de intervención. Asimismo, se estipulará que tanto la Entidad Educativa Certificada como las escuelas autorizadas "estarán sujetas a los procesos de evaluación y las auditorías establecidas por el Secretario o requeridas por ley, para garantizar el cumplimiento con los términos y condiciones de la Carta Constitutiva y los requisitos

---

[155] Art. 13.05 de la Ley 85.

legales aplicables".[156] Las Cartas Constitutivas podrán ser renovadas por un término inicial de 5 años, siempre que el Secretario fundamente el rendimiento, las capacidades demostradas y las circunstancias particulares de cada Escuela Pública Alianza. No obstante, si el Secretario determina que la Escuela Pública Alianza no cumplió con lo requerido en la Carta Constitutiva, entonces podrá revocar o no renovar la misma.[157]

Nótese que, en vista de lo anterior, es claro que la relación entre las Escuelas Públicas Alianza y las Entidades Educativas Certificadas **se da a través de un contrato plasmado en las Cartas Constitutivas**. Mediante las Cartas Constitutivas, las Escuelas Públicas Alianza recibirán un servicio de administración por parte de las Entidades Educativas Certificadas. La contratación de los servicios de administración no descansa en una mera liberalidad.

**D. El recibo de fondos públicos por parte de las instituciones educativas privadas, en el contexto del Programa de Libre Selección de Escuelas de la Ley Núm. 85-2018**

El Art. 14.01 de la Ley 85 señala que el Programa de Libre Selección de Escuelas tiene el propósito de permitir que los padres, madres, tutores o encargados participantes en el Programa, puedan seleccionar la escuela pública o

---

[156] Art. 13.07 de la Ley 85.

[157] Art. 13.07 de la Ley 85.

privada de su preferencia.[158] Entre otras modalidades, y en lo que es pertinente, el Programa de Libre Selección de Escuelas permite que el estudiante que cualifique pueda seleccionar el ingreso a una escuela privada con la total subvención del Estado.[159]   Ciertamente no se podría argumentar, distinto al Programa de Escuelas Públicas Alianza, que la naturaleza de la relación económica que establece la Ley 85 en cuanto al Programa de Libre Selección de Escuelas es una contractual, por cuanto la ley lo que establece es que los padres son los que recibirán la ayuda o subvención, y estos son los que elegirían contratar con las escuelas privadas de su preferencia. De manera que ciertamente no existe una contratación directa entre el Estado y la escuela privada que termine recibiendo el dinero de la subvención que otorga el Estado.  Sin embargo, y para efectos de lo que prohíbe nuestra Cláusula de Sostenimiento, lo anterior no implica que las entidades educativas privadas que terminen recibiendo indirectamente los fondos que provienen de las arcas públicas, reciban una ayuda.  Me explico.  Los programas de selección de escuelas han ido en aumento en Estados Unidos durante los pasados años, de forma tal que en la actualidad estos programas existen en 28 estados y el Distrito de Columbia.  Como bien reconoció el Tribunal de Primera Instancia en su Sentencia,

---

[158] Art. 14.01 de la Ley 85.

[159] Art. 14.02 de la Ley 85.

la Cláusula de Sostenimiento del Art. II, Sec. 5 de nuestra Constitución surge de las llamadas Enmiendas Blaine, llamadas así después de una enmienda constitucional federal fallida propuesta por el congresista James G. Blaine en 1875. Predominantemente aprobadas en los estados a fines del siglo XIX, las Enmiendas Blaine buscan impedir que el estado asigne fondos públicos para ayudar a escuelas sectarias.

Sin embargo, durante los últimos años varias jurisdicciones han resuelto a favor de los programas de selección de escuela con el argumento principal de que este tipo de ayuda no constituye una concesión de ayuda pública a las escuelas privadas. **Esto, porque en realidad estas instituciones lo que reciben es simplemente un pago a cambio de los servicios prestados.** Las familias, no las escuelas religiosas, están recibiendo la "ayuda" pública.[160] Este y otros argumentos han convencido a tribunales en otras jurisdicciones respecto a que las Enmiendas Blaine no aplican a los programas de libre selección de escuelas.[161] También les han dado a más gobiernos estatales la confianza para implementar este tipo de programas.[162]

---

[160] E. Smith, Blaine Amendments and the Unconstitutionality of Excluding Religious Options from School Choice Programs, The Federalist Society Review, Volume 18. https://fedsoc.org/commentary/publications/blaine-amendments-and-the-unconstitutionality-of-excluding-religious-options-from-school-choice-programs (Última visita, 7 de agosto de 2018).

[161] Íd.

[162] Íd.

**E. Lo resuelto en Trinity Lutheran Church of Columbia, Inc. v. Comer**

Recientemente el Tribunal Supremo de Estados Unidos resolvió en <u>Trinity Lutheran Church of Columbia, Inc. v. Comer</u>, 582 US ___ (2017), 137 S. Ct. 2012, que la exclusión de las iglesias de un programa neutral y secular de ayudas del Departamento de Recursos Naturales del estado de Missouri violaba la garantía constitucional contenida en la Primera Enmienda sobre la libertad de culto. Trinity Lutheran Church of Columbia, Inc. (Trinity) operaba un centro preescolar y de cuido de niños, el cual inicialmente comenzó como una corporación sin fines de lucro, pero que posteriormente se fusionó con Trinity. El centro de cuido, cuya base era religiosa, tenía una política de admisión abierta. Es decir, aceptaba a estudiantes de cualquier denominación religiosa.

Por otro lado, el Departamento de Recursos Naturales del estado de Missouri (Departamento) ofreció unas subvenciones a aquellas organizaciones sin fines de lucro que cualificaran con el fin de promover la compra de materiales derivados de neumáticos reciclados y utilizarlos para repavimentar los patios de recreo de dichas instituciones. Los fondos serían otorgados a aquellos participantes que obtuvieran la puntuación más alta luego de evaluar diversos factores como el nivel de pobreza de la población circundante a la entidad solicitante y el plan presentado por la institución para fomentar el reciclaje. No obstante, el Departamento tenía una política estricta de

denegar las subvenciones a cualquier solicitante que perteneciera o fuera controlado por alguna iglesia, secta o institución religiosa.

Trinity solicitó la mencionada subvención y cualificó en el quinto lugar entre las 44 entidades que solicitaron. No obstante, la subvención le fue denegada debido a que el Art. I, Sec. 7 de la Constitución de Missouri establece que no se le otorgará dinero del tesoro público, ya sea de forma directa o indirecta, como ayuda a una entidad religiosa.[163] En consecuencia, Trinity presentó una demanda en la cual alegó, en síntesis, que la denegatoria a su solicitud violaba tanto la Cláusula de la Igual Protección de las Leyes como las disposiciones de la Primera Enmienda relacionadas a la libertad de culto y de expresión.

Ante esos planteamientos, la Corte Suprema federal resolvió que la exclusión de las iglesias de un programa de ayuda laico viola la garantía establecida en la Primera Enmienda de la Constitución federal sobre la libertad de culto. El Tribunal Supremo federal sostuvo que la Cláusula de Libre Ejercicio de la Primera Enmienda protege la libertad de la práctica religiosa y del trato desigual por dicha condición, por lo cual somete a un **escrutinio**

---

[163] El Art. I, Sec. 7 de la Constitución de Missouri dispone lo siguiente:

> That no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such; and that no preference shall be given to nor any discrimination made against any church, sect or creed of religion, or any form of religious faith or worship.

**estricto** las leyes que imponen una carga a dicha práctica religiosa.[164]

Como vimos en el caso de Everson v. Board of Education, supra, el Tribunal Supremo federal ha sostenido que las leyes que niegan un beneficio solamente por el estado religioso de una persona son inconstitucionales. No obstante, ese Foro ha aclarado que existen leyes neutrales que pueden ser válidas incluso si obstaculizan la religión. La distinción en esos casos consiste en establecer si la ley en cuestión discrimina a algunas o a todas las creencias religiosas. A esos efectos, en Lyng v. Northwest Indian Cemetery Protective Association, 485 US 439 (1988), el Tribunal Supremo federal sostuvo que la Cláusula de Libre Ejercicio no prohibía al Gobierno la extracción de madera o la construcción de carreteras en un tramo particular de jurisdicción federal, a pesar de que la acción del Gobierno obstruiría la práctica religiosa de varias tribus nativas americanas que consideraban sagrados algunos de esos tramos. Aunque el Tribunal reconoció que la construcción de una carretera o la tala de madera interferiría significativamente con la capacidad de algunas personas para alcanzar la realización espiritual de acuerdo con sus propias creencias religiosas, no encontró ninguna violación a la Cláusula del Libre Ejercicio, porque los individuos afectados no estaban siendo coaccionados por la acción del Gobierno a quebrantar sus creencias

---

[164] Trinity Lutheran Church of Columbia, Inc. v. Comer, 582 US ___ (2017), 137 S. Ct. 2012; Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 US 520, 533, 542 (1993).

religiosas.[165] No obstante, el Tribunal Supremo federal señaló que la acción del Gobierno no penalizaba la actividad religiosa al negarle a cualquier persona una parte igual de los derechos, beneficios y privilegios que disfrutan otros ciudadanos.[166]

De igual modo, en Employment Division, Department of Human Resources of Oregon v. Smith, 494 US 872 (1990), el Tribunal Supremo federal rechazó un reclamo de libre ejercicio presentado por dos miembros de una iglesia nativa americana de los Estados Unidos a quienes se les denegaron los beneficios del desempleo porque habían violado las leyes de sustancias controladas de Oregon al ingerir peyote para propósitos sacramentales. A base de lo resuelto en Lyng v. Northwest Indian Cemetery Protective Association, supra, el Máximo Foro federal sostuvo que la Cláusula de Libre Ejercicio no daba derecho a los miembros de la iglesia a una dispensa especial de las leyes penales generales a causa de su religión. Al mismo tiempo, reiteró que la Cláusula de Libre Ejercicio protegía contra la imposición del Gobierno de impedimentos especiales a base de puntos de vista religiosos o por el estado religioso.[167]

Ahora bien, al tenor de la doctrina citada, el Tribunal Supremo federal resolvió en Trinity Lutheran Church of Columbia, Inc. v. Comer, supra, que la política

---

[165] Lyng v. Northwest Indian Cemetery Protective Association, 485 US 439, 449 (1988).

[166] Íd.

[167] Employment Division, Department of Human Resources of Oregon v. Smith, 494 US 872, 877 (1990).

del Departamento de denegar a las organizaciones religiosas sus subvenciones violó la Cláusula de Libre Ejercicio de la Primera Enmienda de la Constitución federal. Ello, debido a que discriminaba únicamente contra organizaciones a base de su carácter religioso, organizaciones que de otro modo hubiesen sido elegibles.[168] Es decir, la ley no necesitaba impedir que la organización religiosa practicara su religión, pues era suficiente que la ley le negara a una organización religiosa la misma oportunidad de competir por un beneficio que de otro modo estaría disponible para todas las organizaciones seculares.

Al evaluar las disposiciones de la Ley 85 respecto a las Escuelas Públicas Alianza, al tenor de la jurisprudencia federal, me surgió una preocupación. Esto, específicamente, en cuanto al Art. 13.02 de la Ley 85 que define una Escuela Pública Alianza como "una escuela pública, **no sectaria** y sin fines de lucro, que operará bajo la supervisión del Secretario, de conformidad con la Carta Constitutiva y por el ordenamiento jurídico vigente". (Énfasis suplido). Ello, pues la ley limita a las Escuelas Públicas Alianza a instituciones que no tengan alguna base religiosa. Es decir, si alguna entidad religiosa sin fines de lucro que cumpliera con todos los estándares requeridos por el Departamento de Educación estuviera interesada en contratar con el Gobierno para operar una Escuela Pública Alianza, ésta sería descartada inmediatamente por el solo hecho de tener una base religiosa.

---

[168] <u>Trinity Lutheran Church of Columbia, Inc. v. Comer</u>, supra.

Evidentemente, esto es contrario a lo resuelto recientemente por el Tribunal Supremo federal en <u>Trinity Lutheran Church of Columbia, Inc. v. Comer</u>, supra, donde se aclaró que discriminar contra entidades únicamente por su carácter religioso contraviene la Primera Enmienda de la Constitución federal. Esa práctica violaría la libertad de culto de las organizaciones discriminadas pues, como se explicó en <u>Trinity</u>, para que una entidad religiosa sea por lo menos considerada para contratar con el Estado y así administrar una Escuela Pública Alianza, tendría que abandonar sus prácticas religiosas. Por lo tanto, considero que esa parte de la ley no supera el escrutinio estricto para sostener su validez. Esto, porque si en <u>Trinity</u> el Tribunal Supremo declaró inconstitucional un estatuto que discriminaba contra una entidad religiosa al no permitirle recibir una ayuda o donación condicionada al cumplimiento de unos requisitos, cuanto más con la Ley 85, en donde la entidad religiosa no estaría buscando un donativo o asignación graciosa, sino el derecho a competir como todos los demás en la búsqueda de que se contraten sus servicios.

**III**

Como ya adelanté, no tengo dudas con relación a que no solo el significado lexicológico de la palabra "sostenimiento", sino la evidencia histórica-jurídica demuestra que lo que los Delegados constituyentes buscaron prohibir al redactar la referida Cláusula de Sostenimiento es que el Estado no hiciera aportaciones o asignaciones

graciosas a instituciones privadas. Esto es, el significado literal de la palabra "sostenimiento" se entiende como una ayuda o mantenimiento otorgado graciosamente a alguien o algo. Por otra parte, y en cuanto a las Escuelas Públicas Alianza, también es claro que la relación económica que permite la erogación de fondos públicos se autoriza sobre la base de un contrato de servicios y no como una aportación o ayuda gratuita. La pregunta que corresponde es ¿estaba contemplada esa relación contractual en la mente o intención de los redactores de nuestra Constitución al plasmar la prohibición que establece la Cláusula de Sostenimiento? ¿Lo que buscaban era evitar que el Gobierno contratara con una institución privada educativa? Si así hubiera sido, **¿por qué no lo señalaron expresamente?** De hecho, los Delegados constituyentes no establecieron expresamente una prohibición a contratar en circunstancias como las del caso de autos, aun cuando tal relación jurídica sí fue mencionada expresamente por estos en otra parte de la Constitución, esto es, en la Sec.10, Art. VI de nuestra Ley Suprema.[169] De manera que los términos "contratista" o "contrato" no son extraños al lenguaje de la Constitución.

---

[169] La Sec. 10, Art. VI de nuestra Carta Magna señala lo siguiente:

> Ninguna ley concederá compensación adicional a un funcionario, empleado, agente o contratista por servicios al gobierno, después que los servicios hayan sido prestados o después que se haya formalizado el contrato. Ninguna ley prorrogará el término de un funcionario público ni disminuirá su sueldo o emolumentos después de su elección o

Ahora bien, ¿podríamos llegar a la conclusión de que, aunque no lo utilizaron expresamente en la cláusula en cuestión, el término "contratación" o un equivalente se encontraba inmerso en la expresión "sostenimiento"? Me parece que tal interpretación sería una claramente forzada y errónea, en vista del claro significado lexicológico de la palabra "sostenimiento" y la evidencia histórica-jurídica que envolvió la redacción de la cláusula. A *contrario sensu*, me parece que la inclusión expresa de la palabra "sostenimiento" como sinónimo de ayuda, mantenimiento o sustento, excluye claramente el término "contratación". Me explico. Como sabemos, la mención específica de una cosa implica generalmente la exclusión de otras (*expressio unius est exclusio alterius*). Esta regla de hermenéutica legal tiene como propósito principal determinar la intención del legislador.[170] La misma es inaplicable cuando la intención legislativa surge de otra manera, cuando su aplicación conflige con el pensamiento del legislador y cuando seguirla puede conducir a situaciones incompatibles o injustas.[171] Al analizar las discusiones del Diario de Sesiones de la Convención

---

nombramiento. Ninguna persona podrá recibir sueldo por más de un cargo o empleo en el gobierno de Puerto Rico.

Art. VI, Sec. 10, Const. ELA, LPRA, Tomo 1, ed. 2016, págs. 448-449.

[170] R.E. Bernier y J.A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, San Juan, Pubs. JTS, 1987, pág. 345.

[171] Virella v. Proc. Esp. Rel. Fam., 154 DPR 742 (2001).

Constituyente no encuentro ninguna expresión, aunque fuera somera, que me lleve a pensar que la intención de los Delegados constituyentes fuese prohibir que el Estado pudiera contratar con una institución educativa privada. Tampoco la concepción de tal relación contractual parece confligir con el pensamiento de alguno de los Delegados constituyentes. Y, por último, evidentemente la construcción hermenéutica que aquí se hace del término no conduce a incompatibilidad o injusticia alguna. Por el contrario, es claro que mediante lo que hoy resolvemos se le da el aval constitucional a una política implementada por las ramas constitucionales hermanas, que busca que se adelante el mandato constitucional del derecho fundamental a la educación de los niños y jóvenes, mediante la contratación de un modelo nuevo que se presume mejor, como son las Escuelas Públicas Alianza. Además, esta interpretación permite que la Ley. 85 provea, mediante el Programa de Libre Selección de Escuelas, ayuda a sectores vulnerables, tales como estudiantes con necesidades especiales, dotados o con problemas de disciplina, a quienes se les ha coartado su derecho a la educación debido a la situación de precariedad económica que enfrentamos en el País. No hay duda de que, en la correcta aplicación de *expressio unius est exclusio alterius*, la expresión "sostenimiento" excluye necesariamente la "contratación".

## IV

No albergo dudas de que la intención de la Ley 85, mediante sus programas Escuelas Públicas Alianza y Libre

Selección de Escuelas, es la contratación directa e indirecta, respectivamente, de servicios educativos. Ya sea, como se concluye en la Sentencia de esta Curia, que los fondos públicos se utilicen para la contratación de entidades que en realidad son públicas (Escuelas Públicas Alianzas) o de escuelas privadas que serán las receptoras finales del dinero otorgado a los padres (Libre Selección de Escuelas), lo cierto es que el receptor final de los fondos públicos está obligado a rendir unos servicios. En realidad, de eso trata este caso: **de una ley que permite la erogación de fondos públicos, no como una donación, ayuda o aportación graciosa a las entidades educativas que la reciben, sino como el pago -directo o indirecto- de servicios prestados.** De manera que, sea cual sea la definición final que demos a la entidad que dará el servicio, el hecho es que tal relación contractual escapa al lenguaje de nuestra Cláusula de Sostenimiento.

Como expresamos en <u>Asoc. Maestros P.R. v. Srio. Educación</u>, 137 DPR 528, 547-548 (1994), "[l]a cláusula del sostenimiento impide que el Estado provea **beneficios, ayudas** o **apoyo** a una escuela privada". (Énfasis suplido). Así, al dar un ejemplo de lo anterior, en aquella ocasión utilizamos expresamente la prohibición de una asignación graciosa de fondos del erario, al señalar que "el Estado no podría asignar fondos públicos **para la construcción de escuelas privadas**".[172] En ningún momento señalamos allí que la institución educativa privada no pudiera contratar con

---

[172] <u>Asoc. Maestros P.R. v. Srio. Educación</u>, 137 DPR 528, 547-548 (1994).

el   Estado   para   rendir   sus   servicios   administrativos   y

educativos.


                              Erick V. Kolthoff Caraballo
                                    Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Asociación de Maestros, et al.<br><br>Recurrida<br><br>v.<br><br>Departamento de Educación, et al.<br><br>Peticionaria | CT-2018-006 | *Certificación Intrajurisdiccional* |

Opinión de conformidad emitida por el Juez Asociado señor ESTRELLA MARTÍNEZ a la cual se une el Juez Asociado señor RIVERA GARCÍA

San Juan, Puerto Rico, a 9 de agosto de 2018.

> "Until we get equality in education, we won't have an equal society"
> *Hon. Sonia Sotomayor*[173]

Este caso de alto interés público requiere sopesar un derecho fundamental y una restricción estatal contenidos en una misma sección de la Constitución de Puerto Rico. Ese ejercicio requiere, a su vez, integrar otras garantías esenciales, tales como la igualdad. En consecuencia, voto por otorgarle mayor peso al derecho fundamental a la educación que tiene todo niño o niña de Puerto Rico y proveerle igualdad de oportunidades educativas. Voto por no mantener como rehenes a los niños y niñas de educación especial, a los atletas, los pobres o los estudiantes

---

[173]Mensaje de la Hon. Sonia Sotomayor en ocasión de haber sido galardonada con el premio de diversidad, otorgado por el *Philadelphia Bar Association* (2011).

dotados en un sistema de educación que por décadas ha demostrado su incapacidad para satisfacerles plenamente su derecho fundamental a la educación. Negarle a esos niños y niñas que puedan maximizar su derecho fundamental a la educación, sería sostener una especie de "apartheid educativo". Hoy la igualdad de oportunidades y el derecho a la educación tienen mayor peso sobre otras consideraciones que, aunque no deben ser desechadas livianamente, no pueden ser impedimento para evitar que esas garantías constitucionales queden meramente escritas en una piedra, como epitafio de la inacción en la búsqueda una mejor educación en Puerto Rico. Me explico.

Nuestra Constitución establece claramente que "[t]oda persona tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales". Art. II, Sec. 5, Const. ELA, Tomo 1, pág. 292. Esta premisa es tajante en reconocer que **toda persona** tiene el derecho a recibir una educación de excelencia. Más adelante, en esa misma sección, se dispone lo siguiente:

> Habrá un sistema de instrucción pública el cual será libre y enteramente no sectario. La enseñanza será gratuita en la escuela primaria y secundaria y, hasta donde las facilidades del Estado lo permitan, se hará obligatoria para la escuela primaria. La asistencia obligatoria a las escuelas públicas primarias, hasta donde las facilidades del Estado lo permitan, según se dispone en la presente, no se interpretará como aplicable a aquellos que reciban instrucción primaria en escuelas establecidas bajo auspicios no gubernamentales. **No se utilizará propiedad ni fondos públicos para el sostenimiento de escuelas o instituciones educativas que no sean las del**

**Estado.** Nada de lo contenido en esta disposición impedirá que el Estado pueda prestar a cualquier niño servicios no educativos establecidos por ley para protección o bienestar de la niñez. (Énfasis suplido) Íd.

Acorde a ello, la controversia en este caso consiste en determinar si los programas establecidos en la Ley de Reforma Educativa de Puerto Rico, Ley Núm. 85-2018, están en contravención con esa disposición constitucional. Principalmente, debemos resolver si los modelos creados en esa Ley son inconstitucionales por el fundamento de usar fondos públicos para el sostenimiento de entidades privadas. Conforme a lo que adelanté al momento en que este Tribunal certificó el caso de epígrafe, ciertamente, concluyo que no hay tal violación. La política pública que establece la Ley Núm. 85-2018, la cual instrumenta los nuevos modelos de Escuelas Públicas Alianza y la Libre Selección de Escuelas, persigue el propósito de equiparar las diferencias de los sectores vulnerables que no han alcanzado la plenitud del derecho a la educación. Es decir, persigue darle vida y eficacia concreta a la garantía constitucional de que toda persona tenga derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del ser humano y de las libertades fundamentales. Así, al implementar esos modelos educativos, el Estado atiende la problemática del sistema público de enseñanza con estrategias nuevas en nuestra jurisdicción.

Al examinar la legislación conforme a la Constitución y a la Convención Constituyente, resulta claro que lo que realmente se quiso prohibir en nuestra Carta Magna fue la ayuda directa a las escuelas privadas. También surge de los debates, "que no está prohibido y no significa sostenimiento el hecho de que el Estado otorgue becas a estudiantes de escuelas privadas, siempre y cuando esas becas no vayan dirigidas a sustituir el sistema público de educación". M.J. Figueroa Morales, La constitucionalidad de los nuevos vales educativos, 35 Rev. Der. Puertorriqueño 171, 196 (1996).

A esos efectos, me hago eco de lo siguiente:

> Nuestra Constitución no debe ser interpretada como que prohíbe terminantemente la ayuda a una institución educativa privada. Nuestra Constitución *NO* la prohíbe: la regula y la permite en tanto y en cuanto esa ayuda no se convierta en sostenimiento. Meramente ayudar a cumplir la misión educativa de una institución no debe ser catalogado como sostenimiento. Este es un concepto mucho más amplio, ya que sostener implica que se depende de una ayuda para poder subsistir.
> . . . .
> Entendemos que para definir lo que realmente significa sostener instituciones educativas privadas con fondos públicos se debe analizar las implicaciones de la actuación estatal y ver sus posibles consecuencias, no desde un punto de vista idealista, sino desde una perspectiva pragmática y sin hipérboles jurídicas . . . .
> Es evidente que convertir una escuela privada en hija del estado violaría nuestra Constitución. Pero una ayuda, aunque potencialmente pueda ser sustancial, pero que nunca podrá llegar a ser de tal magnitud que haga que las escuelas privadas participantes dependan de ella para su existencia como entes educativos independientes, no puede ser

definida en buen Derecho como sostenimiento. Figueroa Morales, supra, págs. 196-197.[174]

Como bien expuse desde el principio de este caso, considero válido el modelo de Libre Selección de Escuelas en su totalidad. Los fundamentos expuestos por el Gobierno de Puerto Rico, a la luz de lo pautado por el Tribunal Supremo Federal y del contexto histórico de la crisis educativa que experimenta Puerto Rico así lo ameritan. Véase, Trinity Lutheran Church of Columbia, Inc. v. Comer, 582 U.S. ___ (2017), 137 S. Ct. 2012; Zelman v. Simmons Harris, 536 U.S. 369 (2001). Este programa ofrece una alternativa adicional en la cual los sectores vulnerables tendrán la oportunidad de una real igualdad en el acceso a la educación obteniendo un subsidio mediante becas.

A diferencia de lo planteado por los recurridos, la Ley Núm. 85-2018, por medio del programa de Libre Selección de Escuelas, no sostiene a las escuelas privadas ni prohíbe que los estudiantes se matriculen en escuelas públicas. Nótese que los certificados de ayuda económica serán otorgados directamente a los padres y estos podrán utilizarlo tanto en escuelas públicas como en escuelas privadas, e incluso en universidades. Los padres, conforme el derecho que tienen para tomar las decisiones en

---

[174]Para una abarcadora y adecuada discusión del historial de la Convención Constituyente, véase la Opinión emitida por el Juez Asociado señor Rivera García.

cuanto a la crianza de sus hijos, decidirán en qué entidad educativa utilizar el dinero concedido por medio del programa.[175] De esa forma, el Estado se aseguró de no favorecer indebida ni directamente a las escuelas privadas. Además, el programa no presta una ayuda sustancial en la cual, en efecto, sostenga las escuelas.

Por su parte, el Programa de Escuelas Públicas Alianza serán operadas por entidades sin fines de lucro que estarán certificadas, supervisadas y fiscalizadas por el Departamento de Educación. Además, la Ley es clara en que esas escuelas formarán parte del sistema de educación público gratuito y no sectario. Por tanto, según lo dispone la propia ley, no veo impedimento alguno a que una organización sin fines de lucro desee aportar su estructura y capital humano para establecer una alianza con el Departamento de Educación. A fin de cuentas, este modelo no se aleja de la contratación tradicional que realiza esa agencia con multiplicidad de proveedores de

---

[175]En este caso, al igual que en la reciente controversia sobre el cierre de escuelas, el derecho de crianza de los padres sobre sus hijos está igualmente presente. Véase, Opinión Disidente emitida por el Juez Asociado señor Estrella Martínez en Meléndez De León, et al. v. Hon. Julia Keleher et al., res. el 16 de julio de 2018, 2018 TSPR 126. Consecuentemente, he reconocido la presencia de este derecho y en este caso identifico que el Estado lo observa e implanta a través de mecanismos que promueven la igualdad de oportunidades educativas, mientras que en el proceso de cierre de escuelas no se tomó en cuenta ese derecho y, por el contrario, no se brindó la participación adecuada para ejercerlo debidamente.

servicios educativos. De esa forma, se procura promover una igualdad de oportunidades educativas, tal como lo procura el modelo de Libre Selección de Escuelas.

Sin embargo, hago hincapié en que la segunda vertiente del Programa de Escuelas Públicas Alianza --en el cual una escuela pública de nivel elemental o secundario existente, cuya operación y administración es transferida a una Entidad Educativa Certificada-- debe mantener la naturaleza pública de la escuela. Así como dispone la propia ley, los empleados públicos de esas escuelas "heredadas" no pueden ser obligados de forma automática a perder su interés propietario en sus empleos públicos y convertirse en empleados privados de la entidad. Conforme al Art. 13.08, esa transición debe ser un ejercicio voluntario de los propios empleados. Por todo ello, y tras un análisis detenido de la ley, concluyo que estamos meramente ante un contrato de administración, en el cual la nueva entidad podrá integrar su personal, recursos y capital. Efectivamente, esos contratos de administración son necesarios, al tener en cuenta la realidad operacional actual del sistema, para equiparar las diferencias de sectores vulnerables.

Como bien dispuse al certificarse este caso, al validar los modelos establecidos en la Ley le damos preminencia al principio de la igualdad y brindamos mayor contenido a esa garantía, permitiendo oportunidades reales, en la que estudiantes dotados, atletas destacados

y los de escasos recursos, entre otros, podrán alcanzar la plenitud de su derecho fundamental a la educación. Asimismo, ante el inminente cierre y consolidación de escuelas que fue validado en Meléndez De León, *et al.* v. Hon. Julia Keleher *et al.*, res. el 16 de julio de 2018, 2018 TSPR 126, considero que estos programas incluidos en la ley son alternativas para paliar con las barreras que acechan el derecho a la educación.

Ante ese cuadro, estoy conforme con la decisión en este caso, ya que al validar la Ley Núm. 85-2018 le damos contenido sustantivo al derecho a la educación y reconocemos que existen garantías para los diferentes componentes de la comunidad escolar. A diferencia de la normativa administrativa aplicada en el cierre de escuelas por el Departamento de Educación, la cual a mi juicio no contenía unas garantías procesales y sustantivas para los diversos componentes de la comunidad escolar,[176] la Ley Núm. 85-2018 contiene expresamente unas garantías dirigidas a preservar los derechos adquiridos por los maestros y maestras del sistema. Ello, pues de la propia ley surge que no se podrán afectar los derechos de los maestros y maestras de escuelas públicas existentes que sean certificadas como Escuelas Públicas Alianza. El balance de intereses así lo exige. Por todo lo anterior, estoy conforme con la determinación de este Tribunal de

---

[176]Véase, Opinión disidente emitida por el Juez Asociado señor Estrella Martínez en Meléndez De León, *et al.* v. Hon. Julia Keleher *et al.*, supra.

revocar al Tribunal de Primera Instancia. Considero que la Ley Núm. 85-2018 es válida de su faz, sin perjuicio de que, si en su aplicación vulnera esas garantías a componentes de la comunidad escolar, las puertas de la Rama Judicial estén abiertas para atender tales reclamos. Esperemos que ello no ocurra. Ahora bien, independientemente del desenlace laboral que puedan protagonizar el Departamento de Educación como patrono con los maestros y maestras empleados, no procede mantener de rehenes a los estudiantes que buscan beneficiarse de nuevas y mejores oportunidades educativas.

                                        Luis F. Estrella Martínez
                                        Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |  |
|---|---|---|
| Asociación de Maestros, *et al.* <br><br> Recurridos <br><br> v. <br><br> Departamento de Educación, *et al.* <br><br> Peticionarios | | **Núm.** CT-2018-0006 |

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez a la que se unen la Jueza Presidenta Oronoz Rodríguez y el Juez Asociado señor Colón Pérez

San Juan, Puerto Rico, a 9 de agosto de 2018.

> La Convención Constituyente no perturbó la delicada arquitectura de estas recomendaciones. Por el contrario, hizo aún más clara su voluntad de **cerrar todo camino a la utilización de fondos públicos para el sostenimiento o beneficio de escuelas privadas**, confesionales o laicas, o de institución sectaria alguna, excepto al grado en que éstas pudiesen derivar provecho indirectamente de servicios **no educativos** ofrecidos para protección o el bienestar de la niñez.[177]

Mediante la sentencia y las opiniones de conformidad que se emiten durante el día de hoy, se determina que la concesión de certificados a estudiantes del sistema de educación para que éstos puedan matricularse en escuelas

---

[177] José Trías Monge, *Historia Constitucional de Puerto Rico*, Vol. III, en la pág. 179 (Ed. U.P.R. 1982) (énfasis suplido).

privadas no constituye un desembolso de fondos públicos para sufragar los gastos de una educación privada. Asimismo, se determina que la cláusula de sostenimiento contenida en nuestra Constitución permite que se establezcan escuelas que sean operadas y administradas por entidades ajenas al Departamento de Educación. Con este proceder, producto de un infausto ejercicio de revisionismo histórico, se trastocan los cimientos de esa delicada arquitectura instaurada por nuestros constituyentes y se abre, en definitiva, ese camino vedado a la utilización de fondos públicos para -irónicamente- privatizar nuestro sistema de educación.

Las disposiciones legislativas en controversia y el recuento del tracto procesal de este caso están comprendidos íntegramente en las opiniones de conformidad. No obstante, la interpretación desafortunada de la cláusula constitucional de sostenimiento que hace una mayoría y la revocación indeliberada de un precedente judicial de este Tribunal, como artilugio para alcanzar el resultado deseado, me compele a exponer en detalle los fundamentos sustantivos de mi disenso.

Los errores conceptuales y desaciertos jurídicos de los integrantes de la mayoría no sólo evidencian una propensión indebida al criterio general de las ramas políticas, sino que, además, reflejan un afán desmedido por desentrañar los significados e interpretaciones que mejor se adaptan a la conclusión que se proponen adelantar. En este ejercicio retórico, y hasta tautológico, el criterio mayoritario contrapone los términos "sostenimiento" y

"sustitución" para concluir que el establecimiento de escuelas que **operarán como organizaciones sin fines de lucro** y **no serán administradas** por el Departamento de Educación no tiene el efecto de sustituir o suplantar las escuelas públicas, por lo que no se configura una violación a la cláusula de sostenimiento de nuestra Constitución.

De igual forma, como parte de una semántica discursiva difusa, la mayoría parece equiparar los términos "beneficio" con "sostenimiento" y señala que "todo sostenimiento equivale a que exista un beneficio" y que los constituyentes entendieron que "el término 'beneficio' estaba inmerso dentro de la palabra 'sostenimiento'". Op. de Conformidad (J. Rivera García) en la pág. 39. Sin embargo, a pesar de abordarlos como sinónimos inicialmente, la mayoría entiende que el beneficio que suponen los certificados para la libre selección de escuelas privadas no constituye el tipo de sostenimiento que proscribe nuestra Constitución. En cuanto a esto, la mayoría apoya la conclusión que consiste en que, para que se configure una violación a la cláusula de sostenimiento "el beneficio que se conceda debe llegar al punto de sostener la entidad privada". *Id.* en la pág. 44. Inextricablemente, se subraya que, "un beneficio debe llegar a tal grado que **sostenga**, más aún, que **sustituya**". *Id.* (Énfasis en original). Así, pues, a pesar de que los certificados redundan en una contribución o asistencia económica a las escuelas privadas, la mayoría parece entender que, hasta tanto la totalidad de los estudiantes de dichas escuelas sea subvencionada por los referidos certificados, no se estará

ante un sostenimiento, sino ante un simple beneficio. Es decir, si en una escuela privada cuya matrícula es de 500 estudiantes y sólo 499 de éstos reciben "certificados de ayuda", no cabe hablar de que el Estado sostiene esa escuela privada en violación al texto constitucional, porque hay un estudiante que no recibe tal ayuda. Así de desatinado e incongruente es el "razonamiento mayoritario."

Por último, a pesar de caracterizar la cláusula de sostenimiento como una autóctona y aclarar que, a diferencia de la de establecimiento, su enfoque es uno "estrictamente económico", confusamente se alude a jurisprudencia federal que interpreta esa cláusula religiosa para explicar que, "en el ámbito jurídico, el término tiene su origen en la jurisprudencia federal que considera el sostenimiento (*support*) como una forma de establecimiento".[178] *Id.* en la pág. 22. Así, algunos integrantes de este Foro recurren a casuística federal en la que se avaló el uso de vales educativos bajo el fundamento de que éstos eran neutrales hacia todas las

_____

[178] Como se discute posteriormente, la palabra "support", es una traducción adecuada para la palabra "sostenimiento". Justo por ello, la definición de la Real Academia Española citada por la mayoría de "sostener" incluye entre sus acepciones "proveer apoyo". Sin embargo, el uso de "support" por parte en el razonamiento mayoritario es incompatible con la definición que finalmente formulan de lo que constituye un sostenimiento conforme a la cláusula objeto de su análisis. Como se expone a lo largo de este disenso, las incongruencias semánticas de la mayoría al momento de interpretar el alcance de la palabra "sostenimiento" develan una metodología adjudicativa que parece responder a esa infame máxima política -y no judicial- a los efectos de que "el fin justifica los medios".

religiones. Ciertamente, dicha casuística es del todo inaplicable a la controversia ante nuestra consideración, puesto que no existe una disposición homóloga a nuestra cláusula de sostenimiento en la Constitución federal y el enfoque de la cláusula de establecimiento es, evidentemente, uno estrictamente religioso. Confundir una con otra, como en la práctica hace la mayoría, pone de manifiesto un patente enredo de espíritu.

La privatización acompasada de nuestro sistema de enseñanza pública que se viabiliza mediante la legislación que hoy se valida, se asienta en una transgresión al mandato constitucional el cual, sin ambages, establece que, "[n]o se utilizará propiedad ni fondos públicos para el sostenimiento de escuelas o instituciones educativas que no sean las del Estado". Art. II, Sec. 5, Constitución de Puerto Rico, L.P.R.A. Tomo 1, Ed. 2008, en la pág. 292 (en adelante, Const. P.R.). De esta forma, y mediante una interpretación artificiosa, la mayoría emascula el texto constitucional y hace suya la tesis de privatización que subyace la llamada Reforma Educativa, tesis que se sustenta sobre la premisa de "socializar las pérdidas y rifar las ganancias." Manolo Núñez Negrón, *La tiza y la pizarra*, 28 de abril de 2018, https://www.elnuevodia.com/opinion/columnas/latizaylapizarracolumna-2416358/ (última visita 9 de agosto de 2018).

## I.

Como antesala a una discusión sustantiva del criterio mayoritario, y en atención a los fundamentos jurídicos y la metodología adjudicativa empleada por algunos integrantes

de la mayoría para disponer del presente caso, me veo en la obligación de discutir, si bien brevemente, ciertas **doctrinas básicas del federalismo**. Éstas evidencian la incompatibilidad del razonamiento mayoritario con el resultado al cual arriban. Una vez más, una mayoría recurre a la práctica irreflexiva de aplicar, sin un verdadero rigor metodológico, precedentes federales para analizar una controversia al amparo de una cláusula constitucional autóctona.

Resulta insólito que, en un caso que requiere interpretar el alcance de una cláusula inherentemente puertorriqueña, una mayoría entienda apropiado referirse a un sinnúmero de decisiones del Tribunal Supremo de Estados Unidos que interpretan **una disposición constitucional distinta**, presuntamente "para propósitos ilustrativos". Op. de Conformidad (J. Rivera García), en la pág. 30.

Con relación a la interacción entre las cortes estatales y federales, el ex Juez Asociado del Tribunal Supremo de Estados Unidos, William J. Brennan Jr., publicó en los años setenta un artículo célebre mediante el cual hizo un llamado a las cortes estatales estadounidenses a interpretar sus propias constituciones **de manera independiente** a la Constitución federal con el propósito de ampliar la protección de los derechos individuales. *Véase* William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489 (1977). La tesis central del escrito dio paso al movimiento llamado nuevo federalismo judicial o *state constituionalism movement*, cuyo propósito ha sido, entre otras cosas,

proponer teorías interpretativas para examinar situaciones en las cuales las cortes estatales se enfrentan a derechos reconocidos tanto a nivel estatal como federal y/o cuando interpretan un derecho que no tiene una contraparte en la Constitución federal. *Véase* en general, Robert F. Williams, *In the Glare of the Supreme Court: Continuing Methodology and Legitimacy Problems in Independent State Constitutional Rights Adjudication*, 72 Notre Dame L. Rev. 1015 (1997).

Proponentes de este movimiento han señalado con gran acierto que "an underappreciation of state constitutional law has hurt state and federal law and has undermined the appropriate balance between state and federal courts in protecting individual liberty". Jeffrey S. Sutton, *51 Imperfect Solutions: States and the Making of State Constitutional Law* 6 (Oxford University Press, 2018) (énfasis suplido). Cónsono con esta visión, se ha indicado que, como "mínimo irreductible", las cortes estatales deben impartirle contenido propio a sus constituciones respetando así sus trasfondos constitucionales particulares, al igual que las tradiciones legales que las inspiraron. *Id.* en la pág. 189.

Según este acercamiento a la distribución de soberanías entre el gobierno federal y los estados, cuando la cláusula a interpretarse no tiene una contraparte en la Constitución federal -como ocurre con la cláusula de sostenimiento objeto de análisis en el presente caso- hay un consenso en que la interpretación de ese tipo de cláusulas conllevará un análisis particularizado sobre el alcance del derecho que se reconozca o la prohibición que

en ésta se le imponga al gobierno. Ello, **sin necesidad de recurrir a la jurisprudencia de la esfera federal**. Véase Ann M. Lousin, *Justice Brennan's Call to Arms-What Has Happened Since 1977?*, 77 Ohio St. L.J. 387, 395-99 (2016).

En el contexto específico del Estado Libre Asociado de Puerto Rico, esta discusión ha sido enmarcada en un reconocimiento de que nuestra Constitución, en particular su Carta de Derechos, es de "factura más ancha" que la Constitución federal. *Véase* Ernesto L. Chiesa, *Los derechos de los acusados y la factura más ancha*, 65 Rev. Jur. U.P.R. 83 (1996). A lo largo de nuestra historia, esta interpretación ha propiciado el reconocimiento de derechos que no necesariamente existen en la esfera federal, proveyendo así mayores protecciones individuales para nuestra ciudadanía. Tatiana Vallescorbo Cuevas, *Interpretando la factura más ancha*, 46 Rev. Jur. U.I.P.R. 303 (2012). Lamentablemente, en los últimos años, una mayoría de este Tribunal, ha reducido sustancialmente el alcance de las protecciones y los derechos individuales que nuestra Constitución contempla. Ejemplo de ello es el análisis que hoy suscribe una mayoría.

En *Pueblo v. Díaz Medina*, una mayoría de los miembros de este Tribunal adoptó, mediante *dictum*, una metodología para dilucidar controversias similares anclada en el reduccionismo judicial. El ex Juez Presidente Hernández Denton criticó la adopción de esa metodología y denunció que ésta "no toma en consideración la tradición histórica del federalismo y la interacción dinámica entre el constitucionalismo federal y estatal, la cual ha permitido

que la democracia en Estados Unidos sobreviva y prospere por más de dos siglos". *Pueblo v. Díaz Medina*, 176 D.P.R. 601, 656 (2009) (J. Hernández Denton, Op. Disidente). Con la sentencia que se certifica en el día de hoy, la mayoría olvida, nuevamente, cómo la Constitución federal reconoce "un gran margen para que los tribunales supremos estatales interpreten las garantías de sus respectivas Constituciones con mayor amplitud y a la vanguardia de los preceptos enunciados en algunos de los dictámenes del Tribunal Supremo de Estados Unidos. *Esa es la virtud del federalismo estadounidense tan preciado por sus ciudadanos*". *Id.* (énfasis en original).

Uno de los integrantes de la mayoría señala que "contrario a la Constitución federal, nuestra Constitución es más extensiva y abarcadora. Contamos con una disposición autóctona, la cláusula de sostenimiento." Op. de Conformidad (J. Rivera García), en la pág. 33. Sin embargo, en su análisis e interpretación de nuestro texto constitucional, se divaga entre impartirle contenido propio a esa cláusula autóctona y emular la jurisprudencia federal que interpreta una cláusula distinta; a saber, la cláusula de establecimiento de la Constitución federal. A fin de cuentas, los Jueces y Juezas que suscriben el criterio mayoritario se desentienden de su ineludible deber como intérpretes de nuestra constitución de ampliar y extender el alcance de los derechos que cobijan a nuestra ciudadanía.

En este caso, el derecho en juego es el derecho de todos los niños y niñas de nuestro País a "una educación

que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales". Art. II, Sec. 5, Const. P.R. Nuestra constitución, contrario a la federal, garantiza la existencia de "un sistema de instrucción pública el cual será libre y enteramente no sectario". *Id.* La mayoría, sin embargo, parece entender que el derecho en juego es el acceso a una educación privada, en instituciones completamente desvinculadas del Estado. Validar los programas aquí en disputa bajo el fundamento de que éstos amplían las oportunidades educativas y mejoran nuestro sistema de educación no es más que un subterfugio para adelantar una agenda neoliberal y libertaria a costa de nuestra Constitución y los valores sociales y democráticos que ésta encarna.

## II.

La conclusión de una mayoría de los integrantes de este Foro se sustenta en una interpretación de los debates que se suscitaron durante la Convención Constituyente en lo relativo a la prohibición contenida en la precitada cláusula de sostenimiento. Ese debate, en el marco de una controversia parecida a la que se plantea en el caso de epígrafe, ya había sido analizado por este Tribunal en *Asoc. de Maestros P.R. v. Srio. Educación*, 137 D.P.R. 528 (1994). En aquella ocasión, la Asociación de Maestros, entidad que también figura en este caso como parte recurrida, cuestionó la constitucionalidad de la disposición de la *Ley de Becas Especiales y Libre Selección de Escuelas*, Ley Núm. 71 de 3 de septiembre de 1993 (18

L.P.R.A. sec. 911 *et seq.*). Mediante esta legislación, entre otras cosas, se pretendieron instituir incentivos económicos para que los padres de estudiantes de escuelas públicas pudiesen transferir a sus hijos a escuelas privadas.[179]

Al pasar juicio sobre la constitucionalidad de ese programa de becas o incentivos económicos, en *Asoc. de Maestros de P.R.*, este Tribunal evaluó la compatibilidad de la disposición legal que establecía esos beneficios con la prohibición contenida en la cláusula de sostenimiento de nuestra Constitución. En aquel momento, le correspondió a este Foro impartirle contenido a esa disposición constitucional autóctona y delimitar el alcance de la palabra "sostenimiento". Así, el Tribunal ejerció su deber de interpretar el texto constitucional y concluyó que el programa de incentivos económicos establecido por la legislatura y el ejecutivo creaba un esquema prohibido por la cláusula de sostenimiento. Esto, puesto que derivaba en la utilización de fondos públicos para beneficiar instituciones académicas que eran privadas y, como tal,

---

[179] De manera virtualmente idéntica a las disposiciones sobre libre selección de escuelas que hoy se validan, el programa de becas evaluado en *Asoc. de Maestros de P.R.*, contaba con cuatro (4) modalidades de selección de escuela, a saber: (1) el traslado de estudiantes de escuela pública a cualquier otra escuela pública de su preferencia; (2) el traslado de estudiantes de escuela privada a cualquier escuela pública; (3) la provisión de incentivos monetarios para que estudiantes de escuelas públicas pudiesen transferirse a escuelas privadas, y (4) la otorgación de permisos e incentivo para que estudiantes talentosos tomaran cursos en instituciones universitarias.

estaban exentas del control y la administración del gobierno. Específicamente, se señaló lo siguiente:

> En primer lugar, debemos notar que la palabra "sostenimiento" no está cualificada en el texto constitucional. **Todo sostenimiento está prohibido.** Naturalmente, el problema consiste en delimitar qué interacción entre las escuelas privadas y el Estado es permisible y qué cooperación no lo es por constituir el sostenimiento que nuestra Constitución proscribe.

*Asoc. de Maestros de P.R.*, 137 D.P.R. en la pág. 544.

Dado que el término "sostenimiento" no estaba cualificado, y por entender que la prohibición textual parecía ser una absoluta, le correspondió a este Tribunal delimitar el alcance de la prohibición y analizar los debates que se suscitaron en la Convención Constituyente para determinar en qué instancias la interacción entre el Estado y las instituciones educativas privadas era permisible sin que se infringiera la prohibición constitucional de sostenimiento. Evaluado ese extremo, se concluyó que:

> Un examen del historial de los debates en la Convención Constituyente sobre la cláusula del sostenimiento apoya una interpretación amplia del alcance de la prohibición.
>
> . . .
>
> No hay duda de que la Sec. 5 del Art. II de nuestra Constitución, supra, no permite que el Estado sostenga ninguna institución educativa privada, sea religiosa o no. Su objetivo va más allá de la separación de Iglesia y Estado, pretendiendo proteger y fortalecer al máximo nuestro sistema de instrucción pública frente a toda institución educativa privada.

*Id.* en las págs. 544-45; 547.

A tenor con esta interpretación, el Tribunal invalidó las disposiciones legislativas que permitían el otorgamiento de incentivos económicos a padres de

estudiantes de escuelas públicas para que asistieran a escuelas privadas. Fundamentó su dictamen en lo siguiente:

> La cláusula del sostenimiento impide que el Estado provea beneficios, ayudas o apoyo a una escuela privada. Naturalmente, no estaría prohibido por lo anteriormente expuesto que la escuela privada se beneficie indirecta e incidentalmente de servicios que el Estado provee a toda la ciudadanía, como los de policía y bomberos. Sí estaría el Estado impedido de prestar servicios o ayuda a una escuela privada que, al contribuir directamente a la misión educativa de la institución, constituyen el sostenimiento prohibido por nuestra Constitución. A manera de ejemplo, el Estado no podría asignar fondos públicos para la construcción de escuelas privadas.

*Id.* en las págs. 547-48.

Mediante la sentencia que se certifica hoy, se deja sin efecto el precedente establecido en *Asoc. de Maestros de P.R.*[180] Ello, a pesar de que el texto constitucional objeto de interpretación no ha sido enmendado por la Rama Legislativa.[181] Ese proceder representa una reducción

---

[180] Como se indicó, la mayoría correctamente mantiene en vigor la determinación sobre la legitimación activa de los aquí recurridos. Concurro con esa determinación. No obstante, tal y como expresara el ex Juez Asociado Fuster Berlingeri en su Opinión de Conformidad en *Asoc. de Maestros de P.R.* estimo que la legitimación de la Asociación en este caso se fundamenta en los criterios convencionales pautados para las asociaciones en nuestra jurisprudencia. Por ello, entiendo que resulta innecesario reproducir el esquema de análisis pautado en *Flast v. Cohen*, 392 U.S. 83, 99-100 (1965), sobre la legitimación activa de contribuyentes para pleitos incoados al amparo de la cláusula de establecimiento federal; máxime cuando la resolución del presente pleito se fundamenta en una interpretación de la cláusula de sostenimiento de nuestra Constitución. *Véase Asoc. de Maestros de P.R.*, 137 D.P.R. en la pág. 572 (J. Fuster Berlingeri, Op. Conformidad).

[181] El profesor José Julián Álvarez González, al discutir con aprobación la decisión del Tribunal en *Asoc. de Maestros de P.R.*, justamente señaló que para cualquier

inusitada y sustancial –por no decir absoluta– del alcance y contenido que se le impartió a una cláusula constitucional autóctona ideada para promover y fortalecer ese "sistema de instrucción pública . . . libre y enteramente no sectario" y exteriorizar el compromiso más cabal de nuestros constituyentes con el derecho de todos los niños y niñas de nuestro País a una educación gratuita, según lo consagrado en nuestra Constitución. *Véase* Art. II, Sec. 5, Const. P.R.

La actuación de la mayoría, además, se revela como una manifestación más de esa sagaz insistencia en no respetar nuestros precedentes judiciales cuando éstos no se atemperan o divergen de la formulación de política pública de gobiernos afines.[182] Esta actitud obcecada y del todo incompatible con nuestra función como Jueces y Juezas de este Tribunal pone en duda la independencia judicial y la legitimidad de una institución que no puede estar sujeta a los caprichos de quienes la integran. La predictibilidad, uniformidad y certeza del Estado de Derecho que derivan de la adopción de la doctrina de *stare decisis* en nuestra jurisdicción se disipan irrevocablemente cada vez que una

---

"actuación gubernamental dirigida a proveer un beneficio especial para el sistema de educación privada" el gobierno tenía a su haber el proceso de enmienda constitucional. José Julián Álvarez González & Ana Isabel García Saúl, *Derecho Constitucional*, 65 Rev. Jur. U.P.R. 799, 843 (1996).

[182] Véanse *e.g. Pueblo v. Sánchez Valle*, 192 D.P.R. 594 (2015); *Rivera Schatz v. ELA y C. Abo. PR II*, 191 D.P.R. 791 (2014); *ELA v. Crespo Torres,* 180 D.P.R. 776 (2011).

mayoría olvida que la toga es imperturbable e inmutablemente negra.[183]

La interpretación acomodaticia que hace una mayoría de la discusión que se suscitó durante la Convención constituyente no solamente es diametralmente opuesta a la que hiciera este Tribunal en *Asoc. de Maestros de P.R.* sino que, además, tergiversa y descontextualiza expresiones realizadas por los delegados con el propósito de fundamentar su errada conclusión y restarle contenido a la cláusula constitucional que explícitamente prohíbe el sostenimiento de instituciones educativas privadas con fondos públicos. Veamos.

## III.

Como cuestión de umbral, conviene examinar la definición unívoca adoptada por una mayoría de la palabra "sostenimiento". Lejos de un estudio lingüístico o etimológico del concepto y cómo éste fue empleado por los constituyentes durante los debates de la convención, la mayoría opta por recurrir al diccionario de la Real Academia Española para asignarle un significado que, según

---

[183] Nótese que la mayoría, luego de ofrecer un listado de tres (3) razones por las cuales los precedentes judiciales pueden ser revocados a modo de excepción, limita su análisis a indicar que "la normativa establecida y la interpretación que hicimos sobre la cláusula de sostenimiento en Asoc. de Maestros P.R. v. Srio. Educación, es claramente errónea", sin expresión ulterior. Op. Conformidad (J. Rivera García) en la pág. 21. Acto seguido, se replican e intercalan en esa opinión esencialmente *ad verbatim* el análisis expuesto por el ex Juez Asociado señor Rebollo López en su disidente para ese caso y los argumentos esbozados en los alegatos del Estado y de las interventoras para el caso ante nuestra consideración.

se desprende de la propia Opinión de Conformidad del Juez Asociado señor Rivera García, es incongruente con la discusión habida en la convención en torno al alcance de la palabra "sostenimiento".

Delimitar el alcance del mandato constitucional que prohíbe el sostenimiento de escuelas o instituciones educativas que no sean las del Estado requiere un estudio cabal y ponderado de las expresiones vertidas por los constituyentes y el desarrollo textual de lo que terminó siendo la Sección 5 del Artículo II de nuestra Constitución. Por ello, no cabe citar aisladamente comentarios y expresiones de los delegados, pues, al discernir la verdadera intención de éstos, lo correcto es evaluar el debate en su totalidad.

Inicialmente, lo que vino a ser la cláusula de sostenimiento ni siquiera incluía la palabra con la que se le denominó y actualmente se le conoce. A esos efectos, la cláusula leía de la siguiente manera: "No se utilizará propiedad ni fondos públicos para la **enseñanza** en otras escuelas o instituciones educativas que no sean las del Estado". Diario de Sesiones de la Convención Constituyente, Tomos I, II y III, en la pág. 1765, *disponible en* http://www.oslpr.org/v2/PDFS/DiarioConvencionConstituyente.pdf (en adelante Diario de Sesiones) (énfasis suplido). El delegado Trías Monge propuso eliminar la palabra "enseñanza" y sustituirla por "sostenimiento". *Id.* en la pág. 1791. Luego de que la enmienda propuesta fuese secundada, el delegado Brunet propuso intercalar la palabra beneficio para que la cláusula leyera de la siguiente

manera: "No se utilizará propiedad ni fondos públicos para el sostenimiento o beneficio de otras escuelas o instituciones educativas que no sean las del Estado". *Id.* El delegado Trías Monge explicó las dos enmiendas propuestas de la siguiente manera:

> Diría entonces: "No se utilizará propiedad ni fondos públicos para el sostenimiento o beneficio de escuelas o instituciones educativas...." Se acepta a base de que el lenguaje que se está proponiendo es básica o exactamente más bien, ahora, el de la Constitución del Hawaii, según quedó últimamente aprobada ya: y es también básicamente parecido, a la de la Constitución de Illinois, que ha servido a mi juicio de base para esta disposición y que mantiene más claramente que con la palabra enseñanza el principio de la debida separación entre Iglesia y Estado, a la vez que no afecta la disposición ulterior en la misma sección al efecto de que nada en esta disposición impedirá que el Estado pueda prestar servicios no educativos a los niños. La intención es más bien entonces entre escuelas o instituciones, intercalar o enseñanzas y niños, quedando debidamente salvaguardado el derecho de los niños a recibir aquellas ayudas que el Estado ofrezca. *Id.* en la pág. 1792.

Es decir, el delegado Trías Monge expresamente reconoció que el lenguaje propuesto era exactamente el mismo que el de la Constitución de Hawaii vigente en aquel momento y que éste procuraba ampliar el alcance de la cláusula de establecimiento mediante una prohibición adicional.[184] *Id.* Así, mediante la sustitución de

---

[184] El caso de Hawaii tiene especial relevancia para la interpretación que hoy se hace de nuestra cláusula constitucional y el resultado al que se llega en base a ésta. Al momento de nuestra Convención Constituyente, la cláusula de sostenimiento de la Constitución de Hawaii establecía lo siguiente: "Nor shall public funds be appropriated for the support or benefit of any sectarian or private educational institution". Cuando le correspondió al Tribunal Supremo de Hawaii interpretar esa cláusula, en *Spear v. Honda*, 449 P.2d 130 (1968), ese foro concluyó que los constituyentes habían sido inequívocos al cerrar

"enseñanza" por "sostenimiento", los constituyentes procuraron ser más categóricos en la prohibición, haciendo ésta extensiva no únicamente a la enseñanza, sino al sostenimiento en general y a cualquier otro beneficio que el gobierno pudiese proveer a instituciones educativas privadas mediante el uso de propiedad o fondos públicos.

A todas luces, la discusión que antecede choca con el alcance limitado que la mayoría le atribuye a la palabra "sostenimiento" en el texto constitucional. Conforme a las definiciones provistas por la Real Academia Española a las que se aluden en la Opinión de Conformidad del Juez Asociado señor Rivera García, la mayoría concluye que "el

---

enteramente la puerta que hubiese permitido desembolsar fondos públicos para subvencionar cualquier aspecto de la educación privada. Luego de que el Tribunal Supremo de Estados Unidos validara la implementación de los vales educativos en el estado de Ohio, en *Zelman v. Simmons-Harris*, 536 U.S. 639, el gobierno de Hawaii emitió una consulta a su Secretario de Justicia en torno a la aplicación de esa decisión en virtud de la cláusula de sostenimiento y si la implementación de vales educativos violentaría la misma. En respuesta, el Secretario de Justicia emitió una opinión mediante la cual concluyó que la cláusula de sostenimiento de la Constitución impedía que se instituyera un programa de vales educativos similar al validado por el Tribunal Supremo federal en *Zelman*. Razonó, en esencia, que la determinación en ese caso se había hecho al amparo de la cláusula de establecimiento y que la Constitución de Hawaii contenía una cláusula adicional ausente en la constitución federal que proscribía el desembolso de fondos públicos a instituciones educativas privadas. El Secretario correctamente afirmó que, en ese aspecto, "the Hawaii State Constitution is more restrictive than its federal counterpart". State of Hawaii, Department of the Attorney General, Op. No. 03-01, http://ag.hawaii.gov/wp-content/uploads/2013/01/03-01.pdf. En atención a la Opinión del Secretario de Justicia, el estado de Hawaii enmendó su Constitución para permitir la implementación de un programa de vales educativos.

término sostenimiento equivale a proporcionar lo necesario para subsistir". Op. de Conformidad (J. Rivera García), en la pág. 22. Embozadamente, se explica que "en la medida en que se dé a alguien lo necesario para subsistir, es decir, para mantenerse, permanecer o conservarse implica que se le está sosteniendo". *Id.* Esto, a pesar de que una de las definiciones provistas por la Real Academia Española para la palabra "sostener" que se cita es la de "prestar apoyo, dar aliento o auxilio". *Id.* Como se mencionó, cónsono con esa definición, al referirse al presunto origen del término en la jurisprudencia federal, un integrante de la mayoría confusamente utiliza la palabra "support" como traducción para "sostenimiento". Ello, pese a haber rechazado esa adopción de la palabra en su análisis original.

Esta dicotomía semántica que suscribe la mayoría al interpretar la palabra "sostenimiento" y la sucesión de premisas disparatadas que de ella resultan culmina con la siguiente afirmación:

> [E]l Art. II, Sec. 5 de la Constitución de Puerto Rico lo que quiso evitar era que el Estado, mediante el sostenimiento de escuelas, promoviera una religión en particular y sustituyera el sistema de enseñanza público por uno privado . . . En el debate de la constituyente quedó establecido que lo que el Estado no podía hacer era tomar el sistema becario para sostener escuelas privadas y tampoco sustituir el sistema de instrucción pública por uno privado. *Id.* en la pág. 42.

Para todos los efectos, pues, la determinación de la mayoría tiene el efecto de enmendar, por vía judicial, nuestro texto constitucional para que éste lea: "No se utilizará propiedad ni fondos públicos para la **sustitución** de las escuelas o instituciones educativas del Estado por

instituciones privadas". Es de esta manera que lo que los constituyentes vislumbraron como una prohibición general y abarcadora al sostenimiento de instituciones educativas privadas se reduce a una simple prohibición de sustituir un sistema por el otro. De esta manera, "sostener" no implica prestar "apoyo" o "auxilio" al sector privado, sino más bien crear un esquema que tenga el efecto de "proporcionar lo necesario para [su] subsistencia" y propicie que las escuelas privadas pasen a ocupar el lugar de las escuelas del Estado. *Id.* en la pág. 22.

De otra parte, y como evidencia adicional del amplio alcance que los constituyentes procuraron impartirle a la palabra "sostenimiento", la enmienda propuesta por el delegado Brunet generó una discusión en torno a la necesidad de intercalar la palabra "beneficio" con "sostenimiento". Así, surgió el siguiente debate entre los delegados sobre la conveniencia y adecuacidad de añadir el término "beneficio":

> Sr: IRIARTE: Quisiera una explicación. Quisiera una explicación del alcance de esta disposición en la forma en que está redactada: "No se utilizará propiedad ni fondos públicos para el sostenimiento o beneficio"— dice ahora, según la enmienda del compañero Brunet— "de escuelas o instituciones educativas que no sean las del Estado". ¿Cómo se interpretaría esa frase "o beneficio"? ¿Cuál sería el alcance de esa disposición? El compañero Trías me parece que estaba explicando el alcance de la enmienda. El compañero Brunet podría explicar el alcance de esa enmienda, porque el sostenimiento lo comprendo, pero "el beneficio" me parece tan lato que podría complicar cosas que no deberían complicar[se], a mi juicio. Quisiera una explicación antes de poder argumentar en contra de la enmienda.
>
> Sr. TRIAS: A mi juicio, la enmienda es básicamente de estilo y no expande el concepto

indicado en la línea 10. Se sigue básicamente, como había indicado antes, el lenguaje consagrado en la Constitución de Hawaii que a su vez, pues sigue modelos de otras constituciones estatales estableciendo la distinción entre la obligación del Estado para atender al sostenimiento o beneficio de escuelas, únicamente escuelas **que estén bajo el dominio exclusivo del Estado**; y que el principio de la separación entre Iglesia y Estado, todos reconocemos pues que conlleva esa distinción básica; o sea, que el Estado, los fondos públicos, no deben utilizarse para el sostenimiento o beneficio [de otras escuelas] y eso a mi juicio era lo que se quería decir con: "enseñanza en las escuelas no bajo el dominio exclusivo del Estado."

Sr. IRIARTE: En contra de la enmienda, señor Presidente, compañeros delegados. Me parece que la enmienda por adición del compañero Brunet a la enmienda propuesta por el compañero Trías cambia completamente el propósito de la enmienda. No es lo mismo el sostenimiento de escuelas públicas o instituciones educativas que no sean las del Estado, a el sostenimiento o beneficio de escuelas públicas o instituciones que no sean las del Estado. Podría dársele la interpretación que ya se le dio en los Estados Unidos a disposiciones parecidas a éstas, que han sido motivo de tantos debates públicos y que fueron objeto de extensa información suministrada al Comité de la Carta de Derechos durante todo un día por las personas que aquí comparecieron.

Se podría entender que podría hacerse oposición a que se beneficiaran indirectamente instituciones que no fueren las del Estado. Si se le dieran becas a determinados estudiantes para que fueran a estudiar en el extranjero, en los Estados Unidos, a instituciones que no fueran del gobierno de Puerto Rico o que no fueran del gobierno de los Estados Unidos, que fueran instituciones privadas, administradas o dirigidas por sectas religiosas, digamos, podría interpretarse que indirectamente estaban recibiendo beneficios esas instituciones por el hecho de asignarse becas a estudiantes que estuvieran matriculados en esas instituciones religiosas. Podría darse esa interpretación agregándole esa frase ahí, "o beneficio". Me parece que sería bastante con que la limitación se circunscribiera a nuestras limitaciones territoriales y quedara limitada a lo que implicaría la frase anterior, la enmienda del compañero Trías Monge, pero no agregándole la frase "o beneficio". Si se le pone "beneficio" podría interpretarse de esa manera y entonces

> podría prestarse a discrímenes, que no creo que sea el propósito de la asamblea establecer, toda vez que se están condenando y se vienen condenando hasta ahora en lo que hemos leído en la carta de derechos, esos discrímenes.

Diario de Sesiones, *supra*, en las págs. 1792-93.

Nótese que la preocupación del delegado Iriarte estribaba en que el término "beneficio" se interpretara para impedir el otorgamiento de becas a estudiantes para que completaran estudios en instituciones educativas privadas o en el extranjero. Según expresó, el otorgamiento de esas becas podía interpretarse como un beneficio indirecto para esas instituciones. Varias expresiones del delegado Trías Monge que también son citadas por la mayoría despejan toda duda relacionada con el alcance de la prohibición de sostenimiento a instituciones educativas privadas. A modo de ejemplo, se desprende del debate que antecede que el delegado Trías Monge enfatizó cómo la obligación del Estado para atender al sostenimiento o beneficio de escuelas se extendía únicamente a aquellas **que estén bajo el dominio exclusivo del Estado.** Asimismo, el delegado Trías Monge entendió que la adición de la palabra "beneficio" constituía más bien un asunto de estilo que no tenía el efecto de expandir lo que ya se disponía con el uso de la palabra "sostenimiento".

La aclaración del delegado Trías Monge no puso fin a la preocupación relacionada con la naturaleza de las becas y si éstas podían considerarse beneficios provistos a las instituciones educativas o a los estudiantes. Específicamente, se discutió lo siguiente:

Sr. DAVILA MONSANTO: ¿Me permite una pregunta?

Sr. IRIARTE: Sí, señor.

Sr. DAVILA MONSANTO: Esas becas a que se refiere el compañero, a quién benefician, ¿a una escuela privada o al becado?

Sr. IRIARTE: Benefician al becado, pero ya se ha interpretado en distintos casos que fueron citados ante la carta de derechos, el Comité de la Carta de Derechos, en los distintos estados de la Unión que beneficiaban a las instituciones en las cuales esos becados recibían la enseñanza, la instrucción. Por eso es que para evitar esas interpretaciones traídas así tan a la brava, sería conveniente no agregar esa frase "o beneficio", sino que no se inviertan fondos públicos en Puerto Rico para el sostenimiento de escuelas que no sean las del Estado. En eso estoy de acuerdo. Pero si se pone "o beneficio", podría entenderse que una beca concedida a un estudiante era un beneficio que se le estaba dando indirectamente a esa institución en la cual ese becado recibía la instrucción. Por eso entiendo que no debe ponerse esa frase "o beneficio".

. . .

Sr. BENITEZ: Con la venia de la Presidencia. Sí, otorga tales becas en la actualidad el gobierno de Puerto Rico y la Universidad de Puerto Rico para colegios particulares religiosos a jóvenes que van a estudiar, por ejemplo, medicina en Estados Unidos. En la actualidad hay un número de jóvenes puertorriqueños estudiando en colegios de medicina en Estados Unidos que son colegios católicos y colegios protestantes.

*Id.* en las págs. 1793-94.

En atención a la confusión que podía generar la inclusión de la palabra "beneficio" con relación a la concesión de becas a estudiantes, y como señala uno de los integrantes de la mayoría, el delegado Iriarte solicitó al delegado Brunet que retirara su enmienda. No obstante, la mayoría omite la respuesta del delegado Brunet a tal solicitud:

Sr. BRUNET: Compañero, aquí, como en las vistas públicas, hay una tormenta en un vaso de agua. Bajo las disposiciones de la cláusula 19, tal como está redactada, Puerto Rico le está pagando

[estudios] a los estudiantes que van a cursar carreras en universidades católicas y protestantes. A pesar de que dice: directa o indirectamente, eso se está haciendo con el beneplácito de todo el mundo. *Id.* en la pág. 1794.

De esta manera, el delegado Brunet aclaró que las becas que fundamentaban la objeción del delegado Iriarte a la enmienda propuesta eran becas para estudiantes universitarios y no estudiantes de escuela primaria o secundaria, que eran las instituciones educativas a las que aludía la Sección 5 de la Constitución.[185] Además, en la discusión sobre qué podía considerarse un beneficio, el delegado aludió a la oración de la Sección 5 del Artículo II que finalmente dispuso que, "Nada de lo contenido en esta disposición impedirá que el Estado pueda prestar a cualquier niño servicios no educativos establecidos por ley para protección o bienestar de la niñez". Art. II, Sec. 5, Const. P.R. En cuanto a este enunciado, el delegado Brunet indicó que:

> A lo que se refiere la última disposición es a aquellos servicios que el Estado ofrece a sus propias escuelas y que no podría ofrecerlos en escuelas privadas, como comedores escolares, estaciones de leche, servicio dental, ¿por qué se le va a negar a los niños que estén asistiendo a escuelas privadas esa clase de servicios? No deben negárseles. Esta constitución, como está

---

[185] Hacemos eco de las expresiones de la mayoría a los efectos de que "es importante resaltar el contexto histórico en que se suscitó ese debate". Op. Mayoritaria/de Conformidad en la pág. 29. Cónsono con esto, resulta necesario señalar que Puerto Rico no contó con una Escuela de Medicina hasta el año 1966, por lo que las becas otorgadas por el gobierno a estudiantes universitarios a las que se aluden en la Convención eran de carácter extraordinario y se justificaban en la ausencia de una institución estatal que proveyera esos servicios educativos.

redactada, permite que eso sea así, que eso se haga.

*Id.* en la pág. 1796.

Al evaluar esta cláusula sobre servicios no educativos, los delegados propusieron enmendar la sección para añadirle al final la frase "bien asistan a las escuelas públicas o privadas". *Id.* en la pág. 1816. Esta enmienda fue derrotada, puesto que los delegados discutieron ampliamente la distinción entre servicios educativos y no educativos y entendieron que la referencia a "cualquier niño" cubría ese extremo. Fue en ese contexto, y no en el contexto de la prohibición contenida en la cláusula de sostenimiento –como incorrectamente afirma un integrante de la mayoría– que los constituyentes discutieron la decisión del Tribunal Supremo Federal en *Everson v. Board of Education*, 330 US 1 (1947). Específicamente, el delegado Geigel, quien propuso la enmienda, explicó que su intención era aclarar qué estudiantes de escuelas privadas podrían también beneficiarse de beneficios **no educativos**. Aludiendo al caso de *Everson,* explicó que esos beneficios incluían "los gastos de transportación o del almuerzo, etc., para asistir a la escuela . . . los libros, los zapatos, etc.". Diario de Sesiones, *supra*, en la pág. 1817.[186]

---

[186] La mayoría equipara el tipo de beneficio en controversia en *Everson* con las becas que también fueron objeto de discusión en la Convención Constituyente. Véase Op. de Conformidad (J. Rivera García), en la pág. 29. Empero, una lectura exigua del debate que surgió en torno a este asunto evidencia de forma fehaciente que los delegados entendieron perfectamente la distinción entre ambos beneficios.

En ningún momento, y contrario al razonamiento mayoritario, esas expresiones giraron en torno a la concesión de beneficios puramente educativos, como lo sería un certificado para estudiar en una escuela privada. Incluso, como se dijo, la discusión sobre cómo las becas no necesariamente implicaban una violación a la cláusula de sostenimiento se limitó a aquéllas concedidas a estudiantes universitarios. El delegado Iriarte reconoció en el debate que, en algunas jurisdicciones estatales, se había interpretado que la concesión de esas becas constituía un beneficio directo a la institución educativa. Eso, a su vez, resultó en que el delegado Brunet aclarara que nada en la Constitución prohibía que se les concediera becas a adultos ("Son jóvenes, pero no hay nada en la constitución, compañero, que prohíba conceder becas a adultos. ¿Dónde está?"). *Id.* en la pág. 1796.

El debate en torno a la inclusión de la palabra "beneficio" continuó y, como se señala en la Opinión de Conformidad del Juez Asociado señor Rivera García, los delegados en última instancia derrotaron la enmienda propuesta. Erróneamente, según se explica en esa Opinión de Conformidad "la frase 'o beneficio' quedó excluida de la disposición que alude a la cláusula de sostenimiento para no limitar aquellos aspectos que fueron objeto del debate". Op. de Conformidad (J. Rivera García), en la pág. 27. Sin embargo, de las propias expresiones de los delegados surge la razón por la cual la palabra "beneficio" fue finalmente excluida del texto constitucional:

Sr. BENITEZ: Yo quisiera brevemente, señor Presidente, decir unas palabras para explicar esto. La única razón que tengo para solicitar la exclusión de "beneficio" es que, a mi juicio, está todo cubierto con la palabra "el sostenimiento" y que me parece lo más conveniente que se use el menor lenguaje posible en esta disposición, y es en ese entendimiento que he solicitado la eliminación de "o beneficio".

Diario de Sesiones, *supra*, en la pág. 1797.

Asimismo, el delegado Trías Monge, quien estuvo presente y participó activamente del debate, consignó con posterioridad en su libro sobre nuestra *Historia Constitucional de Puerto Rico* que "[l]a enmienda no se aceptó, pero tan sólo por interpretarse, según consta de las declaraciones del presidente de la Comisión de Carta de Derechos, que 'está todo cubierto con la palabra el sostenimiento'". Trías Monge, *supra*, en la pág. 180. Resalta el ingenio y la inventiva del criterio mayoritario al concluir que la enmienda no prosperó porque los constituyentes no quisieron limitar la concesión de aquellos beneficios no educativos que fueron objeto de discusión. Esta conclusión ignora el texto claro de la oración que sucede la cláusula de sostenimiento y, además, falsea las expresiones de nuestros constituyentes.

En cuanto a este extremo, las expresiones de la mayoría también son contradictorias. Si bien se afirma que la exclusión de la palabra "beneficio" se debió a las preocupaciones de los delegados en el debate en torno a qué exactamente constituía un beneficio, expresiones posteriores en la Opinión de Conformidad son cónsonas con la explicación de los delegados Benítez y Trías Monge. Según se indica, "[u]n examen de los planteamientos allí

suscitados nos lleva a concluir que la razón para no incluir la frase 'o beneficio' era porque si se incluía, en el futuro podía surgir algún impedimento para que las instituciones que no fueran las del Estado se beneficiaran indirectamente". Op. de Conformidad (J. Rivera García), en la pág. 28. Contrariamente, en el acápite de la Opinión de Conformidad del Juez Asociado señor Rivera García en la que se aplica el Derecho a los hechos, la mayoría indica lo siguiente: "Según establecimos al principio, la enmienda para incluir expresamente la frase 'o beneficio' quedó derrotada por entender que, al ser un asunto de estilo, el beneficio estaba inmerso dentro de la palabra sostenimiento". *Id.* en la pág. 39.

Esta ambivalencia irreconciliable de la mayoría sobre la verdadera razón para la exclusión de la palabra "beneficio" resalta aún más cuando se afirma que "todo sostenimiento equivale a que exista un beneficio". *Id.* en la pág. 44. La ambigüedad de este análisis y las obvias contradicciones que de él se desprenden impiden discernir con precisión el razonamiento mayoritario, mucho menos el significado y alcance que finalmente le asignan a la palabra "sostenimiento".

Otro ejemplo más de la manera en que la mayoría descontextualiza y tergiversa las discusiones que se suscitaron en la convención es la interpretación de las expresiones relacionadas con el pago, por parte del gobierno, de la matrícula de estudiantes en escuelas privadas. Dado que la mayoría deliberadamente evita citar la totalidad de las expresiones de los delegados que

participaron de este debate, en aras de contextualizar el mismo, resulta indispensable referirnos íntegramente a la discusión que propició la pregunta del delegado Ramiro Colón:

> Sr. RAMIRO COLON: Simplemente quiero ilustrarme en cuanto al propósito del cambio de la palabra "enseñanza, por "sostenimiento". Para ilustrarme quiero hacerle una breve pregunta al... ahora se la voy a hacer al compañero Benítez en lugar del compañero Brunet, ya que su enmienda fue derrotada. Pero antes de hacerle la pregunta para los efectos de ilustración, de manera que él me la pueda contestar en la mejor forma posible, de acuerdo con la confusión que yo estoy sufriendo en estos momentos, quiero decir, que de acuerdo con lo que aquí se ha manifestado, en caso de que esta enmienda se apruebe como está, podría darse becas a estudiantes puertorriqueños para que vayan a escuelas o universidades privadas o sectarias, sin afectar el texto de la constitución. Si eso es así, pregunto yo ahora al compañero Benítez, ¿podría también el Gobierno resolver pagarles la matrícula a niños puertorriqueños para escuelas privadas en Puerto Rico sin violar el texto de la constitución?

> Sr. BENITEZ: Esta cuestión becaria a la cual usted se refiere, es un aspecto que se circunscribe a un rango sumamente reducido de situaciones dentro de las cuales el Estado provee facilidades de estudio fuera de sus aulas en la situación donde... **en casos excepcionales** no puede brindar esos servicios en sus propias aulas.

> . . .

> Sr. RAMIRO COLON: No me ha contestado. La pregunta era la siguiente: Si de acuerdo con esta constitución, quedando enmendada como se ha propuesto, ¿puede o no puede el gobierno de Puerto Rico por medio de alguna ley o de algunos fondos, pagarle a niños puertorriqueños, matrícula, no darle beca, pagarle la matrícula, en escuelas privadas en Puerto Rico?

> Sr. BENITEZ: Esto dependerá, esto dependerá de cuál sea la situación de hecho que exista, en esa circunstancia. Esto es, el gobierno de Puerto Rico no podría, dentro de estas disposiciones, tomar el sistema becario, o el artilugio de sistemas becarios, para sostener escuelas privadas; o, tampoco podría el Gobierno proveer

un sistema becario para producir a través de él enseñanza religiosa a sus estudiantes. Como tampoco podría utilizar el sistema becario para llevar a cabo un programa de educación en el cual se violara el sentido fundamental de la disposición que rige todo el párrafo de que "habrá un sistema de instrucción pública el cual será libre y enteramente no sectario".

Diario de Sesiones, *supra*, en la pág. 1799.

La mayoría convenientemente se limita a subrayar que el criterio del delegado Benítez "era que 'el gobierno de Puerto Rico no puede establecer un sistema becario que sustituya el sistema de educación pública que tiene la obligación el Estado de establecer, y que tiene la obligación de ser completamente no sectario". Op. de Conformidad (J. Rivera García), en la pág. 27. Evidentemente, se seleccionó la única expresión que apoya esa contención sobre la validez constitucional de que el gobierno utilice fondos públicos para pagar matrícula en escuelas privadas. Nótese que el verdadero criterio del delegado Benítez es, en primera instancia, que sólo en **situaciones excepcionales y de rango sumamente reducido**, el gobierno podría otorgar becas para que un estudiante reciba servicios educativos **que no puedan ser brindados por el Departamento de Educación**. Por otro lado, el delegado Benítez también indicó que la cláusula de sostenimiento prohibía que el gobierno sostuviera escuelas privadas mediante el "artilugio de sistemas becarios". Diario de Sesiones, *supra*, en la pág. 1799.

La mayoría opta por obviar la importancia de estas expresiones, incluyendo aquella mediante la cual el delegado Benítez consignó que el sistema becario no podría

utilizarse por el Estado para violar "el sentido fundamental de la disposición que rige todo el párrafo de que 'habrá un sistema de instrucción pública el cual será libre y enteramente no sectario'". *Id.* La mayoría también descontextualiza las expresiones del delegado Ramiro Colón en torno a su confusión sobre las becas. Una lectura completa de estas expresiones evidencia que la interpretación propuesta es a todas luces errónea.

En lo atinente al contexto específico de este debate, conviene resaltar que la confusión del delegado Ramiro Colón se refiere a la enmienda sobre la sustitución de la palabra "enseñanza" por "sostenimiento" propuesta inicialmente por el delegado Trías Monge. Es decir, el delegado razonó que, luego de que se derrotara la enmienda sobre la inclusión de "beneficio", por entender que ese concepto estaba subsumido en el "sostenimiento", la sustitución podía implicar que se permitiera costear la enseñanza a estudiantes fuera de las aulas del sistema público. Así, luego de la aclaración del delegado Benítez respecto a cómo -salvo contadas excepciones- el gobierno estaba impedido de subvencionar los costos de matrícula en una escuela privada, el delegado Ramiro Colón insistió en su confusión y expuso que:

> Sr. RAMIRO COLON: Permítame el compañero decirle en qué consiste mi confusión, ahora, y lo que trato yo es de hacer, meramente, [claridad] en este asunto, para votar con conciencia.
>
> Se ha dicho aquí, que, al darse una beca a un estudiante, lo que equivale a pagarle una matrícula, no se beneficia el colegio donde va a estudiar, sino al estudiante, y me parece a mí que si ése es el sentido, nada de esta constitución ha de prohibir que el gobierno de

Puerto Rico le pague matrícula en Puerto Rico a los niños cuando vayan a las escuelas privadas. Y yo quiero que me digan si eso puede ser así, para entonces saber cómo debo votar. *Id.* en la pág. 1800.

Nótese que, en primer lugar, el delegado Ramiro Colón está exponiendo las razones por las cuales la enmienda genera confusión. En segundo lugar, sus expresiones están condicionadas a lo que él entendió fue objeto de discusión en el debate ("si ése es el sentido"). Así, pues, lo que está diciendo el delegado es que, en la medida en que se considere que las becas no son beneficios que se le otorgan directamente a las instituciones académicas privadas, el texto constitucional no será óbice para que el Estado pague la matrícula como un beneficio directo a los estudiantes y no a las instituciones. No obstante, al estar condicionadas al parecer de los constituyentes, estas expresiones no son contundentes ni definitivas como lo interpreta la mayoría.

Conviene destacar, además, que el delegado Benítez, al atender esta confusión del delegado Ramiro Colón, reiteró que "el gobierno de Puerto Rico no puede establecer un sistema becario que sustituya el sistema de instrucción pública que tiene la obligación el Estado de establecer". *Id.* La interpretación acomodaticia de esta aclaración no toma en cuenta el contexto de la discusión y la confusión del delegado Ramiro Colón con relación a la procedencia de las becas académicas y si éstas constituían beneficios vedados por el texto constitucional. Asimismo, la mayoría pasa por alto que las expresiones del delegado Ramiro Colón están condicionadas a su entendimiento de la discusión que él mismo reconoce ser fuente de "confusión".

En virtud del análisis que antecede, y como se discute a continuación, los efectos de las disposiciones estatutarias cuya constitucionalidad hoy se decreta fueron esencialmente contemplados y rechazados por los delegados de la Convención Constituyente y representan una afrenta a nuestro sistema de educación pública. Sin lugar a dudas, el uso de fondos públicos para subvencionar la matrícula de estudiantes de escuelas públicas en instituciones educativas privadas infringe la cláusula de sostenimiento y, por consiguiente, es inconstitucional de su faz. Asimismo, es inconstitucional la creación y subvención, por parte del Estado, de instituciones educativas que no serán administradas y operadas por el Departamento de Educación y, por consiguiente, como advirtió el delegado Trías Monge en la Convención Constituyente, no estarán "**bajo el dominio exclusivo del Estado**". *Id.* en la pág. 1792 (énfasis suplido).

### III.

### A.

**La sentencia que hoy suscribe una mayoría de los integrantes de este Foro revoca el precedente pautado en Asoc. de Maestros de P.R. y autoriza el desembolso de fondos públicos a escuelas privadas mediante certificados equivalentes a los vales educativos que se invalidaron en aquel entonces. Por entender que cualquier modalidad de un esquema que permita que fondos del Departamento de Educación sean destinados a sufragar la matrícula de estudiantes en instituciones privadas tiene el efecto de beneficiar y sostener económicamente esas entidades,**

**decretaría la inconstitucionalidad de su faz del Programa de Libre Selección de Escuelas que hoy la mayoría valida.**

La Exposición de Motivos de la Ley de Reforma Educativa[187] reconoce expresamente que un programa similar, por no decir idéntico, fue declarado inconstitucional por este Tribunal en *Asoc. de Maestros de P.R.*, como ya discutiéramos. La Exposición indica que la realidad jurídica bajo la cual se decidió dicho caso presuntamente "ha sufrido cambios sustanciales". *Id.* Así, el texto aduce que "el desarrollo y manera de interpretar la cláusula de establecimiento de la Constitución Federal ha ido evolucionando con el pasar de los años, a tono con las exigencias del Siglo XXI". *Id.* Paso seguido, enumera una lista de decisiones federales, algunas de las cuales fueron citadas por las Opiniones de Conformidad de distintos integrantes de este Tribunal, para concluir que compete "revisitar este asunto a la luz de una detenida evaluación de todos los fundamentos en derecho, de los desarrollos históricos a nivel local y jurisprudenciales recientes a nivel federal". *Id.*

Si bien es cierto que el Tribunal Supremo de Estados Unidos ha emitido distintas decisiones en torno a la constitucionalidad de varios programas educativos similares

---

[187] Para obtener una visión panorámica, analítica e histórica de la educación en Puerto Rico desde los tiempos de España hasta la actualidad que supla el contenido de la Exposición de Motivos de la Ley confróntese: Juan José Osuna, *A History of Education in Puerto Rico*, Ed. UPR, 1949; Mayra Huergo Cardoso, *La Educación en Puerto Rico*, en Héctor Luis Acevedo (Editor), *Puerto Rico y su Gobierno, Estructura, retos y dinámicas*, Ediciones SM, 2016.

al Programa de Libre Selección de Escuelas, todos estos dictámenes, sin excepción, se fundamentan en la cláusula de establecimiento federal sobre la separación de Iglesia y Estado y/o en cláusulas constitucionales de los distintos estados correspondientes a ésta. Estos desarrollos doctrinales federales son completamente irrelevantes al momento de interpretar la cláusula de sostenimiento de nuestra Constitución, que, como bien reconoce el Juez Asociado señor Rivera García, tiene un enfoque estrictamente económico y no religioso. Op. de Conformidad (J. Rivera García), en la pág. 35. Es decir, la implantación de un programa de vales educativos en nuestra jurisdicción debe evaluarse a la luz de las prohibiciones contenidas únicamente en nuestra Constitución. El proceder mayoritario de ratificar la medida legislativa en controversia contraviene un mandato constitucional expreso que prohíbe, en nuestra jurisdicción, el uso de fondos públicos para sostener la enseñanza privada.

Al pasar juicio sobre el Programa de Libre Selección de Escuelas y compararlo con aquél dispuesto en Ley de Becas Especiales y Libre Selección de Escuelas de 1993 que este Tribunal invalidó, se colige que el "nuevo" esquema de ayudas económicas es, en realidad, un intento fallido de reproducir el programa anterior.[188] Una mayoría de este

---

[188] Ambas leyes contienen elementos idénticos en su lenguaje. Por ejemplo, tanto la Ley 71-1993 como la Ley 85-2018: (1) ostentan un carácter experimental para su implantación; (2) delegan funciones y deberes similares a las oficinas administrativas del programa, y (3) proveen prácticamente las mismas modalidades de ayudas económicas, entre otros asuntos.

Tribunal, sin embargo, entiende que los vales educativos son constitucionales en tanto y cuanto no tienen el efecto de "sostener" a las instituciones privadas que de ellos se benefician. Según razonan, el sostenimiento necesario para que se violente la prohibición constitucional ha de llegar al punto de sustituir el sistema público. La mayoría también entiende que los vales educativos son comparables a aquellas becas a las que se aludió en la Convención Constituyente que permitían que estudiantes universitarios completaran estudios en instituciones privadas. Me desconcierta pensar que la mayoría es incapaz de discernir la diferencia entre ambos programas.

En primer lugar, las becas a las que hicieron referencia los delegados eran ayudas económicas para que estudiantes universitarios —no de escuela primaria o secundaria— pudiesen cursar estudios en campos para los cuales el País no contaba con los recursos o las instituciones especializadas para ello. Incluso, como se discutió, cuando se contempló la posibilidad de que el Estado subvencionara estudios a nivel primario en escuelas privadas mediante la concesión de becas similares o el pago directo de los gastos de matrícula, el delegado Benítez fue enfático en aclarar que tal actuación sólo se justificaría en situaciones extraordinarias en las que el Estado estuviese imposibilitado de ofrecer los servicios necesarios al estudiante. Específicamente, el delegado Benítez manifiestamente sostuvo que sólo en **situaciones excepcionales**, el Estado podría otorgar becas para que un

estudiante reciba servicios educativos que **no puedan ser brindados** por el Departamento de Educación.

En segundo lugar, nada en la Exposición de Motivos o en la Ley que crea el Programa de Libre Selección de Escuelas justifica la concesión de los certificados en el hecho de que el sistema de educación pública del País carece de los medios y/o recursos para ofrecer los servicios a los estudiantes que podrían beneficiarse del Programa. De hecho, el propio Programa implica que los recursos económicos están disponibles, puesto que éstos serán transferidos del presupuesto del Departamento de Educación a las instituciones educativas privadas mediante el pago de la matrícula correspondiente. La mayoría también guarda silencio en torno a las consideraciones prácticas, de política pública o las razones que justifican este desembolso de fondos públicos a escuelas privadas. Excepto por la interpretación incorrecta que se hace del término sostenimiento y la adaptabilidad que se le atribuye a las expresiones de los constituyentes, ningún argumento de la mayoría derrota la patente inconstitucionalidad del Programa de Libre Selección de Escuelas.

En cuanto al argumento mayoritario sobre el debate que se suscitó en la Convención Constituyente respecto a quiénes eran los recipientes de las becas académicas, el profesor José Julián Álvarez González, al criticar argumentos similares contenidos en la Opinión Disidente del ex Juez Asociado señor Rebollo López en *Asociación de Maestros de P.R.* acertadamente señaló que la distinción entre **quién** recibe la ayuda económica, si los padres o la

entidad educativa privada, es una **"artificial e imposible de aplicar racionalmente"** puesto que el efecto de financiar con fondos públicos las instituciones privadas sigue siendo el mismo. José Julián Álvarez González & Ana Isabel García Saúl, *Derecho Constitucional*, 65 Rev. Jur. U.P.R. 799, 842 n. 191 (1996) (énfasis suplido).

No hay que ser un experto en finanzas para deducir que el pago de la matrícula de escuelas privadas por parte del Departamento de Educación –al margen de que éste se haga mediante certificados concedidos a los padres o cheques directos a las escuelas– constituye un desembolso monetario que tiene el efecto de beneficiar y sostener a la entidad educativa que en última instancia lo recibe. Este esquema satisface la acepción de la palabra "sostenimiento", que la mayoría descarta, y que conlleva prestar "apoyo" o "auxilio" económico a una escuela privada. A la luz de lo anterior, resulta inconcebible que una mayoría entienda que no se configura una violación a la cláusula de sostenimiento, máxime cuando los fondos serán extraídos directamente del presupuesto que se le asigna al Departamento de Educación y por tanto, dejarán de estar disponibles para costear gastos en beneficio del estudiantado de las escuelas públicas. Como bien señaló el profesor Álvarez González al evaluar el razonamiento mayoritario en *Asoc. de Maestros de P.R.*, "Lo decisivo es que el Estado paga por **servicios educativos similares** a los que ofrece su sistema de instrucción pública". *Id.* (énfasis suplido).

De otra parte, una mayoría sostiene que los fondos públicos destinados el Programa de Libre Selección de Escuelas, a nivel administrativo y en cuanto a los recursos asignados por estudiante, no son sustanciales en proporción al presupuesto total del Departamento de Educación. Véase Art. 14.07 de la Ley de Reforma Educativa (sección en la cual se expone que habrá una asignación de un 3% o menos del equivalente presupuestado por estudiante para cada año fiscal para implementar el Programa y de un 2% de los fondos que el Departamento asigne para cubrir los gastos administrativos). Por entender que esta cuantía es mínima, la mayoría refuerza su conclusión de que el Programa no infringe la cláusula de sostenimiento.

Como anticipamos, este razonamiento parte del error conceptual que supone equiparar la palabra "sostenimiento" con el verbo "sustituir". Al despojar de contenido nuestra cláusula de sostenimiento, la mayoría intima que sólo se podrían invalidar programas educativos que impliquen el desembolso de fondos públicos a favor de instituciones educativas privadas si éstos tienen el efecto de reemplazar o sustituir nuestro sistema de enseñanza público. Como también mencionáramos en el acápite III, la mayoría de los integrantes de este Tribunal -que en numeradas ocasiones ha criticado el activismo judicial- está, para todos los efectos prácticos, **reescribiendo**, hasta el punto de limitar su alcance a contadas excepciones, una cláusula de sostenimiento que se vislumbró como una de carácter abarcador que serviría de garantía para la permanencia y estabilidad del sistema de educación pública.

De acuerdo al criterio mayoritario, cabe preguntarse: ¿Qué intereses sociales y económicos protege esta cláusula constitucional? ¿Qué tipo de programa gubernamental la contravendría? ¿Cuánto del presupuesto del Departamento de Educación tendría que ser asignado a este Programa para que se entienda que se configura un sostenimiento prohibido? ¿Qué sería una asignación "sustancial" del presupuesto? ¿Un 5%, 15%, 30% o un 50%? Todas estas interrogantes reflejan lo absurdo del razonamiento mayoritario y cómo su determinación tiene el efecto de hacer inoperante la cláusula de sostenimiento. La prohibición del uso de fondos públicos para sufragar escuelas privadas **no es una cuestión de gradación**, sino **una de absolutos**.[189] No cabe validar una transgresión al texto constitucional porque la consideramos *de minimis*.

No albergo duda, que, al igual que aquellos vales educativos propuestos por el gobierno en 1993, los certificados que una mayoría valida hoy que permiten la transferencia de estudiantes de escuelas públicas a escuelas privadas claramente contravienen la cláusula de sostenimiento.[190] Según discutido, la emisión de esos

---

[189] Precisamente, como se mencionó anteriormente, nuestros delegados constituyentes optaron por no cualificar la palabra "sostenimiento" para así no limitar su alcance.

[190] Los otros tipos de certificados contemplados en la Ley de reforma Educativa que facilitan la transferencia de estudiantes a escuelas dentro del sistema de educación pública o de escuelas privadas a escuelas públicas no infringen la cláusula de sostenimiento, en tanto y cuanto no requieren un desembolso de fondos públicos a entidades ajenas al Departamento de Educación. A esos efectos, coincido con la apreciación del profesor Álvarez González cuando señaló que:

certificados requerirá que el Estado financie los gastos de matrícula para los estudiantes que los reciban y, consiguientemente, transfiera fondos públicos a las arcas de las instituciones privadas que, indiscutiblemente, obtendrán un beneficio económico de la transacción.

Tal y como ocurrió en Hawaii, correspondería a la legislatura, previo a implementar un programa de certificados para el pago de matrícula en escuelas privadas, enmendar nuestra Constitución para eliminar la cláusula de sostenimiento o cualificar la prohibición para así permitir que se puedan destinar fondos públicos al beneficio de instituciones educativas privadas, lo que actualmente nuestra Constitución prohíbe. Todo parece indicar, sin embargo, que una mayoría prefiere relevar a la Rama Legislativa de su rol constitucional en aras de acelerar la implantación de una política púbica a toda costa y al margen del texto de la Constitución.

---

Los vales educativos otorgados a estudiantes de una escuela pública que deseen transferirse a otra y a estudiantes de escuelas privadas que deseen transferirse a una escuela pública **son rigurosamente operaciones de contabilidad** dentro del presupuesto del Departamento de Educación. Su efecto es aumentar los fondos que reciben las escuelas públicas seleccionadas del presupuesto de ese departamento. Las becas especiales son harina de otro costal: **transfieren fondos del presupuesto de ese departamento a aquellas escuelas privadas que reciban a estudiantes que provengan del sistema público.** (énfasis suplido) (citas omitidas).

Álvarez González & García Saúl, *supra*, en la pág. 840 n. 188.

En cuanto a esto, resulta curioso cómo la Ley dispone que "[l]os fondos del Programa se distribuirán entre las cinco (5) modalidades del mismo con arreglo a la demanda que cada uno tenga". Art. 14.07.

Conforme al alcance de la cláusula de sostenimiento establecida por nuestros constituyentes y correctamente interpretada en *Asoc. de Maestros de P.R.*, procedía confirmar al Tribunal de Primera Instancia y decretar la inconstitucionalidad del Programa de Libre Selección de Escuelas que permite la transferencia de estudiantes de escuelas públicas a escuelas privadas mediante el pago de la matrícula por parte del Gobierno con fondos públicos.

**B.**

Además de la otorgación de certificados para el pago de matrícula en instituciones educativas privadas, la Ley de Reforma Educativa también establece un programa para la creación de lo que se denominan "Escuelas Públicas Alianza". Estas escuelas, en esencia, no son más que escuelas privadas cuyo presupuesto se nutre parcialmente de fondos públicos, pero que pueden ser administradas y operadas por entidades ajenas al Estado. Por tanto, la implantación de Escuelas Públicas Alianza que operen bajo el control de entidades privadas o sin fines de lucro, y que no estén bajo el control del Estado, también es contraria a la cláusula de sostenimiento de nuestra Constitución. Según se discute a continuación, el andamiaje operacional y administrativo detrás de la instauración de estas escuelas implica la utilización de fondos públicos para el sostenimiento de instituciones educativas privadas.

Una lectura ponderada de las disposiciones estatutarias que rigen este Programa me lleva a concluir que dichas instituciones educativas se asemejan considerablemente al modelo de escuela chárter

estadounidense.[191] Las leyes que habilitan estas instituciones educativas en Estados Unidos, como sería el caso la Ley de Reforma Educativa en Puerto Rico, sirven para ilustrar si el modelo adoptado por la jurisdicción correspondiente responde a las características de una **escuela pública** o **privada.** Para llegar a esta conclusión se requiere pasar juicio sobre aquellas disposiciones en ley en torno a la administración, gobernanza, filosofía educativa y protecciones laborales de las instituciones educativas en cuestión. *Véase* Preston C. Green, III, Bruce D. Baker, Joseph O. Oluwole, *The Legal Status of Charter Schools in State Statutory Law*, 10 U. Mass. L. Rev. 240 (2015).

Con estos postulados en mente, si se evalúan los pormenores del Programa de Escuelas Públicas Alianza, me parece insostenible la tesis de la Legislatura, avalada por una mayoría, a los efectos de que estas instituciones constituyen "escuelas públicas".[192]

---

[191] Véase *Charter Schools 101*, Nat'l Educ. Ass'n, http://www.nea.org/home/60831.htm ("Charter schools are privately managed, taxpayer-funded schools exempted from some rules applicable to all other taxpayer-funded schools") (última visita 9 de agosto de 2018). Véase además, Derek W. Black, *Charter Schools, Vouchers, and the Public Good*, 48 Wake Forest L. Rev. 445 (2013).

[192] Parte del análisis mayoritario para evaluar el carácter público de las Escuelas Públicas Alianzas en Puerto Rico surge tras examinar decisiones de las cortes estatales de Michigan y California. Utilizar estos precedentes estatales, no vinculantes, propenden a un razonamiento descontextualizado porque dichas jurisdicciones estadounidense no tienen en sus constituciones cláusulas de sostenimiento comparables a la nuestra. Las denominadas "Enmiendas Blaine" que llevaron al desarrollo de cláusulas estatales que prohíben el desembolso de fondos públicos para beneficiar la enseñanza pública respondían a una

Las Escuelas Públicas Alianza, con excepción de aquéllas administradas por entes jurídicos públicos, son -en realidad- instituciones educativas **privadas**. La naturaleza privada de estas escuelas chárter queda probada si consideramos que: (1) serán administradas y dirigidas, en su mayoría, por entidades educativas certificadas **ajenas** al Estado; (2) se regirán por un acuerdo contractual propio del Derecho Privado, la denominada "Carta Constitutiva", el cual podrá ser renovado o revocado, a discreción del Departamento de Educación; (3) tendrán autonomía plena sobre sus decisiones en asuntos de finanzas, matrícula estudiantil, currículo académico y método de instrucción; (4) operarán con personal docente y no docente, en ocasiones denominados como empleados públicos y en otras como empleados privados, completamente exentos de las leyes y reglamentaciones laborales del Departamento de Educación, y (5) podrán recibir, además de cierto dinero público presupuestado, una serie de fondos adicionales -en calidad de donaciones, equipos y materiales- sin importar la naturaleza jurídica de quién los dispense. *Véase*, en general, Arts. 13.01, 13.02, 13.05, 13.06, 13.07 y 13.08 de la Ley de Reforma Educativa.

Estos elementos demuestran inequívocamente que el programa que se procura instituir mediante la Ley de Reforma Educativa crea empresas educativas privadas que

---

realidad histórica, social y religiosa distinta a nuestra cláusula de sostenimiento. Véase Acápite II y Matthew Sondergard, *Blaines Beware: Trinity Lutheran and the Changing Landscape of State No-Funding Provisions*, 66 U. Kan. L. Rev. 753, 754-60 (2018).

miden su rendimiento a base de la eficiencia de su operación y siempre bajo la lógica financiera del costo-beneficio. Un estudio más detallado de los elementos sobre su administración, autonomía y el esquema laboral revelan lo desacertado del razonamiento mayoritario y cómo la creación de estas escuelas infringe la cláusula de sostenimiento insalvablemente. Veamos.

La administración de estas instituciones educativas estará en manos, por virtud de un contrato, de **entes externos** al Departamento de Educación. En específico, la gobernanza de las escuelas chárter se regirá por "una junta de directores u otro cuerpo de gobernanza" conforme a la entidad educativa autorizada por el Departamento de Educación. *Véase* Art. 13.02(e). Todo este esquema operacional estará regido, además, por los términos y condiciones establecidos en la Carta Constitutiva entre el Departamento de Educación y la entidad certificada correspondiente. En este aspecto, la Ley permite al Departamento de Educación una flexibilidad considerable al momento de redactar estos contratos.

El alcance de estos contratos levanta serias preocupaciones e interrogantes. Dichos acuerdos, contrario a lo que intiman las opiniones de conformidad, no son contratos gubernamentales "tradicionales" que brindan servicios no-educativos. Por el contrario, lo que está en juego y se figura propiamente como la causa contractual es el ofrecimiento de servicios estrictamente educativos con fondos estatales. En cuanto a la vigencia de esta relación contractual, la Ley de Reforma Educativa establece que,

"[s]e podrá revocar la Carta Constitutiva en cualquier momento". Art. 13.07(15)(f). Esto, en claro perjuicio de los estudiantes, padres y maestros que opten por formar parte de estas instituciones educativas, quienes estarán sujetos a un estado constante de incertidumbre respecto a su estabilidad y permanencia.

La autonomía que la Ley de Reforma Educativa otorga a las entidades certificadas a cargo de administrar y operar estas instituciones educativas, de por sí, es suficiente para decretar su inconstitucionalidad. En cuanto a este aspecto, la Ley dispone que una Escuela Pública Alianza "tendrá autonomía sobre sus decisiones, incluyendo, pero sin limitarse a, asuntos de finanzas, personal, calendario, currículo e instrucción". Art. 13.02(b). Asimismo, la Ley requiere que la Carta Constitutiva garantice "la autonomía fiscal, operacional y administrativa de las escuelas". Art. 13.07(10). Claramente, pues, estas escuelas operarán de forma virtualmente independiente en todo lo que atañe la educación que recibirán sus estudiantes. A tenor con esto, la Ley también les reconoce a estas escuelas la facultad para: (1) negociar y contratar con otras entidades; (2) recibir donaciones; (3) expulsar estudiantes; (4) adoptar un código de ética; (5) establecer criterios particulares de admisión; (6) fijar una misión educativa propia; (7) contratar maestros que no estén adscritos al Departamento de Educación y, por tanto, no pasen a ser empleados del gobierno, y (8) operar como entidades sin fines de lucro, entre otras cosas. *Véase*, en general, Arts. 13.02, 13.03, 13.06.

En lo atinente a este grado de autonomía, resulta insostenible el razonamiento mayoritario que enmarca toda su discusión sobre la constitucionalidad de las Escuelas Públicas Alianza desde una óptica de gradación gerencial. Según las opiniones de conformidad, el nivel desmedido de autonomía otorgado ha de ceder ante la realidad de que estas instituciones educativas estarán sujetas a la "responsabilidad directa y exclusiva" de la Secretaria de Educación y ciertos "mecanismos de evaluación y rendición de cuentas". *Véase* Op. de Conformidad (J. Rivera García), en las págs. 55-58. Para una mayoría de los integrantes de este Tribunal, esto resulta suficiente para catalogar estas instituciones como "escuelas públicas" y disipar cualquier duda sobre su independencia del Departamento de Educación. Más en concreto aún, el criterio mayoritario, olvidando que "el nombre no hace la cosa", concluye que estas escuelas son "públicas" porque así las define expresamente la Ley. Este análisis contiene varias premisas disparatadas que tergiversan la verdadera naturaleza privada de estas instituciones. Veamos.

El presunto rol "fiscalizador" y el grado de reglamentación por parte del Estado sólo supone una obligación legal que —en la actualidad— ya tiene el Departamento de Educación cuando supervisa, mediante los procesos de acreditación y licenciamiento, a cualquier entidad educativa que opere en Puerto Rico. Los Reglamentos del Departamento de Educación aplicables a las escuelas públicas "tradicionales" y privadas en cuanto a estos

procesos así lo evidencian.[193] De hecho, los "estándares de evaluación y rendición de cuentas" que la mayoría utiliza para resaltar el carácter "público" de las Escuelas Públicas Alianza guarda un parecido inmenso con el proceso de licenciamiento necesario para operar una escuela privada. Sin embargo, todo indica que el grado de control que ejercerá el Departamento de Educación **no convierte de por sí** a las escuelas chárter en entidades de educación pública tradicional.[194]

---

[193] Por ejemplo, el proceso de acreditación por parte del moribundo, pero aún vigente, Consejo de Educación de Puerto Rico (CEPR) para instituciones básicas *privadas* es uno "voluntario" pero uno "compulsorio" para escuelas *públicas*. Véase Art. 7(3) del Reglamento 8309-2012 del Departamento de Educación; Art. 7(2) Reglamento 8310-2012 del Departamento de Educación. La importancia del reconocimiento oficial, hasta hoy día, por parte del CEPR estriba en el hecho de que esto garantiza que dichas instituciones estarán operando "a niveles de ejecutoria, calidad e integridad como superiores a los requeridos para ostentar licencia". Arts. 7(3) y 11 del Reglamento 8309-2012. El Programa de Escuelas Públicas Alianza nada dispone sobre este particular, dando la impresión de que no estarán obligadas a someterse a dicho proceso; una característica atribuida a las escuelas privadas, más no a las escuelas públicas.

[194] El razonamiento mayoritario erradamente concluye que, según las disposiciones de la Ley de Reforma Educativa, "no es lo mismo delegar ciertas funciones educacionales, que la transferencia del sistema de instrucción pública". Op. de Conformidad (J. Rivera García), en la pág. 58. Sin embargo, este razonamiento no es más que un silogismo jurídico. La premisa mayor sería que "el Departamento de Educación tiene la obligación de asegurarse que todas las escuelas públicas 'tradicionales' cumplan con ciertos estándares y procedimientos para ser licenciadas". Por su parte, la premisa menor sería que "el Departamento de Educación tendrá la obligación de asegurarse que las 'Escuelas Públicas Alianzas' cumplan con ciertos estándares y procedimientos para ser certificadas". Al evaluar la relación entre ambas premisas, el Juez Asociado señor Rivera García parece concluir que "las Escuelas Públicas Alianzas son, por ende, escuelas públicas tradicionales". El error resulta obvio, puesto que la premisa mayor es

Debo dejar claro que, distinta sería la situación en la cual una Escuela Pública Alianza esté administrada por **entes jurídicos públicos**; por ejemplo, como lo son un municipio, consorcios municipales o la universidad pública del Estado. *Véase* Art. 1.03 (19). Un esquema que delegue la operación y administración de escuelas por parte de estas entidades que forman parte del Gobierno de Puerto Rico y están bajo el control del Estado, no contravendría la cláusula de sostenimiento. Ello, porque se trata justamente de entidades públicas que son financiadas con fondos públicos pero que, a su vez, pueden recibir fondos privados para la implementación de programas educativos. En este sentido, las Escuelas Públicas Alianzas administradas por entes del Estado, y permitidas bajo nuestra Constitución, deben ser el norte a seguir. [195]

---

falsa, dado que el Departamento de Educación tiene la obligación de asegurarse que todas las escuelas, ya sean públicas o privadas, cumplan con ciertos estándares y procedimientos para ser certificadas.

[195] De hecho, el modelo de las escuelas públicas Montessori en Puerto Rico y su rol fundamental que ha jugado el Instituto Nueva Escuela (INE) en su expansión a lo largo del País sirven como ejemplos exitosos de una filosofía pedagógica que opera bajo esquemas administrativos y de financiamiento -en su mayoría- públicos y que respetan nuestro mandato constitucional. Estas escuelas son públicas y están supervisadas por una Secretaria Auxiliar de Educación Montessori. *Véase* Keila López Alicea, *Preocupación en las escuelas Montessori por la reforma educativa*, El Nuevo Día, 11 de febrero de 2018, https://www.elnuevodia.com/not

iciaslocales/nota/preocupaciónenlasescuelasmontessoriporlar eformaeducativa-2397773/ (última visita 9 de agosto de 2018). Bajo la Ley de Reforma Educativa, estas instituciones educativas conservan su carácter público, aunque ahora existan mayores elementos de gobernanza compartida entre el INE y el Departamento de Educación. Todo esto apunta a que parte de una solución responsable al

No obstante, dado que la función de este Tribunal, como máximo foro judicial, conlleva salvaguardar –a toda costa- la Constitución del Estado Libre Asociado de Puerto Rico, no puede haber cabida en nuestro ordenamiento jurídico para escuelas privadas que sean financiadas con fondos públicos y no estén sujetas al control del Estado.

Asimismo, debo resaltar que la insistencia de la Legislatura y la mayoría en denominar desacertadamente a las entidades educativas certificadas como "escuelas públicas" es insuficiente para validar su naturaleza pública.[196] Sostener que las Escuelas Públicas Alianzas son públicas porque lo dice el "nombre" es crear una ficción lingüística para la creación de un sistema educativo

_____

presunto "apartheid educativo", que menciona el Juez Asociado señor Estrella Martínez, se encuentra en robustecer aquellos modelos pedagógicos, como el método Montessori, cuya naturaleza sea cónsona a los postulados democráticos y de avanzada contenidos en la Constitución del Estado Libre Asociado de Puerto Rico.

[196] Recurriendo nuevamente a los Reglamentos del Departamento de Educación, la definición provista en éstos para una escuela privada se asemeja, *de facto*, a la de una Escuela Pública Alianza y no a la de una escuela pública "tradicional". Bajo estos Reglamento una institución de educación privada "es controlada y administrada por persona natural o jurídica no gubernamental (por ejemplo, Iglesia, empresa, etc.) o; si su Junta de Gobierno se compone en su mayoría de miembros no designados por una agencia o funcionario público." Artículo 7(40) del Reglamento 8309-2012; Artículo 7(35) Reglamento 8310-2012. Mientras la institución de educación pública "es controlada y administrada directamente por una agencia o autoridad de educación pública o; es controlada y administrada directamente por una agencia gubernamental o por una Junta, Consejo, Comité cuyos miembros en su mayoría son designados por una autoridad pública o electos por un sector público." Artículo 7(41) del Reglamento 8309-2012; Artículo 7(36) Reglamento 8310-2012.

privado financiado con fondos públicos, lo que constituye una clara violación a nuestra Constitución.

Por último, como si el grado de autonomía y las facultades operacionales que se le reconocen a las Escuelas Públicas Alianzas no fuesen suficiente, el carácter privado de estas escuelas queda en manifiesto al escudriñar las políticas y protecciones -o falta de ellas- disponibles para su fuerza laboral. Por disposición de la Ley, el personal docente y no docente de estas instituciones se compondrá de empleados públicos y el esquema diseñado para el traspaso de maestros entre instituciones propone un elemento de voluntariedad altamente cuestionable. *Véase* Art. 13.08. Esto, por razón de la encrucijada que implicaría para los maestros y las maestras del País tomar la decisión entre la seguridad de ser empleados gubernamentales y la incertidumbre de ser empleado privado sujeto a los vaivenes de la libre empresa.

Las licencias sin sueldo que serán otorgadas por el Departamento de Educación y la posible contratación de empleados privados para una Escuela Pública Alianza, cuyo plantel físico sea de nueva creación, tiene el efecto de crear dos castas de maestros dentro del mismo sistema y de excluir aquellos maestros que opten por trabajar en una Escuela Pública Alianza de muchos de los reglamentos y requisitos aplicables a los empleados del Departamento de Educación. No importa que las Escuelas Públicas Alianza sólo constituyan, en la actualidad, un pequeño por ciento de las escuelas del País, validar este andamiaje jurídico

abriría las puertas a la desaparición total de nuestro sistema público de enseñanza.

En fin, no cabe duda de que las Escuelas Públicas Alianza recibirán fondos públicos, por vía del Departamento de Educación, pues así lo dispone claramente el propio texto de la Ley de Reforma Educativa. *Véase* Art. 13.06. Nuestra Constitución, como hemos repetido a lo largo de este disenso, prohíbe que el Estado brinde ayuda económica a las instituciones de enseñanza privada. En atención a ello, soy del criterio que el Programa de Escuelas Públicas Alianza infringe la cláusula de sostenimiento. Al igual que el razonamiento del Tribunal de Primera Instancia en este caso estimo que, siempre y cuando los administradores de estas instituciones sean entes externos al Estado, la creación de Escuelas Públicas Alianza resulta contraria a la Constitución.

Según lo acotado, empero, la prohibición contenida en nuestra Carta de Derechos no se extiende a los municipios y a las universidades públicas, puesto que éstas son extensiones del Gobierno de Puerto Rico. Resolver lo contrario conllevaría que el Estado renuncie a su responsabilidad como garantizador de lo *público*, y persiga paradigmas de rentabilidad y privatización para inyectar en las aulas del País esa mentalidad mercantil que supone lo *privado*.

Por todo cual, al igual que con el Programa de Libre Selección de Escuelas, correspondía confirmar al Tribunal de Primera Instancia y declarar la inconstitucionalidad parcial del Programa de las Escuelas Públicas Alianza.

## IV.

Las precariedades y los fracasos de nuestro sistema de educación no son subsanables mediante la implementación de programas que tiendan a desvirtuar su naturaleza pública y propicien la sujeción del derecho constitucional a una educación gratuita a las contingencias de la libre competencia y los intereses del sector privado. La inversión de fondos públicos en la creación de escuelas que, para todos los efectos prácticos son instituciones educativas privadas, es contraria a la prohibición contenida en la cláusula de sostenimiento de nuestra Constitución. La remisión de capital por parte del Gobierno a escuelas privadas a través de certificados para el pago de la matrícula en esas instituciones tiene el efecto de potenciar la primacía de la educación privada en nuestra Isla. Esto, en perjuicio de nuestro sistema de enseñanza público. Lo que es peor, ese desembolso también constituye una flagrante violación al mandato constitucional de no utilizar "fondos públicos para el sostenimiento de instituciones educativas que no sean las del Estado". Art. II, Sec. 5, Const. P.R.

Los fondos que serán invertidos en el fortalecimiento de las instituciones educativas privadas, conforme al esquema legislativo cuya constitucionalidad hoy se decreta, deberían destinarse a mejorar nuestro sistema actual público de enseñanza y así poder ofrecer a sus estudiantes los servicios esenciales para promover su superación y progreso. Sólo de esta manera podremos salvaguardar para nuestra niñez "el derecho a una educación que propenda al

pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre [y la mujer] y de las libertades fundamentales" consagrado en nuestra Constitución. En una sociedad cada vez más competitiva, resulta inaceptable y vergonzoso permitirle al Estado abdicar su obligación de proveer a la ciudadanía "un sistema de instrucción pública . . . libre y enteramente no sectario". Art. II, Sec. 5, Const. P.R.

En el Puerto Rico de hoy, más que nunca, urge aunar esfuerzos para retomar la visión de la Comisión de la Carta de Derechos sobre la importancia de la Sección 5 del Artículo II de nuestra Constitución:

> La escuela pública ha sido una de las mayores fuerzas de democracia, de unidad colectiva y de oportunidad abierta al talento en la vida puertorriqueña. En su salón de clase se han educado codeándose hombres y mujeres de todas las clases sociales, de todas las religiones, de todos los grupos políticos, de todas las razas. En ella han aprendido la igualdad, la tolerancia, el esfuerzo. Debe continuar y ampliar esta su responsabilidad y trayectoria.

*Informe de la Comisión de Carta de Derechos*, Convención Constituyente de Puerto Rico (1951) en la pág. 13.

Lamentablemente, al igual que las ramas políticas, la mayoría prefiere doblegarse ante la adversidad y entregar a manos privadas un componente esencial de esa visión de País que se hace cada vez más turbia. Porque me rehúso a pensar que somos incapaces de mejorar nuestro sistema de educación mediante modelos efectivos que sean administrados y operados exclusivamente por el Estado, disiento del dictamen que hoy suscribe una mayoría. Fiel al texto constitucional y a los debates de aquellos puertorriqueños

que forjaron las bases de una sociedad democrática e igualitaria asentada en la educación como un valor universal, declararía inconstitucional tanto el Programa de Libre Selección de Escuelas como la creación de las Escuelas Públicas Alianza que estén bajo el control de entidades privadas desvinculadas del Estado.


                              Anabelle Rodríguez Rodríguez
                                   Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Asociación de Maestros, su sindicato, Asociación de Maestros de P.R. – *et al.*

   Recurridos

         v.

Departamento de Educación; Hon. Julia Keleher, en su carácter oficial como Secretaria del Depto. de Educación del E.L.A. de P.R.

   Peticionarios

CT-2018-0006   Certificación Intrajurisdiccional


Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ.


En San Juan, Puerto Rico, a 9 de agosto de 2018.

Con el mismo grado de seriedad, responsabilidad y compromiso con nuestro País, con el que hace unas semanas validamos el cierre de ciertas escuelas públicas en la Isla -- ello por considerar que, en el caso que en aquel momento teníamos ante nuestra consideración, no estaban presentes las circunstancias, de privación del derecho constitucional a una educación primaria y secundaria, que ameritasen la intervención del Poder Judicial --, en el día de hoy disentimos enérgicamente del proceder seguido por una mayoría de este Tribunal en el presente caso, mediante el cual se declaran constitucionales ciertas disposiciones de la llamada Ley de Reforma Educativa

de Puerto Rico, Ley Núm. 85-2018, presentada por el gobierno de turno y aprobada por la Asamblea Legislativa.

Los fundamentos en derecho para disentir del mencionado proceder se recogen con particular precisión en la Opinión Disidente emitida por la compañera Juez Asociada señora Rodríguez Rodríguez, razón por la cual hemos decidido unirnos a la misma. A todas luces, y como bien se recoge en la mencionada Opinión Disidente, las disposiciones más relevantes de la legislación aquí en controversia (los vales educativos y las Escuelas Públicas Alianzas o escuelas *charters*, según definidas en esta "Reforma Educativa"[197]) son inconstitucionales de su faz por violar el Art. 2, Sec. 5, de la Constitución del Estado Libre Asociado de Puerto Rico, LPRA Tomo 1, en específico la conocida Cláusula de Sostenimiento.[198] Lo anterior no admite interpretación en contrario y, en lo relacionado a los vales educativos, ya así había sido previamente sentenciado por este Tribunal en *Asoc. Maestros P.R. v. Srio. Educación,* 137 DPR 528 (1994), por voz del ex Juez Presidente Hon. Federico Hernández Denton.  Un precedente

---

[197] Exceptuamos de nuestro análisis aquellas escuelas que decidan ser adoptadas por los Municipios o alguna otra instrumentalidad pública, por entender que ello no choca con Cláusula de Sostenimiento de la Constitución del Estado Libre Asociado de Puerto Rico. Art. II. Sec. 5, Const. ELA, LPRA Tomo 1.

[198] La referida Cláusula de Sostenimiento de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*, establece que "[n]o se utilizará propiedad ni fondos públicos para el sostenimiento de escuelas o instituciones educativas que no sean las del Estado".

bien pensado, en extremo estudiado y cuidadosamente trabajado.

El que ya exista un precedente previo de este Tribunal que dispone, en gran parte, de los planteamientos traídos ante nuestra consideración -- y que muy bien pudo haber sido utilizado para disponer de la controversia relacionada a las Escuelas Públicas Alianza o escuelas *charters* -- nos mueve a recalcar, una vez más, la importancia que en todo proceso decisorio tiene la doctrina de *stare decisis*. Como sabemos, dicha doctrina es aquella que postula que un Tribunal -- **en aras de proveer estabilidad y certidumbre al ordenamiento jurídico** -- está llamado a seguir sus dictámenes previos. Véase*, Rivera Ruiz v. Mun. De Ponce,* 196 DPR 410 (2016); *González v. Merck*, 166 DPR 659, 687-689 (2006). Ello, es un elemento esencial para generar confianza de la ciudadanía en su sistema de justicia.

Ciertamente, y como señalan algunos miembros de este Tribunal, reconocemos que la doctrina antes expuesta tiene sus excepciones y los Tribunales no estarían llamados a seguir la misma cuando el precedente previamente establecido fuera claramente erróneo, los efectos del mismo sobre el ordenamiento sean adversos, o la cantidad de personas que confiaron en éste fuese limitada. *Pueblo v. Camacho Delgado*, 175 DPR 1, 20 esc. 4 (2008); *Pueblo v. Díaz De León*, 176 DPR 913, 921-22 (2009). Sin embargo,

contrario a lo señalado por éstos y éstas, ninguna de esas instancias están presentes en el precedente bajo estudio.

**No procedía, pues, -- por consideraciones que no están del todo claras -- ignorar lo correctamente dispuesto por este Tribunal hace más de dos décadas en _Asoc. Maestros P.R. v. Srio. Educación, supra_. La Constitución del Estado Libre Asociado de Puerto Rico que en dicha ocasión se interpretó es la misma que hoy se interpreta. No ha variado en nada.**

**En ese sentido, nos resulta altamente preocupante la regularidad con la que una mayoría de este Tribunal, en tiempos recientes, ha optado por obviar el valor que tiene el precedente en todo ordenamiento jurídico.[199] Máxime, cuando se hace para validar el uso de fondos públicos para fines privados. En esa instancia, la preocupación es doble.**

Establecido lo anterior, no empece a habernos unido a la Opinión Disidente de la compañera Juez Asociada señora Rodríguez Rodríguez, -- y toda vez que el derecho no opera en el abstracto[200] --  nos  parece necesario  alejarnos un poco

---

[199] La más reciente actuación de este Tribunal donde se revoca un precedente fue hace tan sólo un año atrás en _Com. PNP v. CEE_, 197 DPR 914 (2017).

[200] Ello, pues, según insisten los teóricos del movimiento de Estudios Críticos del Derecho (_Critical Legal Studies_):

> [S]e quiere una perspectiva distinta del razonamiento jurídico, en el que si bien las normas y principios jurídicos son la columna vertebral del derecho, igualmente se enfatiza en la necesidad de valorar otros factores que comprenden desde la política, la economía, la historia, la sociedad, la teoría y la filosofía, hasta la propia psicología, a efecto de aproximarnos a

de las complejidades que envuelve el uso del lenguaje técnico-legal, en aras de que, desde una perspectiva distinta, nuestros ciudadanos y ciudadanas entiendan el resultado al que finalmente se llegará con la legislación que una mayoría de este Tribunal hoy valida y el efecto que la misma tendrá dentro del entorno en se desenvuelven.

En esa dirección, hemos optado también por hacer nuestras, *in extenso*, las palabras empleadas hace unos meses atrás -- en cierta columna de opinión publicada en un diario de circulación general -- por el abogado, doctor en Filosofía y Literatura de la Universidad de Harvard, y ganador en el año 2017 del *Festival de la Palabra* que se celebra en nuestro País, Dr. Raúl Manuel Núñez Negrón. En su columna *La tiza y la pizarra*,[201] el doctor Núñez Negrón, nos retrata la triste y dura realidad que enfrentan los y las estudiantes de las escuelas públicas del País y, en lo que consideramos una excelente contribución al campo de Derecho y Literatura,[202] sobre lo dispuesto en la Reforma Educativa aquí en controversia, sentenció lo siguiente:

---

los alcances de la vulnerabilidad humana, a la que están sujetos los operadores jurídicos. Jorge Robles Vázquez & Yvonne Georgina Tovar Silva, *Teoría Jurídica Critica Norteamericana, Una introducción a los Critical Legal Studies,* Universidad Nacional Autónoma de México, Instituto de Investigaciones Jurídicas, 2016, pág. 28.

[201] Manolo Nuñez Negrón, *"La tiza y la pizarra",* El Nuevo Día, 2018, https://www.elnuevodia.com/opinion/columnas/latizaylapizarra-columna-2416358/.

[202] Sobre la relación entre el Derecho y la Literatura, el profesor. Carmelo Delgado Cintrón, en su obra *Tratado de Derecho y Literatura, Visión Literaria del Derecho*, nos comenta:

A estas alturas del año no quedan ramas secas en los árboles de la zona central y estos tres jóvenes reunidos junto al camino, un varón con su gorra de béisbol y dos niñas adolescentes, aguardan sentados en una curva de la PR 111. El sol no ha terminado de levantarse y duermen las palomas sobre los aleros. La neblina decora montes y peñas. La tierra sigue sin agrietarse y es sedoso el rumor de los bambúes. Ya se anuncian en el paladar, con los sonidos de la mañana, los sabores de los primeros mangós y los últimos nísperos. El reloj marca las seis, cantan los gallos y a lo lejos, en el horizonte, asoma la guagua.

Para respetar la costumbre, van vestidos de uniforme. No quieren perderse la trilla y por eso se han levantado a las cinco, cuando todavía estaba oscuro. Después de recibir la bendición de sus familiares, que salen al balcón para verlos alejarse con la taza de café humeante en la mano, caminaron algunas millas contemplando los animales que se inclinaban a comer pasto y llegaron al punto de encuentro, un terreno baldío frente a una iglesia, peleando con los bostezos.

Este es su ritual cotidiano: cargar una mochila de tela con un par de lápices y

---

[E]l estudio de las relaciones entre el Derecho y la literatura no se restringe a un país, una época o una temática literaria y jurídica. El desarrollo de la disciplina de Derecho y Literatura sucede en dos etapas. Tenemos pues, los autores y creadores literarios que recurren al mundo jurídico donde toman las temáticas -los quehaceres de abogados, jueces, tribunales, juicios, lo jurídico entre otros- que transforman en obras de arte. Es decir, son argumentos y situaciones propias del Derecho que el narrador, el novelista, el poeta, el cuentista, el dramaturgo transforman en una obra literaria, una suya muy personal. Es obvio que el artista no le interesa producir una obra de Derecho, para eso están los juristas. Luego tenemos los abogados y profesores de Derecho que estudian críticamente esas creaciones literarias sobre el Derecho, esas obras literarias para examinar los contenidos estéticos, literarios y jurídicos según los creadores literarios y aprender de ellos. Eventualmente desenvolviendo una teoría de *Derecho y Literatura.* Carmelo Delgado Cintrón, *Tratado de Derecho y Literatura, Visión Literaria del Derecho,* Escuela de Derecho, Universidad de Puerto Rico, 2012, T. I, pág. 15.

A juicio nuestro, éste es uno de esos casos.

libretas, amarrarse los cordones de los tenis, practicar las tablas de multiplicar y, a veces, copiarse las asignaciones. Tan pronto aparece el vagón amarillo se suman al vacilón de los compañeros: "Papón, métele chambón a la gasolina."

En ocasiones, vencidos por el cansancio, intentarán quedarse en la cama, ausentarse del ábaco y las lecciones de gramática. Enseguida, la voz de los padres o de los abuelos se escuchará en el cuarto, compitiendo con el despertador: "arriba, sacudan las sábanas, hay que estudiar." Si las crías se preparan, si se convierten en profesionales, tendrán un futuro mejor. He ahí la convicción que sustenta la mayoría de los hogares isleños y ante la que cualquier sacrificio palidece. La misión es educarlos contra viento y marea, para así poner a raya la precariedad y evitarles un destino de pobreza.

Es una pena que los argumentos que han cooptado el debate público en torno a este asunto no atiendan la difícil, compleja realidad que viven maestros y estudiantes en sus talleres de trabajo. **Se repite, por el contrario, el mismo guión de antaño: el país está obsoleto y sus centros docentes carecen de una cultura de la competitividad. La solución: privatizar a diestra y siniestra. Es decir: socializar las pérdidas y rifar las ganancias.**

La Reforma Educativa aprobada por el gobierno no procura enfrentar los problemas reales de las comunidades pedagógicas, solo persigue orientar el conocimiento hacia el paradigma de la rentabilidad, una filosofía trasplantada del orbe empresarial que trae consigo al salón de clases conceptos que nada tienen que ver con el saber: rendimiento, eficacia, ¡productividad! O en su versión anglosajona, que goza de mayor prestigio léxico: downsizing, attrition, resilience, maximization. Resulta trágico, y sintomático, que permanecieran ausentes de la discusión general nociones básicas de la didáctica: alfabetización, pensamiento crítico, creatividad, imaginación, empatía.

Se ha completado, por desgracia, un capítulo adicional de esa larga, siniestra saga, que registra el lento pero seguro desmantelamiento de las estructuras estatales en beneficio de los intereses económicos.

Llamarlo de otra manera sería un ejercicio de falsificación y una hipocresía colosal. La distribución indiscriminada de una parte de nuestro patrimonio supone, entre otros riesgos inquietantes, la posibilidad de que el dinero corra hacia las cuentas bancarias de quienes han identificado en la educación una fuente de riqueza fácil. El régimen de los planteles charter, con resultados muy cuestionables en los Estados Unidos, podría traer consigo una enorme cuota de especulación financiera y no la anhelada – y necesaria – renovación de la enseñanza.

Mientras tanto, en la cordillera y en la costa, miles de alumnos ajenos al holocausto de fondos que aquí tiene lugar esconden las sonrisas tras los viejos cuadernos y festejan el aviso del recreo chupándose un caramelo. Lo peligroso, lo imperdonable, sería que ese timbre que marca el periodo de juegos retumbe también en los golosos tímpanos de los inversionistas, y que presagie la hora [...] del despilfarro. (Énfasis suplido).

No es momento, pues, de "socializar las pérdidas y rifar las ganancias". Es momento de asegurarnos de que nuestros niños, niñas y jóvenes puedan llegar a una escuela de excelencia, reciban el pan de la enseñanza y logren su pleno desarrollo como hombres y mujeres de bien, según fue consagrado en el Art. II, Sec. 5 de la Constitución del Estado Libre Asociado de Puerto Rico, LPRA Tomo 1. Las alternativas que la legislación aquí en controversia contempla para ello (los vales educativos y las Escuelas Públicas Alianzas o escuelas *charters*, según definidas en esta "Reforma Educativa"), a todas luces contrarias a lo dispuesto en nuestra Carta Magna, y en la

medida que chocan con ella, a juicio de quien suscribe, no pueden ser la solución.

Una vez más, los Poderes Ejecutivo y Legislativo, y este Tribunal, pierden una magnífica oportunidad de hacerle justicia a los y las estudiantes de nuestro País. Olvidando así, nuevamente, que "sin estudiantes no hay escuelas, y sin escuelas no hay país". *Menéndez González, et al. v. U.P.R.*, 198 DPR 140, 147-48 (2017) (Op. Disidente, Juez Asociado Colón Pérez).


                              Ángel Colón Pérez
                              Juez Asociado